# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**FILED**

**APR 0 5 2023**

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA
OAKLAND OFFICE

---

LARRY GOLDEN,

        Plaintiff,

        V.

GOOGLE LLC

        Defendants.

CIVIL CASE NO: <u>4:22-cv-05246-HSG</u>

**JURY TRIAL DEMANDED**

**(Direct Patent Infringement),**
**(Contributory Patent Infringement),**
**(Joint Patent Infringement)**

April 4, 2023

---

## PLAINTIFF'S SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGEMENT & INJUNCTIVE RELIEF

Proving patent infringement in court requires Plaintiff to prove two broad elements: ownership and validity of the patent(s), and infringement of the patent by the defendant(s).

Qualcomm is named as a joint infringer with Google. Samsung's (related Case No. 3:23-cv-00048-WHO), alleged infringing devices "mirrors" the alleged infringing devices of Google.

Google has already recently been found liable at the Federal Circuit for allegedly infringing Plaintiff's CMDC devices i.e., smartphones, and Samsung and Qualcomm have recently been found liable in a District Court for allegedly infringing Plaintiff's CPUs.

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "in a relatively straightforward manner" ... and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 ... [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) ... this court has explained that a plaintiff ... must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...."

Plaintiff alleged Qualcomm and Google jointly infringed Plaintiff's patents in *Larry Golden v. Google LLC*; Case No. 22-1267; and in this current case *Larry Golden v. Google LLC* Case No. 4;22-cv-05246-HSG by Qualcomm "contributing" its Snapdragon chipsets to the infringement of Plaintiff's CMDC devices "made and sold" by Google and Samsung.

Plaintiff owns the patent rights to exclude Google, Samsung, and Qualcomm from "using" any of Plaintiff's CMDC devices (i.e., new, improved upon, or useful desktop PCs, laptops, tablets, PDAs, cell phones, etc. and smartphones). The related case *Larry Golden v. Samsung Electronics America, Inc.* Case No. 3:23-cv-00048-WHO is attached **Exhibit A** to show how Samsung devices "mirrors" Google devices and how both Google and Samsung devices are equipped with Qualcomm's Snapdragon chipsets i.e., Plaintiff patented CPUs.

Plaintiff realizes how difficult it is for some to accept those facts, because they want to believe so very badly that the White man, Steve Jobs invented the smartphone; or, believe at the very least that the smartphone was not invented by a Black man.

While the Samsung and Qualcomm case *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG was tried by a jury and the jury found both to be liable for patent infringement; the same causes of action and the same allegedly infringed upon patent claims of the Plaintiff is being challenged in this current Google case as being frivolous. This prejudicial double-standard causes harm to Plaintiff.

A claim is frivolous when the claim lacks any arguable basis either in law or in fact *Neitze v. Williams*, 490 U.S. 319, 325 (1989). Ridiculous, absurd, ludicrous, and nonsensical— these are all words that can be used to describe a frivolous lawsuit.

In the *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG case, Qualcomm "tied" the patented technology (FinFet) of *Kaist* to its modem

processors and sold the systems-on-a-chip as the Snapdragon chipset. Likewise, Qualcomm "tied" the patented technology (CPUs) of Plaintiff to its modem processors and sold the systems-on-a-chip as the Snapdragon chipset.

Plaintiff's case is much more significant than just the "tying" arrangements discuss above. Plaintiff's case against Qualcomm as a joint infringer with Google and Samsung, extends to the accused Snapdragon chipsets, that includes the patented technology (CPUs) of Plaintiff, and how Qualcomm forced the alleged infringing chipsets on the OEMs (Google and Samsung) in a "no license, no chip" contract.

The OEMs (Google and Samsung) were "induced" by Qualcomm to infringe Plaintiff's CMDC devices, and Qualcomm also "contributed" to the infringement of Plaintiff's patented CMDC devices with its Snapdragon chipsets.

More importantly is Qualcomm collecting a 5% royalty on the price of every handset (Plaintiff's patented CMDC devices) sold. Qualcomm is not authorized; does not have Plaintiff's consent; and does not have the legal right, nor patents to do so. Google and Samsung are participants in the illegal activities of Qualcomm.

Plaintiff is introducing *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al.*; Civil Action No. 2:16-CV-01314-JRG as supplemental authority to the relevant issues, the causes of actions, and the infringement "use" of Plaintiff's patented inventions that has already been decided by a jury. Samsung and Qualcomm were found guilty of the same allegations brought against Google in this case. In view of *Kaist IP US LLC, v. Samsung Electronics Co., LTD., et al,* Plaintiff's motions for summary judgement and injunctive relief should be granted:

> "KAIST IP filed the new patent infringement suit [] claiming Samsung Electronics has additionally violated its patent in new products production including smartphones. In its written accusation, KAIST IP reportedly claimed the defendants have

not stopped infringing on the university's patent despite last year's court ruling, saying they have continued to develop and commercialize new products by utilizing the FinFet technology. KAIST IP claimed those products included smartphones such as Samsung Galaxy S8, Galaxy S9, Galaxy Note 8 and Galaxy Note 9 as well as the next generation modem chip Exynos Modem 5100 and infotainment system supporting drivers." *KAIST sues Samsung, Qualcomm for patent infringement.* https://www.koreatimes.co.kr/www/tech/2019/03/133_265114.html **Exhibit B**

"Samsung argues that Mr. Weinstein failed to tie his damages analysis to the smallest salable unit. Samsung says he applied his regression analysis to end-user smartphones and tablets and then apportioned down from there to stand alone chips. (Dkt. No. 577 at 15–16.) ... [H]owever, Mr. Weinstein then summarily opines that this value should be "apportioned" down to the chip level for stand-alone "SoCs not sold in phones." (Id. at 188:15–18.) ... [W]ithout any explanation, the jury had no substantial evidence from which to conclude that the royalty rate for the smartphones and tablets properly captured the incremental value of the Asserted Patent, whether the much lower royalty rate for the stand-alone chips properly captured that amount, or whether it was somehow both ... Mr. Weinstein's report "concludes the sales prices of Samsung's devices increase by an amount tied to the benefits stemming from the accused processors" and that "[t]his approach stays sufficiently clear of the concerns addressed by the 'smallest salable unit' principle." (Dkt. No. 453 at 6.)" *In the United States District Court for the Eastern District of Texas-Marshall Division: Kaist IP US LLC, Plaintiff, v. Samsung Electronics Co., LTD., et al., Defendants. Civil Action No. 2:16-CV-01314-JRG, Memorandum Opinion and Order. Dkt. 676* **Exhibit C**

"A jury trial commenced in this case on June 11, 2018. On June 15, 2018, the jury returned a unanimous verdict (Dkt. No. 499) finding that Defendants Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries, Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm Inc. ("Qualcomm") each infringed one or more claims asserted by Plaintiff KAIST IP US LLC ("KAIST"), such claims being claims 1–6, 11–13, and 15–17 of U.S. Patent No. 6,885,055 (collectively, the "Asserted Claims"); that none of the Asserted Claims were

invalid; that Samsung's infringement had been willful; that GlobalFoundries and Qualcomm's infringement had not been willful; that KAIST should recover from Samsung $400,000,000.00 for such infringement as a lump-sum royalty; ... KAIST has moved for entry of Final Judgment (Dkt. No. 587), which the Court now GRANTS. Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the foregoing, the Court hereby ORDERS and ENTERS JUDGMENT as follows: 1. Samsung has infringed one or more of the Asserted Claims; 2. GlobalFoundries has infringed one or more of the Asserted Claims; 3. Qualcomm has infringed one or more of the Asserted Claims; 4. The Asserted Claims are not invalid; 5. Samsung's infringement was willful; 6. GlobalFoundries' infringement was not willful; 7. Qualcomm's infringement was not willful; 8. KAIST is hereby awarded damages from and against Samsung and shall accordingly have and recover from Samsung the sum of $203,003,416.00 U.S. Dollars ..." *In the United States District Court for the Eastern District of Texas-Marshall Division: Kaist IP US LLC, Plaintiff, v. Samsung Electronics Co., LTD., et al., Defendants. Civil Action No. 2:16-CV-01314-JRG, Final Judgement. Dkt. 678* **Exhibit D**

It is improper for the Court to dismiss this case for "frivolousness" because valid patents have a place in law and in fact. 35 U.S. Code § 282(a) states In General. "A patent shall be presumed valid. Each claim of a patent (... independent, dependent, or multiple dependent ...) shall be presumed valid independently of the validity of other claims".

In the District Courts, invalidity must be proven on the heightened standard of "clear and convincing evidence" before a claim is considered invalid. Invalidating a claim(s) because one feels the technological rational, or person, behind the claimed inventions are "to fantastical" or "to unbelievable" has no basis in law.

All Plaintiff's cases concern motions to dismiss. Such motions do not resolve whether Plaintiff will ultimately prevail, but simply whether the complaint was sufficient to cross the Court's pleading threshold. In *Intel Corp. v. Future Link Sys.* Recovery may appear remote and

6

unlikely on the face of the pleading, but that is not the test for dismissal. *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) (citing *Scheuer*, supra, 416 U.S. at 236).

A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In reviewing a Rule 12(b)(6) motion, this Court must accept the factual allegations of the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 117 (1994). The review of such a motion is limited, and "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 235-36 (1974)).

Each time a Judge prematurely dismisses Plaintiff's patents; without reviewing the Defendant's invalidity contentions; and without a Marksman Hearing/claim construction, the Judge involves himself/herself in a conspiracy against rights: 18 U.S.C. § 241: "Section 241 makes it unlawful for two or more persons to agree to injure, threaten, or intimidate a person in the United States in the free exercise or enjoyment of any right or privilege secured by the Constitution or laws of the Unites States or because of his or her having exercised such a right." Unlike most conspiracy statutes, §241 does not require, as an element, the commission of an overt act. *Department of Justice* https://www.justice.gov/crt/statutes-enforced-criminal-section#:

Plaintiff is asking this Court to grant Plaintiff's Motions for Summary Judgement & Injunctive Relief.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 4th day of April, 2023, a true and correct copy of the foregoing "Plaintiff's Supplemental Authority in Support of Plaintiff's Motions for Summary Judgement & Injunctive Relief", was served upon the following Defendant by priority "express" mail:

> Matthew S. Warren
>
> WARREN LEX LLP
>
> 2261 Market Street, No. 606
>
> San Francisco, California, 94114
>
> Phone: (415) 895-2940
>
> Fax: (415) 895-2964
>
> Email: 22-5246@cases.warrenlex.com

> Larry Golden, Pro Se
>
> 740 Woodruff Rd., #1102
>
> Greenville, South Carolina 29607
>
> atpg-tech@charter.net
>
> 864-288-5605

# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**F I L E D** #14

JAN 05 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CIVIL CASE NO: **C 23    00048**

**WHO**

---

LARRY GOLDEN,

        Plaintiff,

        V.

SAMSUNG ELECTRONICS
AMERICA, INC.

        Defendants.

**JURY TRIAL DEMANDED**

**(Direct Patent Infringement), (Induced
and Contributory Patent Infringement),
(Joint Patent Infringement)**

January 02, 2023

---

## COMPLAINT FOR PATENT INFRINGEMENT

1.    The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". **Exhibit A**

2.    The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

3.     This is an action of alleged patent infringement, in which plaintiff Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for alleged patent infringement of United States Patents-in-suit Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit"), attached hereto as—**Exhibits B-D**—is filed against Defendant SAMSUNG ELECTRONICS AMERICA, INC ("Samsung" or "Defendant"), and alleges as follows:

4.     This current complaint against Samsung "mirrors" the complaint against Google submitted for review at the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 — that was "vacated and remanded" back to the District Court after the Circuit reviewed the case under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The panel's "DISCUSSION in *Golden v. Google LLC*; CAFC Case No. 22-1267 states:

> "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead 'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

5.     Samsung allegedly uses the same Android open-source architecture as Google; the same chipset provider (Qualcomm) for the USA as Google; the same allegedly infringing CPUs, or equivalent designed, manufactured for the smartphone as Google; the same standard smartphone sensors, or equivalent designed, manufactured for biosensor detection as Google; the same hazard-awareness-and-response tools (the Android Team Awareness Kit, ATAK), for chemical, biological, radiological, and nuclear (CBRN) plug-ins as Google; and, Samsung's

smartphones are allegedly infringing the same patent claims and patents-in-suit asserted in the

Google case (claim 5 of the '287 patent, claim 23 of the '439 patent, and claim 1 of the '189

patent).

      6.     The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 opinion

on the relevant patents and claim charts:

> "[I]n the Google case, the district court again concluded that Mr. Golden's complaint was
> frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart
> mapping features of an accused product, the Google Pixel 5 Smartphone, to independent
> claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,096,189. The district court
> discounted this claim chart because it 'contains the exact same language as the claim
> charts previously rejected by the Federal Circuit [in the 2019 case], although Google
> Pixel 5 Smartphone appears in the far-left column instead of Apple.' But to the extent
> that the chart includes the 'exact same language' as previously rejected charts, it is
> simply the language of the independent claims being mapped to. The key column
> describing the infringing nature of the accused products is not the same as the complaint
> held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim
> limitations to infringing product features, and it does so in a relatively straightforward
> manner ..."

> "We conclude that the district court's decision in the Google case is not correct with
> respect to at least the three claims mapped out in the claim chart. Mr. Golden has made
> efforts to identify exactly how the accused products meet the limitations of his claims in
> this chart. On remand, the district court should allow the complaint to be filed and request
> service of process. Our decision does not preclude subsequent motions to dismiss by the
> defendant for failure to state a claim or for summary judgment. We express no opinion as
> to the adequacy of the complaint or claim chart except that it is not facially frivolous."

## NATURE OF ACTION

      7.     This is an action for patent infringement of United States Patent Nos. 10,163,287

('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit"), arising

under the patent laws of the United States of America, Title 35 of the United States Code, and

seeking damages and other relief under 35 U.S.C. § 271.

8. Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued

with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In

General": is Plaintiff's evidence that Plaintiff owns the patent rights for a Communicating,

Monitoring, Detecting, and Controlling (CMDC) device, that includes the smartphones of

Samsung, alleged in this case as infringing Plaintiff's patents.

9. On information and belief, Samsung and/or their affiliates, have directly infringed

each Asserted Claims of the '287, '439, and '189 patents, by making, using, selling and offering

to sell, and by inducing and contributing to others' infringement through their sales, offers for

sale, and use of Samsung Galaxy smartphones such as Galaxy S8, S8+, Note 8, S7, S7 Edge, and

the latest Samsung Galaxy models such as Galaxy S22, S22+, S22 Ultra, Note 20, S20, S20+,

S20 Ultra, and other products depicted on Defendants' websites and sold on third party websites

("the Accused Products") within the United States, such as the Galaxy S21 5G, and S21+ 5G; all

without authorization or license from Plaintiff within the United States, less than six years before

the filing of this Complaint, and prior to the April 05, 2026 expiration date of the '287, '439, and

'189 patents (the "Relevant Time Period").

## THE PARTIES

10. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of

business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

11. Defendant SAMSUNG ELECTRONICS AMERICA, INC. (referred to

individually herein as "SEA") is a New York corporation, with its principal place of business at

85 Challenger Road, Ridgefield Park, New Jersey 07660. On information and belief, SEA was

4

formed in 1977 as a subsidiary of Samsung Electronics Corporation ("SEC") and markets, sells, and/or offers for sale a variety of consumer electronics.

12.      On information and belief, within Samsung's Information Technology & Mobile Communications ("IM") business division, SEA operates an office in Mountain View, California, located at 665 Clyde Avenue, as depicted below. On information and belief, within the IM business division, SEA imports into the United States, and distributes, markets, and sells mobile devices in the United States, including smartphones that operate on cellular networks in the United States.



13.      On information and belief, there may be other corporate affiliates of Samsung who participated in the infringing acts complained of herein. The identities of such affiliates are currently unknown, because publicly available information does not permit the identification of

each affiliate who participated in the infringing acts. Plaintiff expects the identities of such affiliates to be revealed in discovery. Plaintiff reserves the right to amend this Complaint to name such affiliates, if necessary, once they have been revealed.

14.     Samsung's Information Technology & Mobile Communications ("IM") business division is responsible for the design, manufacture, and sale of mobile devices, including smartphones that operate on cellular networks in the United States. According to Samsung, it "is one of the largest manufacturers of wireless communications devices in the world and has long focused on the United States as a critical market for its products." *See In the Matter of Certain Wireless Communications Equipment and Articles Therein*, USITC Inv. No. 337-TA-866, Complaint at ¶ 9 (Dec. 21, 2012)

## STANDARD FOR REVIEW

15.     IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA GREENVILLE DIVISION *Larry Golden, Plaintiff, vs. Apple Inc.; Samsung Electronics USA; LG Electronics USA, Inc.; Qualcomm Inc., Motorola Solutions, Inc.; Panasonic Corporation; AT&T Inc.; Verizon Corporation Service Group; Sprint Corporation; T-Mobile USA, Inc.; Ford Global Technologies, LLC; Fairway Ford Lincoln of Greenville; General Motors Company; Kevin Whitaker Chevrolet; FCA US LLC; Big 'O' Dodge Chrysler Jeep Ram, Defendants. No.: 6:20-cv-04353-JD-KFM Date Filed 11/02/21 Entry 26.*

16.     "Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein. IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is <u>dismissed without prejudice</u> and without the issuance of service of process."

**Dismissal "Without Prejudice"**

17.     Dismissal "without prejudice" occurs when a court dismisses a claim but leaves

the plaintiff free to bring a subsequent suit based on the same grounds as the dismissed claim.

*In Semtek Intern. Inc. v. Lockheed Martin Corp.*, the Supreme Court pointed out that one of the

main features of dismissal without prejudice is that it does not prevent refiling of the claim… "a

case that is dismissed "without prejudice" is only dismissed temporarily. This temporary

dismissal means that the plaintiff is allowed to re-file charges, alter the claim, or bring the case to

another court."

## JURISDICTION AND VENUE

18.     This is a civil action for patent infringement arising under the patent laws of the

United States, Title 35 of the United States Code. This Court has subject matter jurisdiction

pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

19.     On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue

for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods*

*Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach

to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held

for 27 years that a domestic corporation can be sued for patent infringement anywhere that

corporation was subject to personal jurisdiction.

20.     The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b),

has two provisions permitting venue: "[1] where the defendant resides, or [2] where the

defendant has committed acts of infringement and has a regular and established place of

business."

7

21.     Since the enactment of that statute, the Supreme Court consistently has interpreted

Section 1400(b)'s first provision of proper venue — "where the defendant resides". *E.g., Fourco*

*Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic

corporation may now be sued for patent infringement only in its state of incorporation or where it

has committed acts of infringement and has a regular and established place of business.

22.     Venue is proper over the Defendant in this judicial district under 28 U.S.C.

§§1391 and/or 1400(b). Venue is proper within this District under 28 U.S.C. § 1391(b) and (c)

because Samsung transacts business within this District and offers for sale in this District

products that infringe the patents-in-suit. In addition, a substantial part of the events giving rise

to the claims occurred in this District. Thus, venue is proper over Samsung under 28 U.S.C. §

1400(b), because Samsung resides in this district, has committed acts of infringement in this

district, and has regular and established places of business in this district.

## INTRADISTRICT ASSIGNMENT

23.     This case is a patent infringement dispute that is appropriate for district-

wide assignment. Assignment to the San Jose Division is appropriate because a substantial part

of the events that gave rise to the claims asserted in this Complaint occurred in Santa Clara

County.

## NOTICE OF RELATED CASES

24.     Pursuant to the California Rules of Court; Rule 3.300. Related cases: This

pending civil case is related to two other pending cases [*Larry Golden v. Google LLC*, Case No.

4:22-cv-05246-HSG, and *Larry Golden v. Qualcomm, Inc.* 4:22-cv-03283-HSG] filed in the U.S.

District Court for the Northern District of California.

25.     All three cases involve the same Plaintiff and are based on the same or similar

claims; arose from the same or substantially identical transactions, incidents, or events requiring

the determination of the same or substantially identical questions of law or fact; involve claims

of infringement, and damages to the same patents; and, are likely to require substantial

duplication of judicial resources if heard by different judges.

## STANDARD FOR REVIEW

26.     The Rules of the COFC ("RCFC") provide contractors at least two avenues for

being heard at court. First, RCFC 14(b) allows parties to formally notify any interested third-

party, such as an indemnitor, of the § 1498(a) complaint. A noticed party "may file an

appropriate pleading setting forth the person's interest in the subject matter of the litigation."

RCFC 14(c)(1)(a). Second, RCFC 24 allows interested parties to proactively intervene,

permissively or by right.

27.     In the COFC case *Larry Golden v. USA*; Case 1:13-cv-00307-EGB Document 224

Filed 03/31/21 Page 2 of 4; Samsung Electronics of America, Inc. was provided notice to appear

to protect any interest Samsung may have in the case (**Exhibit E**). Samsung failed to appear to

protect its interest. Claiming an interest in this current case is an indication Samsung deliberately

defaulted on its responsibility to appear and defend any interest Samsung may have had in the

case. It is a waste of judicial resources to allow Samsung the opportunity to defend against

Plaintiff's current claims of infringement; especially after the Federal Circuit's decision in *Larry

Golden v. Google LLC* Case No. 22-1267.

28.     Under Rule 14(b) of the Rules of the United States Court of Federal Claims

(RCFC), the court "may notify any person with the legal capacity to sue or to be sued who is

alleged to have an interest in the subject matter of the suit." Further, a "person served with a

notice issued . . . may file an appropriate pleading setting forth the person's interest in the subject

matter of the litigation."

29.     In resolving a petition for mandamus, the Federal Circuit held in *In re* UUSI,

LLC, that a third party's potential obligation to indemnify the government for any patent

infringement liability provides "sufficient interest in litigation to offer evidence and advance

legal arguments appropriate to protect its own interests. As the USCFC held in *Bowser, Inc. v.*

*United States*:

> "We think there is implicit in the whole plan and purpose of Subsection 14(b) a
> congressional intent that the issues of fact and law decided in a suit against the United
> States in the Court of Claims may not be retried in another court at the insistence of a
> third party, who had a "possible" interest in the case in this court but who failed to appear
> and protect his interest after timely notice or summons had been served upon him." 420
> F.2d 1057, 1060 (Ct. Cl. 1970).

# COUNT I

## (Infringement of the '287 Patent)

30.     Golden realleges and incorporates herein the allegations set forth in ¶¶ 1-29.

31.     On information and belief, Samsung is jointly, directly, indirectly and/or under

the 'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Samsung Galaxy S8, S8+, Note 8, S7, S7 Edge, S22, S22+,

S22 Ultra, Note 20, S20, S20+, S20 Ultra, and Galaxy S21 5G, and S21+ 5G.

32.     As set forth in Golden's preliminary infringement contentions, Samsung's

making, using, offering for sale, selling and/or importing Plaintiff's patented devices, have at a

minimum directly infringed the '287 patent and Samsung is thereby liable for infringement of the

'287 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

33.     The alleged infringement Golden has identified to this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II
### (Infringement of the '439 Patent)

34.     Golden realleges and incorporates herein the allegations set forth in ¶¶ 1-33.

35.     On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Samsung Galaxy S8, S8+, Note 8, S7, S7 Edge, S22, S22+, S22 Ultra, Note 20, S20, S20+, S20 Ultra, and Galaxy S21 5G, and S21+ 5G.

36.     As set forth in Golden's preliminary infringement contentions, Samsung's making, using, offering for sale, selling and/or importing Plaintiff's patented devices, have at a minimum directly infringed the '439 patent and Samsung is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

37.     The alleged infringement Golden has identified to this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

38.    Golden realleges and incorporates herein the allegations set forth in ¶¶ 1-37.

39.    On information and belief, Samsung is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Samsung Galaxy S8, S8+, Note 8, S7, S7 Edge, S22, S22+, S22 Ultra, Note 20, S20, S20+, S20 Ultra, and Galaxy S21 5G, and S21+ 5G.

40.    As set forth in Golden's preliminary infringement contentions, Samsung's making, using, offering for sale, selling and/or importing Plaintiff's patented devices, have at a minimum directly infringed the '189 patent and Samsung is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Samsung have caused damage to Golden, which infringement and damage will continue unless and until Samsung is enjoined.

41.    The alleged infringement Golden has identified to this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## ALLEGED INDUCED AND CONTRIBUTORY INFRINGEMENT

**Plaintiff's Owns the Patent Rights on the CPUs Samsung uses with its Smartphones. The CPUs are Described as the "Brains" of the Smartphone.**

42.    The Central Processing Unit (CPU) is the programmable device capable of general-purpose computation. It is the engine of logic, as with the "brain", and the core piece of hardware in the Patent Owner's Communication, Monitoring Detecting, and Controlling

(CMDC) devices (i.e., new, improved upon, and useful desktop PCs, laptops, tablets, cell phones [smartphone], etc.)

43.    The Patent Owner's CPU is capable of arithmetic operations such as add and divide and flow control operations such as conditionals. The Patent Owner's central processing unit (CPU) is the electronic circuitry within the CMDC device that is vital and essential to processing and executing program instructions.

44.    The CPU, which controls all Programmable Logic Controllers (PLCs) consists of two basic sections: the central processing unit (CPU) and the input/output interface system. The input/output system is physically connected to field devices (e.g., sensors, etc.) and provides the interface between the CPU and the information providers (inputs) and controllable devices (outputs).

45.    To operate, the CPU "reads" input data from connected field devices through the use of its input interfaces, and then "executes", or performs the control program that has been stored in its memory system. The CPU processes instructions in order to carry out certain functions that make the device operate properly. The CPUs are often described as the "brain" of computers, smartphones and tablets because of the central role they play in the functioning of the devices.

46.    All of the different components that make up a computer's processor have to be condensed to fit in devices, such as a laptops and tablets, where they exist as a mobile application processor, Chipset, or a System-on-a-Chip (SoC). Mobile application processors are found in mobile devices, such as smartphones.

47.    A core, or CPU core, is the "brain" of a CPU. It receives instructions, and performs calculations, or operations, to satisfy those instructions. A CPU can have multiple

13

cores. A CPU (processor) with two cores is called a dual-core processor; with four cores, a quad-core; six cores, hexa-core; eight cores, octa-core. https://www.computer hope.com/jargon/c/core.htm#:~:text

48.    Plaintiff owns the patent rights to a new, improved upon, and useful cell phone; smartphone; and central processing unit designed specifically for Plaintiff's CMDC device (i.e., new, improved upon, and useful cell phone; smartphone, etc.)

49.    Plaintiff filed his first Disclosure Document (No. 565732) with the USPTO on November 26, 2004; and his first patent application on April 05, 2006.

50.    Following is a list of apparatuses, mechanisms, devices, and products (GPS, open-source architecture, internal sensor for C/B detection, external detector for CBRNE, fingerprint scanner, NFC), Samsung allegedly used for the assembly of their smartphones (i.e., Plaintiff's CMDC—smartphone—device); and, which antedates the same used by Samsung.

**Samsung's First Smartphone Global Positioning System (GPS). (2007)**

51.    "Samsung's i550 mobile phone is seen in an undated handout image, released to Reuters on October 17, 2007. Mobile phone maker Samsung Electronics Co Ltd said on Tuesday it would launch its first-ever phone incorporating a Global Positioning System (GPS). The phone—called the i550will use the operating software of Britain's Symbian ..." REUTERS/ Samsung/ Handout. TECHNOLOGY NEWS, (2007, Oct. 16). *Samsung to launch its first-ever GPS phone* https://www.reuters.com/article/us-samsung-phone/samsung-to-launch-its-first-ever-gps-phone-idUSL1664279020071017

**Samsung's First "Product Grouping" Platform for Smartphones (2007)**

52.    In late 2007, the Open Handset Alliance (OHA) announced its formation. The OHA was a coalition of more than 30 hardware, software and telecom-munications companies,

including Google, Qualcomm, Broadcom, HTC, Intel, Samsung, Motorola, Sprint, Texas

Instruments and Japanese wireless carriers KDDI and NTT DoCoMo. The alliance's goal was to

contribute to the develop-ment of the first open-source platform for mobile devices. Google

released the public beta version of Android 1.0 for developers around the same time of the

alliance's announcement, in November 2007. *Android OS* https://www.techtarget.

com/searchmobilecomputing/definition/Android-OS. [*Product Grouping*: products grouped

together by common features and design similarities].

      53.    The Samsung GT-I7500 Galaxy is a smartphone manufactured by Samsung that

uses the open-source Android operating system. It was announced on 27 April 2009, [*"Samsung*

*launches I7500, the company's first Android-powered mobile phone". Innovator.samsungmobile*

*.com. Archived from the original on 2012-05-02. Retrieved 2010-12-16*] and was released on 29

June 2009 as the first Android-powered device from Samsung Mobile, ["*Samsung Galaxy full*

*specs – Phone Arena". PhoneArena. Retrieved 2017-04-26*] and the first in what would become

the long-running Galaxy series. It is succeeded by the Samsung Galaxy S.

**Samsung's First "built-in" Smartphone Sensor for Chemical and/or Biological Detection
(2008)**

      54.    Samsung's camera lens in smartphones with microfluidic lens functions as

cameras; "uses microscope to focus on a chemical sensor ... [a] megapixel camera captures the

image from the array of nanopores uses fluid rather than bulky moving parts. The sensors

contained in one array is determined by the pixel resolution phone camera. Megapixel resolution

in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors*

*tucked into cell phones could map airborne toxins in real time*. Source: https://

www.understanding nano.com/cell-phone-sensors-toxins.html

**Samsung's First "remote" Smartphone Detectors for CBRNE Detection (2010)**

55.     Initially created in 2010 by the Air Force Research Laboratory: Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. As of 2020, ATAK has a growing base of 250,000 military and civilian users across numerous public safety agencies and US partner nations, and has seen the addition of 15 United States Department of Defense programs. "*ATAK Improves Situational Awareness for California Fire Department*". Samsung Business Insights. 2019-10-16. Retrieved 2019-10-19.

**Samsung's First Smartphone Fingerprint Scanner (2010)**

56.     "The mid-2010s was when fingerprint scanners on smartphones really took off. The technology became a common feature for flagship smartphones. Apple's first phone with the technology was the iPhone 5s, and Samsung's was the Galaxy Note4." *Fingerprint Scanners On Modern Smartphones*" https://www.makeuseof .com/fingerprint-scanners-evolution/

**Samsung's First Smartphone 'Lock Disabling Mechanism' that is Interconnected to the Fingerprint Scanner (2010)**

57.     "Samsung devices come with a range of security options, so that you can prevent unauthorized users from accessing your device. You can also set additional security measures that stop unauthorized users from resetting your device and its security methods … [i]f you are locked out of your device and have not set up a remote unlock method, you will need to perform

16

a factory reset …[t]here are several screen lock options available on Samsung devices. These

will vary depending on your specific devices but can include: Swipe; Pattern; PIN; Password;

Facial recognition; and Fingerprint recognition … [i]f you can unlock your device using your

biometric method (fingerprint or face recognition) but can't change your screen lock type

because you've forgotten your PIN, pattern or password, use Find My Mobile to reset the unlock

methods. This will remove all unlock data including PIN, pattern, password and biometric

methods so that you can reset them again." *I can't unlock my Samsung phone & Remote unlock

is off* https://www.samsung.com/uk/support/mobile-devices/i-cant-unlock-my-device/

**Samsung's First Central Processing Unit (Chipset / System-on-a-chip) for the Smartphone (2010)**

58.    "Wanting to cement its position as a bonafide competitor in the SoC arena,

Samsung started working on designing custom CPUs from scratch. It set up the Samsung Austin

R&D Center (SARC) in 2010 and staffed it with chip industry veterans from the likes of Intel,

AMD and ARM. Under Samsung's LSI division, the SARC was tasked with developing high-

performance, low-power complex CPU architectures and designs … Announced in November

2015, the Exynos 8 Octa 8890 was Samsung's first premium chipset with a custom-designed

CPU and embedded LTE modem. It featured Mongoose 1 (M1) cores, the first in-house high-

performance low-power ARM microarchitecture from Samsung. The company followed an

aggressive 3-year design schedule for the custom CPU …" *Samsung begins designing custom

CPUs from scratch* https://www.sammobile. com/samsung/exynos/#:~:text=Samsung%20

introduced%20the%20industry%27s%20first,5%20Octa%205410%2C%20in%202013.

**Samsung's First Radio Frequency Near-Field Communication (NFC) for Smartphones (2010)**

59. In 2010, the Samsung NEXUS S became the first Android with NFC support. The ***Nexus S 4G is a smartphone co-developed by Google and Samsung and manufactured by Samsung Electronics*** for release in 2010. It first appeared in September 2011 in the U.S. on the Nexus S smartphone over the Sprint wireless network. The Samsung Galaxy S III launched in 2012 with NFC and S Beam (built on Android Beam) for data sharing. Samsung also launched tiny NFC TecTile tags in 2012 that can be programmed and rewritten by NFC devices. *The Evolution of Near Field Communication (NFC)* https://www.techpats.com/evolution-near-field-communication-nfc/#:~:text=In%202010%2C%20the%20Samsung%20NEXUS, first%20Android%20with%20NFC%20support.

**Samsung's First Internet Mobile Web Browser for Smartphones (2012)**

60. Samsung Internet replaced the stock Android browser as the default on Samsung Galaxy devices in 2012 *"Samsung Internet Overview"*, Samsung Developers. Retrieved 2018-04-08. Around early 2013, it was decided to base the browser on Chromium, and the first Chromium-based version was shipped with an S4 model later that year *"Samsung Internet browser will get 'Smart Go Next' for better form navigation, also coming to Chrome"*. Android Police. 10 October 2017. Retrieved 2018-04-08.

61. Samsung Internet is a mobile web browser for smartphones and tablets developed by Samsung Electronics. It is based on the open-source Chromium project. It comes pre-installed on Samsung Galaxy devices. Since 2015, it has been available for download from Google Play *"Introducing Samsung Internet v6.2 stable"*, Samsung Developers. Retrieved 2018-04-08; *"Get Samsung's Internet Browser on Almost Any Android Device"*, Gadget Hacks. Retrieved 2018-04-08; ... Samsung estimated that it had around 400 million monthly active users in 2016.

## Samsung Galaxy S21 "mirrors" Google Pixel 5: "Literal Infringement"

| Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | Claim 5 of the '287 Patent | Claim 23 of the '439 Patent | Claim 1 of the '189 Patent |
|---|---|---|---|---|
|  |  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G. OS: Android 11, upgradable to Android 13 | CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) - USA/China. System-on-a-chip: Qualcomm SM8350 Snapdragon 888 5G (5 nm) - USA/China. OS: Android 11, upgradable to Android 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. | Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6.2 inches flexible OLED display at 421 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, Wi-Fi Direct. Bluetooth 5.0, A2DP, LE. NFC, GPS, GLONASS, BDS, GALILEO. Nano-SIM and eSIM or Dual SIM | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, Wi-Fi Direct. Bluetooth 5.0, A2DP, LE. NFC, GPS, GLONASS, BDS, GALILEO. Nano-SIM and eSIM or Dual SIM | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
|---|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, Wi-Fi Direct. Bluetooth 5.0, A2DP, LE. NFC, GPS, GLONASS, BDS, GALILEO. Nano-SIM and eSIM or Dual SIM | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.  Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | The Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.  Samsung Smart Doorlock - Apps on Google Play. Google Nest ×Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |

| | | | |
|---|---|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | Samsung USB-C Cable lets you charge your USB-C device as well as sync your data to your smartphone | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |

| | | | | |
|---|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, Wi-Fi Direct. Bluetooth 5.0, A2DP, LE. NFC, GPS, GLONASS, BDS, GALILEO. Nano-SIM and eSIM or Dual SIM | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | Samsung Smart Doorlock - Apps on Google Play. Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | Samsung Smart Doorlock - Apps on Google Play. Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit,* ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Android Team Awareness Kit,* ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

62.     To avoid infringing Plaintiff's patents, Samsung must do the following: 1) discontinue using the open-source Android operating system; 2) block all software applications that are specific to integrating CBRNE sensors with Samsung's mobile devices; 3) design mobile devices that does not include a port for CBRNE plug-ins; 4) design mobile devices that does not include cameras for CBRNE detecting; 5) design mobile devices that does not include the nine standard sensors illustrated in *Figure 4* below that are used as biosensors; or 6) settle previous damages with Plaintiff and negotiate a licensing agreement.

63.     The devices, and products listed in the above "ALLEGED INDUCED AND CONTRIBUTORY INFRINGING PRODUCTS" section of this document are all included as limitations of claim 5 of the '287 patent (see claim chart above). Amendment is reserved.

*Figure 1* shows the integration requirement of the three patent claims [5, 23,

& 1] of the three patents ['287, '439, & '189] asserted in this case.

| Claim 5 of the 10,163,287 Patent | Claim 23 of the 9,589,439 Patent | Claim 1 of the 9,096,189 Patent |
|---|---|---|
| A monitoring device, comprising:<br><br>at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;<br><br>one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | A cell phone comprising:<br><br>at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;<br><br>… the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes [] location data [] sent to the cell phone. | A communication device of [] a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal [] comprising:<br><br>a transmitter for transmitting signals and messages to at least one of [] a multi-sensor detection device, [] a cell phone detection device…;<br><br>a receiver for receiving signals, data or messages from at least one of [] a multi-sensor detection device, [] a cell phone detection device…; |

*Figure 1*

The patents' written support can be found in Plaintiff's patent specifications. Detector

case is considered the "genus" to a group of products that represent the "species". Included in the

group are CBRNE-H sensors.

> … detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, [] cell phones, [] personal digital assistants (PDAs), [], handhelds.

27

*Figure 2* shows how the smartphone cameras satisfies the requirements of the three patent claims [5, 23, & 1]. The camera is an addition or an alternative to the ATAK.

| Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|---|
| *Google Pixel 5: Dual - 12.2 MP (megapixel), OIS 16 MP (megapixel)* Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understandingnano.com/cell-phone-sensors-toxins.html | *Samsung Galaxy S21: 12 MP (megapixel), Dual Pixel PDAF OIS 64 MP (megapixel)* Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understandingnano.com/cell-phone-sensors-toxins.html | *Claim 5 limitation of the '287 Patent* one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | *Claim 23 limitation of the '439 Patent* at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | *Claim 1 limitation of the '189 Patent* a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device … a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device |

*Figure 2*

*Figure 3* is a visual display of different ways the smartphone camera [1] [2] can be used for detecting Chem/Bio agents. For each different way used, it qualifies as an alternative to the ATAK.



*Figure 3*

---

1    The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

2    Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

29

*Figure 4* describes how at least nine (9) standard sensors for the smartphone can be used as "biosensors". For each different way used, it qualifies as an alternative to the ATAK.



**Figure 4**

The Smartphones Biosensors:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

*Figure 5* list some of the same standard sensors illustrated in Figure 4. The

port on the smartphone below is used for the CBRN *plug-ins* included in ATAK.



*Figure 5*

ATAK is a digital application available to warfighters throughout the DoD. Built on the

Android operating system, ATAK offers warfighters geospatial mapping for situational

awareness during combat — on an end-user device such as a smartphone or a tablet. With

DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear

(CBRN) *plug-ins*.

Just having a plug-in is not all that's involved. There has to be an app specific software to

sync the chemical, biological, radiological, and nuclear sensors to the smartphone plus the

Google Android Operating System.

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.      A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B.      A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.      A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.      As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E.      Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the United States Constitution.

Respectfully submitted,

S/ *Larry Golden*          Date: 01 /02/2023

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit B

# KAIST sues Samsung, Qualcomm for patent infringement

2019-03-10 : 17:05



Graphic by Cho Sang-won

By Jun Ji-hye

KAIST IP has filed a patent infringement lawsuit against Samsung Electronics and Qualcomm in the United States, claiming the companies violated the university's patent tied to key semiconductor technologies, industry sources said Sunday.

KAIST IP is a subsidiary of the Korea Advanced Institute of Science and Technology (KAIST) in charge of managing intellectual property (IP) belonging to the nation's top science and research university.

The latest lawsuit came after the licensing arm of the university filed a similar suit against Samsung, Qualcomm and GlobalFoundries in 2016. In June last year, a U.S. federal jury in Texas found Samsung guilty of infringing U.S. Patent No. 6,885,055 that relates to FinFet, ordering the Korean firm to pay a $400 million fine to the university. Qualcomm and GlobalFoundries were also found to have infringed the patent, but were not ordered to pay damages.

KAIST IP filed the new patent infringement suit Feb. 14, claiming Samsung Electronics has additionally violated its patent in new products production including smartphones.

FinFETs are the three-dimensional transistor structures that help send current more stably and efficiently. The technology is the key to producing modern processors.

The technology was developed in early 2000 in partnership with KAIST and Prof. Lee Jong-ho who was one of the key researchers at Wonkwang University. Lee is now a professor at Seoul National University.

In its written accusation, KAIST IP reportedly claimed the defendants have not stopped infringing on the university's patent despite last year's court ruling, saying they have continued to develop and commercialize new

products by utilizing the FinFet technology.

KAIST IP claimed those products included smartphones such as Samsung Galaxy S8, Galaxy S9, Galaxy Note 8 and Galaxy Note 9 as well as the next generation modem chip Exynos Modem 5100 and infotainment system supporting drivers.

Regarding the issue, Samsung Electronics said the technology used in its products was different from the university's patent technology.

"There is difference between KAIST's patent technology and Samsung's production method," a Samsung Electronics official said. "We will fully explain this during the trial."

Industry officials said Samsung may have to pay a larger fine, compared to the previous $4 million, if it loses the suit.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:16-CV-01314-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD., | § | |
| ET AL., | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants'[1] Motion to Stay Case Pending *Ex Parte* Reexamination

(the "Motion to Stay"). (Dkt. No. 651.) Having considered the Motion to Stay, the Court is of the

opinion that it should be and hereby is **DENIED**.

Also before the Court are the following motions: (1) Defendants' Renewed Motion for

Judgment as a Matter of Law on Non-Infringement and Invalidity (the "Liability JMOL") (Dkt.

No. 578); (2) Samsung's Renewed Motion for Judgment as a Matter of Law for Damages of No

More Than $6.2 Million (the "Damages JMOL") (Dkt. No. 577); (3) Samsung's Renewed Motion

for Judgment as a Matter of Law on Willfulness (the "Willfulness JMOL") (Dkt. No. 580); (4)

Motion by KAIST IP US ("KAIST") for Enhancement of Damages Due to Willful Infringement

(Dkt. No. 586) (the "Motion for Enhancement"); (5) Samsung's Motion for New Trial and

Contingent Motion of GlobalFoundries and Qualcomm for New Trial (Dkt. No. 579) (the "Motion

---

[1] Samsung Electronics Co., Ltd.; Samsung Electronics America, Inc.' Samsung Semiconductor, Inc.; Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm Inc. ("Qualcomm") (Samsung, GlobalFoundries, and Qualcomm collectively, the "Defendants").

for New Trial"). Having considered these motions, and for the reasons set forth herein, the Court is of the opinion that Defendants' Liability JMOL, Samsung's Damages JMOL, and Samsung's Willfulness JMOL should be and hereby are **DENIED**. The Court further concludes that KAIST's Motion for Enhancement should be and hereby is **GRANTED**. Finally, the Court concludes that Samsung's Motion for New Trial should be and hereby is **CONDITIONALLY DENIED** subject to a remittitur in the amount of $203,003,416.

Finally, before the Court are (1) Motion by KAIST for Entry of Final Judgment as the Prevailing Party and Award of Costs and Pre- and Post-Judgment Interest (Dkt. No. 587) (the "Motion for Final Judgment'); and (2) Motion by KAIST for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) (the "Motion for Fees and Costs"). In light of the foregoing, the Court **CARRIES** the Motion for Final Judgment and the Motion for Fees and Costs.

## I.    BACKGROUND

KAIST brought suit against Defendants alleging infringement of United States Patent No. 6,885,055 (the "'055 Patent" or the "Asserted Patent") entitled "Double-Gate FinFET Device And Fabricating Method Thereof." (Dkt. No. 1 ¶ 19.) Jong-Ho Lee is listed as the primary inventor of the '055 Patent. (Dkt. No. 1-1.) KAIST asserted that Defendants "commonly and/or jointly manufacture semiconductors and/or sell infringing application processor chips" that infringe upon the '055 Patent. (*Id.* ¶ 17.) A jury trial was held beginning on June 11, 2018. (Dkt. No. 487.) At trial, KAIST asserted infringement of Claims 1–6, 11–13, and 15–17 of the '055 Patent (the "Asserted Claims"). (Dkt. No. 429.) At the close of evidence, the parties moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on the issues of infringement, invalidity, willfulness, and damages, which were denied. (Dkt. No. 497.) On June 15, 2018, the jury returned a verdict finding that Samsung, GlobalFoundries, and Qualcomm had each infringed at least one of the Asserted Claims; that none of the Asserted Claims were invalid; that Samsung's

infringement had been willful but GlobalFoundries and Qualcomm's infringement had not been willful; and that KAIST should be awarded the following sums: $400,000,000.00 from Samsung, $0.00 from GlobalFoundries, and $0.00 from Qualcomm. (Dkt. No. 499.) The award against Samsung was designated as a lump sum and was found to be fair and reasonable compensation for Samsung's infringement. (*Id.*) These post-trial motions followed.

On October 31, 2018, more than four months after the jury returned its verdict, Samsung filed a request for *ex parte* reexamination at the U.S. Patent and Trademark Office ("PTO") challenging the Asserted Claims of the '055 Patent. (Dkt. No. 659 ¶ 2.) The PTO granted the request and, on reexamination, rejected the Asserted Claims. (Dkt. No. 659-3 at 103.) This rejection has not yet been made final by the PTO as KAIST has not yet exhausted its appeals of this determination. (*See* 659-1 ¶¶ 9–23.) Until a final determination is made, the Asserted Claims remain part of a duly issued United States Patent. *See* 35 U.S.C. § 307(a).

## II.    DEFENDANTS' MOTION TO STAY

As a threshold matter, the Court considers whether, as Defendants argue, a stay is warranted in light of the PTO's determination on reexamination. (Dkt. No. 651.) The Court determines that it is not.

In deciding whether to stay litigation pending reexamination, courts consider: "(1) whether the stay will unduly prejudice the nonmoving party; (2) whether the proceedings before the court have reached an advanced stage, including whether discovery is complete and a trial date has been set; and (3) whether the stay will likely result in simplifying the case before the court." *Papst Licensing GmbH & Co., KG v. Apple, Inc.*, No. 6:15-cv-1095-RWS, 2018 WL 3656491, at *2 (E.D. Tex. Aug. 1, 2018). None of these factors militate in favor of a stay while several clearly militate against a stay.

3

As to the first factor, a stay would be highly prejudicial to KAIST and would present Defendants with a clear tactical advantage. The Court notes the extreme dilatoriness and delay of Samsung's request for reexamination. Samsung waited until after the jury's verdict in this case, which found against Defendants on *all* their invalidity arguments raised at trial, and *then* it ran to the PTO with *new* invalidity arguments never raised before the jury. (*See* Dkt. No. 659-2 at 12.) In doing so, Samsung manipulated an administrative process designed to streamline disputes to *avoid* the need for a jury trial. There is little doubt this was done in order to gain instead a second bite at the apple.[2] *See* MPEP § 2209 ("Parties are cautioned that the reexamination statute, regulations, and published examining procedures do not countenance so-called 'litigation tactics' in reexamination proceedings.").

While Samsung is within its statutory rights to avail itself of the administrative remedies the Patent Act affords, such should not be used to effect a collateral attack on the verdict of a jury empaneled pursuant to the Seventh Amendment or the judgments of an Article III court. *See In re Swanson*, 540 F.3d 1368, 1379 n.5 (Fed. Cir. 2008) ("[A]n attempt to reopen a final federal court judgment of infringement on the basis of a reexamination finding of invalidity might raise constitutional problems."). If a final judgment in this case is entered, as KAIST has requested (Dkt. No. 587), KAIST's right to enforce that judgment will stand regardless of any subsequent determinations regarding the underlying patent. *See Moffitt v. Garr*, 66 U.S. 273, 283 (1861) (Title

---

[2] Having been denied repeated attempts to institute *inter partes* review of the Asserted Patent, Samsung's reexamination request is more likely akin to at least a fourth bite at the apple. *See* Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2017-01046, Paper 12 (P.T.A.B. Oct. 2, 2017) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2017-01047, Paper 13 (P.T.A.B. Oct. 2, 2017) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2018-00266, Paper 9 (P.T.A.B. May 29, 2018) (denying institution); Decision, *Samsung Elecs. Co. v. KAIST IP US LLC*, IPR2018-00267, Paper 9 (P.T.A.B. May 29, 2018) (denying institution).

to money judgments for patent infringement "does not depend upon the patent, but upon . . . the judgment of the court."). By contrast, if this case is stayed and no final judgment issues, the issuance of a final reexamination certificate would effect the destruction of this lawsuit.[3] *See Fresenius USA, Inc. v. Baxter Int'l, Inc.*, 721 F.3d 1330, 1339 (Fed. Cir. 2013); *see also id.* at 1351 n.2 (Newman, J. dissenting). To stay the case at this stage would reward Samsung's dilatory tactics while substantially prejudicing KAIST's right to rely on a jury verdict that it spent significant hours and resources to secure. This factor weighs strongly against a stay.

As to the second factor, to say that the proceedings before the court have reached an advanced stage would be an understatement. Discovery is complete, a trial date has been set, a trial has occurred, and the jury and the Court have both issued their determinations on the merits of this case. This factor weighs strongly against a stay.

As to the third factor, simplification of the case, if any, would be negligible, if not microscopic. The jury has already rendered its verdict in this case (Dkt. No. 499) and the Court has already issued its findings of fact and conclusions of law regarding Defendants' equitable defenses (Dkt. No. 569). All that remains is for the Court to rule on the parties' post-trial motions, which the Court does today.[4] Thus, any simplification of the issues could only be *de minimis*. This factor is at best neutral.

Having found no factors weighing in favor of as stay and finding a majority of the factors weighing against such a stay, the Court determines and finds that a stay of this case in favor of

---

[3] *Fresnius* explains that "Congress expected reexamination to take place *concurrent* with litigation." 721 F.3d at 1339 (emphasis added). Samsung's request for reexamination was not concurrent with this litigation but took place several months after a trial on the merits was held and the jury returned its verdict.

[4] The Court herein denies Samsung's Motion for New Trial conditioned up a remittitur by KAIST. The Court will not speculate on what decision KAIST will make in that regard.

Samsung's dilatory reexamination request would be not only inappropriate but unfair. Consequently, the Court denies Defendants' Motion to Stay and will proceed to consider the parties' post-trial motions.

## III.   DEFENDANTS' MOTIONS RELATED TO LIABILITY AND WILLFULNESS

Having considered Defendants' Liability JMOL and Samsung's Willfulness JMOL, the Court finds that substantial evidence exists to support the jury's verdict on each issue.

### A.   Legal Standard

"Judgment as a matter of law is proper when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013) (quoting Fed. R. Civ. P. 50(a)). The non-moving party must identify "substantial evidence" to support its positions. *TGIP, Inc. v. AT&T Corp.*, 527 F. Supp. 2d 561, 569 (E.D. Tex. 2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eli Lilly & Co. v. Aradigm Corp.*, 376 F.3d 1352, 1363 (Fed. Cir. 2004).

"The Fifth Circuit views all evidence in a light most favorable to the verdict and will reverse a jury's verdict only if the evidence points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1361 (Fed. Cir. 2018) (citing *Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 773 (5th Cir. 2010)). A court must "resolve all conflicting evidence in favor of [the verdict] and refrain from weighing the evidence or making credibility determinations." *Gomez v. St. Jude Med. Daig Div. Inc.*, 442 F.3d 919, 937-38 (5th Cir. 2006).

### B.   Infringement

In their Liability JMOL, Defendants assert that Plaintiff failed to establish that several limitations of the Asserted Claims were met in the accused products: (1) a "gate which is formed

on said . . . second oxide layer"; (2) a "first oxide layer"; (3) a "first oxide layer . . . with a thickness greater or equal to that of the gate oxide"; and (4) "a Fin active region which is a wall-shape single crystalline silicon." (Dkt. No. 578 at 1.) These limitations appear in Claims 1 and 13 of the '055 Patent from which the remaining Asserted Claims depend. (DX-001 at 12:2–27; 13:40–14:22.) Defendants further assert that there is no evidence of direct infringement by Defendant GlobalFoundries Inc. (Dkt. No. 578 at 1.)

### 1.   "gate which is formed on said . . . second oxide layer"

Defendants assert that the "undisputed evidence establishes . . . as a matter of law" that the limitation "a gate which is formed on said . . . second oxide layer" is not met. (Dkt. No. 578 at 5.) The parties did not request, and the Court did not provide, a construction of the phrase "formed on." (*See* Dkt. No. 179 (construing disputed claims).) Accordingly, the jury was instructed to apply its plain and ordinary meaning. (Dkt. No. 498 at 43:15–17.)

Defendants argue that KAIST's expert, Dr. Kelin Kuhn, identified the "second oxide layer" as a "silicon dioxide" layer formed on either side of the fin in the accused products. (Dkt. No. 490 at 9:1–10:7.) However, it is undisputed that in the accused product the "gate" is always formed on a hafnium layer that itself is formed on the silicon dioxide layer; the gate is not formed directly on the silicon dioxide layer.[5] (Dkt. No. 491 at 59:23–61:10.) Defendants argue that since it is undisputed that the "gate" is formed on the hafnium layer instead of the "second oxide layer," a finding of infringement is precluded as a matter of law. (Dkt. No. 578 at 7.)

KAIST responds that Defendants' argument requires construing the term "formed on" to mean "formed *directly* on." (Dkt. No. 592 at 3 (emphasis in original).) However, Dr. Kuhn testified

---

[5] The parties and their witnesses at times refer to "silicon dioxide" as "SiO2." Similarly, the parties and their witnesses at times refer to "hafnium" as "hafnium oxide," "HfO," "high-k," or a "high-k dielectric."

that "there's nothing in the claims that says that the gate is directly on an SiO2 layer." (Dkt. No. 490 at 23:4–5.) Moreover, Defendants' expert, Dr. Vivek Subramanian, testified that he did not dispute in his expert report that this element was met. (496 at 81:21–82:6.)

The Court agrees with KAIST that Defendants argument effectively asks the Court to construe "formed on" as "formed directly on." "In the absence of such a construction, however, the jury was free to rely on the plain and ordinary meaning of the term . . . ." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 520 (Fed. Cir. 2012). "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1331 (Fed. Cir. 2009) (citations, quotations omitted). The jury heard testimony that the claims do not require the gate to be formed directly on the second oxide layer and was entitled to credit this testimony.

Moreover, that something may be considered to be "on" something else, even if there is an intervening layer, is consistent with the plain and ordinary meaning of the term. (*See* Dkt. No. 498 at 33:18–22 (instructing jurors that they "are permitted to draw such reasonable inferences . . . as [they] feel are justified in the light of common experience").) For example, the court observes that one might properly describe paint as being put "on" a wall even if there is an intervening layer of primer or describe a table as "on" the floor even if it is on a rug that itself is on the floor. The Court finds that there was substantial evidence from which the jury could conclude that the accused products contain a "gate which is formed on said . . . second oxide layer."

### 2. "first oxide layer"

Defendants argue that the accused products do not have a layer that meets all the limitations of the "first oxide layer," but instead, KAIST identified the combination of the silicon dioxide layer and the hafnium layer as the "first oxide layer." (*See* Dkt. No. 490 at 21:22–22:4.) It is undisputed that the silicon dioxide layer and hafnium layer are two different layers formed by

separate processes at separate times and having separate properties. (*See* Dkt. No. 497 at 199:17–200:5.) However, according to Defendants, "the recited 'first oxide layer' cannot be made up of two separate layers formed at different times, as only one can be 'first.'" (Dkt. No. 578 at 9.) The express requirements of the "first oxide layer" cannot be met by either the silicon dioxide layer or hafnium layer alone, and therefore, according to Defendants, no reasonable jury could have found that this limitation was met. (*Id.* at 9–10.)

KAIST responds that this argument "is a surreptitious request for claim construction after trial." (Dkt. No. 592 at 7.) KAIST argues that the "overwhelming weight of evidence established that" the silicon dioxide and hafnium together constituted a "first oxide layer." (*Id.*; *see, e.g.*, Dkt. No. 490 at 15:3–9, 21:25–22:2; Dkt. No. 497 85:25–86:14.)

The Court agrees that Defendants argument again seeks to obtain a favorable claim construction after trial and that such has been waived. *Cordis*, 561 F.3d at 1331. Moreover, Defendants offer no explanation to the Court as to why the term "first" must be used in a temporal sense, precluding two layers formed at separate times from being the "first oxide layer," rather than, for example, a means of differentiating it from the "second oxide layer." The Court finds substantial evidence from the record that the jury was free to credit showing that the silicon dioxide and hafnium layers together meet the limitation of a "first oxide layer."

### 3.  "a first oxide layer . . . with a thickness greater or equal to that of the gate oxide"

Defendants argue that this limitation is not met because KAIST relied on a theory that the first oxide layer (at the top of the fin) and the gate oxide (on the sides of the fin) were "considered equal *with manufacturing variation*." (Dkt. No. 578 at 11 (emphasis in original) (quoting Dkt. No. 490 at 18:21–19:2).)  This theory, Defendants assert, "fails as a matter of law, both literally and under the doctrine of equivalents." (*Id.*)

9

### a.   There is substantial evidence of literal infringement

Defendants argue that this theory fails as a matter of literal infringement for several reasons. First, the term "greater or equal to" is a "mathematically precise, numerical boundary" that uses no words of approximation to add any flexibility. (*Id.* at 12.) Second, the Federal Circuit has already rejected the theory that manufacturing tolerances can be read into claim terms. (*Id.* at 13 (citing *Senmed, Inc. v. Richard-Allan Med. Indus., Inc.*, 888 F.2d 815, 820 n.10 (Fed. Cir. 1989); *Middleton, Inc. v. 3M*, 311 F.3d 1384, 1389 (Fed. Cir. 2002)).) Third, Defendants argue that, "Dr. Kuhn did not demonstrate that *any* accused product, much less *all* of them, satisfied this limitation" because she did not establish that the products she measured were "representative of all accused products." (*Id.*)

The Court finds these arguments unpersuasive. First, the Court does not find that the terms of the Asserted Claims must necessarily be interpreted with mathematical precision. Rather, "the ordinary and customary meaning of a claim term is the meaning that the term would have to a personal of ordinary skill in the art in question at the time of the invention." *Phillips v. AHW Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). There is ample evidence in the record that a person of ordinary skill in the art would have understood the term "equal" to include some manufacturing variation. Defendants seek to elevate "equal" to mean "exactly equal" without any support in the evidence for such a construction.[6]

Dr. Subramanian admitted that "when a person of ordinary skill in the art is reading the '055 patent and reading the claim that says equal thickness on the upper surface and the sidewalls,

---

[6] Extending defendants argument to its logical conclusion, they would say that a person of ordinary skill in the art would not consider 1.0000000001 nm to be "equal" to 1.0000000002 nm. Defendants offer no evidence that such unerring precision is necessary in the relevant art such that the claims should be understood this way. In any event, Defendants seek in effect a post-verdict claim construction.

that person is reading the patent with the understanding of manufacturing tolerances." (Dkt. 496 at 99:20–100:1.) Dr. Kuhn testified that "you're going to see some level of manufacturing variation even in an extremely healthy uniform process." (Dkt. No. 491 at 102:11–13.) The jury was entitled to take this testimony into account in determining whether this limitation was met under its plain and ordinary meaning as understood by a person of skill in the art.

Second, the Court disagrees that the Federal Circuit has foreclosed any consideration of manufacturing tolerances in interpreting patent claims. To the contrary such considerations would be entirely appropriate if there is evidence that a person of ordinary skill in the art would understand the claims terms with these variations in mind. The Federal Circuit's decisions in *Senmed* and *Middleton* do not compel an opposite result. The *Senmed* court did not find that manufacturing tolerances were never relevant but found that they were not sufficient in that case to overcome prosecution history estoppel. *See* 888 F.2d at 820 & n.10. There is no similar prosecution history estoppel in this case.

In *Middleton*, the Federal Circuit criticized the patentee's reliance on a post-issuance supply contract showing manufacturing tolerances as evidence of a patent claim term. The Federal Circuit made the unremarkable observation that "[t]he meaning of a patent term . . . is not subject to revision or alteration by *subsequent* contract between the patentee and its suppliers." 311 F.3d at 1389 (emphasis added). What the *Middleton* court did *not* do, however, was to hold that manufacturing tolerances are never relevant. To the contrary, if such evidence "supplies some insight into the understanding of skilled artisans *at the time of invention*, it may have some relevance to claim construction." *Id.* (emphasis added). Here, KAIST has not attempted to revise the meaning of a claim term with a subsequent contract or other *post-hoc* evidence. Rather KAIST's experts—and Defendants' experts—testified that a person of ordinary skill in the art *at*

11

*the time* would have read the patent with manufacturing tolerances in mind. (*See, e.g.*, Dkt. 496 at 99:20–100:1.) The Court views this as entirely in keeping with *Phillips* and not afoul of the Federal Circuit's admonition in *Middleton*.

Finally, the Court finds that Dr. Kuhn provided substantial evidence that the accused products satisfied this limitation. As an initial matter, the Court agrees with KAIST that Defendants' criticism of the products Dr. Kuhn claimed were representative in her analysis is essentially a late-breaking, and thus waived, *Daubert* challenge. (Dkt. No. 592 at 9 (citing *Versata Software, Inc. v. SAP America, Inc.*, 717 F.3d 1255, 1264 (Fed. Cir. 2013)).) The reliability of Dr. Kuhn's analysis goes to the admissibility of Dr. Kuhn's opinion, not its sufficiency once offered. *See Stevenson v. E.I. DuPont De Nemours & Co.*, 327 F.3d 400, 407 (5th Cir. 2003).

Dr. Kuhn testified that she "analyzed transistors incorporating the Defendants' 14-nanometer bulk FinFET technology" and that this analysis was "representative of all the 14-nanometer LPE/LPP devices, chips, and products." (Dkt. No. 489 at 72:8–12, 73:21–24.) Dr. Kuhn testified that on average, "for the logic transistors, for all the data I had, was an upper surface measurement of 2.78 nanometers and a side-wall measurement of 2.65 nanometers," and for the I/O devices, "the upper surface on this one is 5.13, and the side-walls are 5.12, which is astonishingly close." (Dkt. No. 497 at 171:18–23, 172:9-15.) Defendants' own expert, Dr. Bob Wallace, admitted that "averaging would be appropriate" to measure "the thickness numbers at the top and sides of the Fin." (Dkt. No. 494 at 188:1–5.)

Further, Defendants' own internal documents confirm that the thickness was "equal on all sides." (Dkt. No. 490 at 16:5–24; PX0853 at 51.) Heedon Jeong, a senior engineer at Samsung, likewise testified that the thicknesses on all three sides of the Fin "are equivalent" and that "[t]here is no difference on the gate oxide on the sides and the gate oxide on the top of the fin." (Dkt. No.

12

493 at 47:16–20, 49:20–24.) Thus, there was substantial jury to conclude that the "first oxide layer" had "a thickness greater or equal to that of the gate oxide" in the accused products, and therefore that this limitation was met.

              **b.**        **There is substantial evidence of infringement by equivalents**

Even if this limitation were not literally met in the accused products, the jury had substantial evidence from which to find infringement under the doctrine of equivalents. Defendants argue that Dr. Kuhn's doctrine of equivalents analysis is insubstantial because it "does not focus on the differences in the *thicknesses* required by the claims." (Dkt. No. 602 at 6 (emphasis in original).) This argument is unpersuasive for two reasons. First, it is factually wrong. Dr. Kuhn testified that "under the doctrine of equivalents, the differences in the oxide layer *thicknesses* are insubstantial." (Dkt. No. 490 at 20:14–16 (emphasis added).) Second, it is legally inapposite. "Under the doctrine of equivalents, a product or process that does not literally infringe a patent claim may nevertheless be held to infringe 'if it performs substantially the same function in substantially the same way to obtain the same result.'" *Duncan Parking Techs., Inc. v. IPS Grps., Inc.*, 914 F.3d 1347, 1362 (Fed. Cir. 2019) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)). The test does not require an analysis of whether the relative dimensions are insubstantial. Dr. Kuhn provided competent testimony under the appropriate standard for the doctrine of equivalents. (Dkt. No. 490 at 20:17–25.)

Next, relying on *Lear Siegler, Inc. v. Sealy Mattress Co.*, Defendants argue that Dr. Kuhn's doctrine of equivalents analysis is "legally insufficient because it relies on the exact same 'manufacturing tolerances' she used for literal infringement." (Dkt. No. 578 at 16 (citing 873 F.2d 1442, 1425 (Fed. Cir. 1989)).) However, *Lear* does not stand for the proposition that a patentee cannot rely on the same theories for both literal infringement and the doctrine of equivalents. *Lear* merely requires "testimony explicitly comparing the claimed and accused devices as to all three

elements of equivalents" outlined in *Graver Tank*. 873 F.2d at 1426. Dr. Kuhn provided such testimony. (Dkt. No. 490 at 20:17–25.)

Finally, Defendants argue that KAIST's equivalents theory results in claim vitiation because it equates "greater than or equal to" with its polar opposite, "less than." (Dkt. No. 578 at 16 (citing *Moore U.S.A., Inc. v. Standard Reg. Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000)).) However, this is not the case. Rather, KAIST argues that manufacturing variations result in points of inequality because the layer is "bumpy at the atomic level." (Dkt. No. 592 at 15 (citing Dkt. No. 490 at 17:5–19:20).) Claim vitiation applies where "one of skill in the art would understand that the literal and substitute limitations are not interchangeable." *Brilliant Instruments, Inc. v. GuideTech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013). Defendants' own expert admitted that a person of ordinary skill in the art would read the claim language with manufacturing tolerances in mind. (Dkt. No. 496 at 99:20–100:1.) Thus, the it would not be clear to a person of skill in the art that "greater than or equal to" forecloses layers that are substantially equal within manufacturing tolerances.

### 4.   "a Fin active region which is a wall-shape single crystalline silicon"

Defendants argue that that the accused products do not meet the "wall-shape" Fin limitation of the claims because "the irrefutable evidence shows that the accused fin is parabola-shaped," which "is critical because, unlike a wall, a parabola has no clear demarcations between its sides and upper-surface." (Dkt. No. 578 at 17.) It is ironic that Defendants argue there are no clear demarcations between the sides and top of the Fins of the accused products *immediately* after devoting seven pages of their motion to arguing that the thickness of the first oxide layer on the upper surface of the Fin is not greater than or equal to the gate oxide layer of the sides of the Fin, seemingly having no problem distinguishing the upper surface from the sides. (*See* Dkt. No. 578 at 10–16.) Defendant's witnesses Dr. Wallace and Mr. Jeong had no issue distinguishing the upper

14

surface and sides of the Fins either. (Dkt. No. 494 at 194:11–14; Dkt. No. 493 at 49:7–50:12.) Dr. Kuhn explained that Defendants' devices have a Fin active region that is wall-shape and single crystal. (Dkt. No. 489 at 76:9–78:9.) This is substantial evidence in the record from which the jury could conclude that this limitation is met.

### 5.    Infringement by GlobalFoundries, Inc.

Defendant's challenge the jury's finding of infringement by GlobalFoundries, Inc. ("GFI"). Defendants do not dispute the finding of infringement as to GlobalFoundries U.S. Inc. ("GF US"), but dispute such finding as to GFI, as distinct from GF US, on the grounds that the undisputed evidence showed "that GFI is a holding company with no operations—including no sales, manufacturing, or other ordinary business activities." (Dkt. No. 578, at 18 (citing Dkt. No. 493 at 61:12–15, 72:2–74:16; Dkt. No. 494 at 50:13–14, 75:17–20).) The jury returned a verdict finding the "GlobalFoundries Defendants" liable for infringement but also finding such infringement was not willful and awarding $0.00 in damages for such infringement. (Dkt. No. 499.) The verdict defined the "GlobalFoundries Defendants" as "GlobalFoundries, Inc., and GlobalFoundries U.S. Inc., collectively." (*Id.* at 1.)

The Court notes with some level of frustration—as it did when Defendants objected to collective reference to "GlobalFoundries" for the *first time* after the close of all evidence—"that beginning with its preliminary jury instruction, the Court has indicated throughout the trial that the Defendants would be identified and referred to on that basis." (Dkt. No. 498 at 8:6–9.) Indeed, from the time they first introduced themselves to the venire panel, counsel for Defendants referred to GFI and GF US collectively as "GlobalFoundries." (Dkt. No. 487 at 11:14–16, 61:13–16 ("I am proud to be here . . . today representing the Defendants, Samsung, Qualcomm, and GlobalFoundries. Earlier you met representatives . . . of the three Defendants.").) Immediately after being sworn in, the Court instructed the jury members, without objection, that "throughout

the course of the trial you may hear [GFI and GF US] referred to collectively as either GlobalFoundries or as the GlobalFoundries Defendants." (Dkt. No. 488 at 11:8–10.) Defendants sat on their hands and never objected to this approach until all the evidence had been presented to the jury. In fact, from their opening statement onward, Defendants themselves regularly referred to "GlobalFoundries" as if it was a single defendant. (*Id.* at 64:12 ("GlobalFoundries is another Defendant involved here.").)

Thus, it was amply clear to the jury that references to "GlobalFoundries" throughout the trial would refer to *both* GFI and GF US. On that basis, the jury was free to credit evidence and testimony that "GlobalFoundries" infringed the Asserted Claims, including the opinions of Dr. Kuhn, as being equally applicable to both GFI and GF US. (*See, e.g.*, Dkt. No. 489 at 72:8–23, 73:25 *et seq.*) Indeed, in their cross-examination of Dr. Kuhn, Defendant's made no attempt to distinguish GFI from GF US. (Dkt. No. 491 at 94:19–23 ("Q. And you were asked to do an infringement analysis . . . of GlobalFoundries's products, right? A. Yes, sir.").)

The Court acknowledges that testimony was adduced at trial indicating that GFI is a holding company without operations. (*See, e.g.*, Dkt. No. 494 at 50:13–14.) However, the Rule 50(b) motion standard is not whether there was substantial evidence to support a finding contrary to the jury's verdict. Nor is the standard whether the Court sitting in place of the jury would have found the contrary evidence adequate to outweigh the evidence supporting the jury's verdict. Rather, the Court must determine whether there is substantial evidence to support the jury's verdict as those citizens returned it. The jury, being free to credit testimony about "GlobalFoundries" as

16

equally applicable to GFI and GF US, had substantial evidence from which to make a finding that GFI infringed the Asserted Claims.[7]

### C. Invalidity

Defendants assert that judgment as a matter of law "of invalidity is appropriate, as there is clear and convincing evidence that [the Asserted Claims] are invalid under 35 U.S.C. §§ 102, 103." (Dkt. No. 578 at 21.)

As an initial matter, the Court notes that Defendants argument that "Plaintiff conceded" that certain limitations are met in the prior art is unsupported in the record and misunderstands Defendants burden under Rule 50(b). (Dkt. No. 578 at 22.) KAIST did not stipulate that any limitations were met in the prior art. It was therefore Defendants burden to prove by clear and convincing evidence that *all* limitations were met in the prior art, and it is their burden now to demonstrate evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361. Having failed to point to any evidence to support such a conclusion as to several limitations, the Court finds that Defendants have failed to meet their burden.

The Court further finds that substantial evidence exists in the record from which the jury could have concluded that the limitations Defendants actually did challenge are not met in the asserted prior art.

---

[7] The Court observes that this issue has all the earmarks of the kind of challenge raised for the first time after a trial is complete and the appellate lawyers comb the record after the trial lawyers have left the field. Whether or not such is the case here, GFI is itself largely responsible for any problem about which it now complains. Here, GFI sat silently when the Court indicated these entities would be referred to collectively, and further, GFI regularly treated them as one and the same throughout the trial.

> **1.     Limitations appearing in both independent Claims 1 and 13**

Defendants argue that Claims 1–4 and 16–17 are invalid in view of U.S. Patent No. 5,844,278 ("*Mizuno (US)*").[8] Specifically, Defendants argue that four limitations that KAIST contended were not met by *Mizuno (US)* are in fact met. The Court notes that, though Defendants characterize this argument as directed only to certain Asserted Claims, if any of these four limitations are not met by *Mizuno (US)*, such evidence would support a finding of no invalidity as to independent Claim 1 and all of its dependent claims, i.e., Claims 1–6, 11–12, and 15–17. It would also support a finding of no invalidity as to independent Claim 13, which likewise contains each of these four limitations.

> **a.     "a bulk silicon substrate"**

Defendants argue that, on cross-examination, Dr. Kuhn conceded that *Mizuno (US)* does disclose a bulk silicon substrate. (Dkt. No. 578 at 22 (citing Dkt. No. 497 at 186:4–16; Dkt. No. 491 at 41:3–6, 42:12–14; PX-1290 at 9:1–4, Fig. 8A).) KAIST responds that Dr. Kuhn did no such thing. According to KAIST, Dr. Kuhn explained that *Mizuno (US)* was a silicon-on-insulator ("SOI") design and did not disclose a bulk silicon substrate. (Dkt. No. 592 at 20 (citing Dkt. No. 497 at 124:4–15, 129:16–130:12).) Dr. Kuhn agreed on cross-examination that Figure 8A of

---

[8] The Court distinguishes this reference from Japanese Published Patent Application No. 1996-139325 ("*Mizuno (JP)*"), which was not asserted by Defendants in this case and was asserted for the first time before the PTO *after* the jury's verdict in this case as part of Samsung's request for *ex parte* reexamination. (*See* Dkt. No. 651-2 at 3; 659-1 ¶ 2.) Indeed, Samsung specifically distinguished *Mizuno (JP)* from *Mizuno (US)* in its request for *ex parte* reexamination. (Dkt. No. 659-2 at 12 (stating that *Mizuno (US)* "is not part of any invalidity ground raised in this reexamination request").) The Court finds that consideration of *Mizuno (JP)* would be inappropriate on this record. Likewise, any attempt to overturn the jury's verdict, by this or another court, on such a basis would be inappropriate. *See Moffitt*, 66 U.S. at 283 (Title to money judgments for patent infringement "does not depend upon the patent, but upon . . . the judgment of the court."); *In re Swanson*, 540 F.3d at 1379 n.5 ("[A]n attempt to reopen a final federal court judgment of infringement on the basis of a reexamination finding of invalidity might raise constitutional problems.").

*Mizuno (US)*, shows "a protrusion extending up from its bulk substrate," (*Id.* (citing Dkt. No. 497 at 186:4–16)), but on redirect she clarified that the projection is connected to an SOI substrate, not a bulk substrate (*Id.* (citing Dkt. No. 497 at 195:8–18)).

The Court agrees that Dr. Kuhn clarified her testimony and reaffirmed her original testimony that *Mizuno (US)* does not disclose a bulk silicon substrate. This is substantial evidence from which the jury could conclude that Claim 1 and its dependents were not anticipated by *Mizuno (US)*.

                    **b.**      **"a source/drain region which is formed on both sides of the Fin active region except where said gate overlaps with the Fin active region"**

Defendants next argue that *Mizuno (US)* in fact discloses a "source/drain region which is formed . . . except where said gate overlaps with the Fin active region." Defendants acknowledge that Dr. Kuhn testified that *Mizuno (US)* does not disclose such, but that "the source/drain would be diffusing under the gate." (Dkt. No. 578 at 22 (citing Dkt. No. 497 at 132:25–134:20).) However, Defendants contend that KAIST offered no evidence of such but that the evidence shows the opposite, citing only *Mizuno (US)* itself and its own experts' interpretation of the reference. (*Id.* at 23 (citing PX1280 Fig. 8A; Dkt. No. 496 at 55:24–56:15; Dkt. No. 497 at 34:8–35:2).) Indeed, Defendants consistently argue that "Dr. Kuhn *contended* that" a limitation is not met, as if Dr. Kuhn's testimony is mere attorney argument and not competent evidence. (*See, e.g.*, Dkt. No. 578 at 22.) Dr. Kuhn's testimony that a limitation is not met is evidence that the jury was entitled to credit over Defendants' experts' testimony to the contrary.

Defendants do not explain why Dr. Kuhn interpreting *Mizuno (US)* one way is not substantial evidence but its own experts interpreting the reference another way is substantial evidence. The jury was free to credit whichever experts and their testimony it found to be credible.

There is substantial evidence in the record from which the jury could have concluded that this limitation is not met in *Mizuno (US)*.

c.    **"a Fin active region which is a wall-shape"**

KAIST's expert, Dr. Kuhn, opined that *Mizuno (US)* does not disclose a "wall-shape" Fin active region because there is no evidence *Mizuno (US)* uses the Fin shape and gates to create the fully depleted Fin active region. (Dkt. No. 497 at 131:1–132:24.) Defendants argue that this theory fails because Dr. Kuhn conceded that full depletion is not a requirement of the "wall-shape" term. (Dkt. No. 578 (citing Dkt. No. 497 at 186:17–24).) KAIST responds that Dr. Kuhn admitted only that the Court has not construed "wall-shape" to require full depletion but also explained that the term has a plain meaning to a person of ordinary skill in the art. (Dkt. No. 592 at 21 (citing Dkt. No. 497 at 131:1–132:24).) While Dr. Kuhn testifies that the "wall-shape" term is met because there is full depletion, she does not, in fact, ever link full depletion to the term "wall-shape" or explain why a person of ordinary skill in the art would understand "wall-shape" to require full depletion. (*See* Dkt. No. 497 at 131:1–132:24.)

However, it was not KAIST's burden to establish that this limitation is *not* met in *Mizuno (US)*. Rather, it was Defendants' burden at trial—and their burden on this motion—to identify evidence establishing that this limitation *has been* met by clear and convincing evidence. Defendants have not pointed to any such evidence, let alone evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361. Defendant have failed to meet their burden of establishing that this limitation was met.

20

### d. "a contact region and a metal layer which are formed at said source/drain and gate contact region"

Defendants concede that Dr. Kuhn testified that *Mizuno (US)* "does not disclose the 'metal layer which is formed at said source/drain and gate contact region' as Mizuno's 'aluminum wiring is not one of the source/drain with a gate,' but is 'sitting up further.'" (Dkt. No. 578 at 23 (quoting Dkt. No. 497 at 134:21-136:16).) However, Defendants argue that *Mizuno (US)* "expressly discloses otherwise," citing the reference itself and their expert's testimony that it discloses "aluminum wiring" used as a "metal wiring layer." (*Id.*; Dkt. No. 497 at 35:25–36:17.) Dr. Kuhn explained why, in her opinion, a person of ordinary skill in the art would not interpret this reference to "aluminum wiring" as meeting the "contact region and a metal layer" limitation:

> [A]luminum is a material that diffuses like made in a semiconductor device. And device engineers do not put aluminum anywhere near an active gate. So aluminum wiring is certainly used, but it's always used away from the gate. In a process with a metal contact, the usual material will be tungsten or a refractory material. So this aluminum wiring is not one of the source/drain with a gate.

(Dkt. No. 497 at 135:14–136:13.) The jury was free to credit this testimony over that of Defendants' experts, and it—without more—constitutes substantial evidence from which the jury could have concluded that this limitation is not met in *Mizuno (US)*.

### 2. Additional Limitations

As noted above, Defendants failure to meet their burden to show that *each* of the four limitations discussed above are met, as well as their failure to establish the limitations of Claims 1 and 13—which they do not even raise in their motion—are each an independently sufficient reason to uphold the jury's verdict on invalidity as to all of the Asserted Claims. Nonetheless, for completeness, the Court considers Defendants' arguments as to the additional limitations of Claim 13 and the dependent Asserted Claims. That done, however, the Court finds that Defendants have failed to meet their burden as to these limitations as well.

### a. Claims 5 and 6

Defendants argue that the additional limitations of Claims 5 and 6 are indisputably met under the Court's claim construction. Defendants argue that under the Court's construction, reducing "the parasitic capacitance between the gate and the bulk substrate," as required by Claim 5, "is satisfied by a second oxidation layer thickness between 20 nm and 800 nm." (Dkt. No. 578 at 23–24 (citing Dkt. No. 179 at 32).) Similarly, Defendants argue that the Court construed "the contact resistance is reduced," as required by Claim 6, to be met "merely by selecting the contact size to be greater than the fin width." (*Id.* at 23 (citing Dkt. No. 179 at 35–36).) Defendants argue that, because it is undisputed that *Mizuno (US)* discloses both of these structural elements—a "second oxidation layer" between 20 nm and 800 nm as well as a contact size greater than the fin width—that these limitations are met by *Mizuno (US)*. (*Id.* at 23–24.)

KAIST responds that the Court's construction is not an explanation of how the limitations are met, but an explanation of why the limitations are not indefinite in light of the teachings of the Asserted Patent. (Dkt. No. 592 at 22.) Though a limitation is not indefinite because the patent explains the steps required to meet it, it does not follow that any reference disclosing these steps also discloses the limitation. The Court agrees that without the teachings of the Asserted Patent, it would not be clear how to satisfy these limitations. (*Id.*; *see also* Dkt. No. 179 at 32, 35–36.)

Dr. Kuhn explained why *Mizuno (US)* failed to meet these limitations. (Dkt. No. 497 at 138:6–139:11.) The jury was free to believe her testimony over Defendants' experts' contrary testimony.

### b. Claim 13

In its argument with regard to the additional limitation of Claim 13, "enlarging the width of said Fin active region within the oxidation layer as it approaches the bulk substrate," Defendants again note Dr. Kuhn's testimony that this limitation is not met by *Mizuno (US)*, but then argue that

it is "indisputably" the opposite, citing their own expert's testimony and *Mizuno (US)* itself. (Dkt. No. 578 at 24 (citing Dkt. No. 497 35:7–24, 140:22–141:21; Dkt. No. 496 at 67:10–69:6; PX1290, fig. 18.)

The fact that Dr. Kuhn disputed that this limitation was met means it is not "indisputably show[n]." (*Id.*) Dr. Kuhn and Dr. Subramanian both offered competent expert opinions about their respective interpretations of Figure 18 of *Mizuno (US)*. The jury was free to credit either one and the Court will not substitute its judgment for that of the jury's where substantial evidence to support the jury's finding exists.

### c.    Claims 11, 12, and 15

Defendants argue that Claims 11, 12, and 15 are invalid as obvious based upon combinations of *Mizuno (US)* and U.S. Patent Pub. No. 2002/0011612 ("*Hieda*") or *Mizuno (US)* and U.S. Patent No. 6,355,532 ("*Seliskar*"). (Dkt. No. 578 at 24–25.) Dr. Kuhn explained why a person of skill in the art would not be motivated to combine these references. (Dkt. No. 497 at 149:23–151:3, 154:15–157:16.) This is substantial evidence that the jury was entitled to credit in finding that the claims were not obvious.

### D.    Willfulness

Samsung challenges the jury's finding that it willfully infringed the Asserted Claims and requests judgement as a matter of law of no willfulness. (Dkt. No. 580.) KAIST opposes this motion and in its own motion requests that the Court enhance the damages awarded by the jury as a result of Samsung's willfulness. (Dkt. No. 586.) The Court concludes that there is substantial evidence to support the jury's finding of willfulness and that such willfulness warrants

enhancement of the damages awarded to KAIST. The Court therefore awards KAIST two times the amount of damages that the Court finds are supported by the evidence.[9]

### 1.    Judicial Estoppel

As a threshold matter, Samsung argues that KAIST is judicially estopped from arguing that Samsung acted willfully because it previously argued to the Court that Samsung did not rely on the Asserted Patent at all and because the Court accepted such an argument in finding against Samsung on its defense of equitable estoppel. However, Samsung's argument in this regard misunderstands this Court's prior fact-finding. In the Court's view, it's prior finding that Samsung did not "rely on a belief that Professor Lee would never assert the '055 patent when it decided to adopt the patented technology" (Dkt. No. 574 at FF 140; *see id.* at FF141–FF152) is not "plainly inconsistent" with a finding of willfulness, *In re Oparaji*, 698 F.3d 231, 235 (5th Cir. 2012).

The Supreme Court in *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, described conduct warranting enhancement under § 284 as "willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate." 136 S. Ct. 1923, 1932 (2016). Where an individual or entity takes another's property without any regard for whether or not the victim is entitled to that property or will later seek to reclaim it, such conduct is "characteristic of a pirate" and equally characteristic of a lack of reliance on—or a lack of regard for—the conduct of the property owner. *Id.*

The Court found that Samsung thought the '055 Patent "was not quite important" and thus "did not pay really much attention to [it]." (Dkt. No. 574 at FF143 (quoting Dkt. No. 547-9, at

---

[9] The Court makes this determination mindful of the actual amount of damages the Court finds are supported by the evidence, as such is relevant to at least *Read* Factor 4. The Court makes this enhancement determination in order to determine an appropriate remittitur to offer KAIST. Should a jury in a new damages trial award a meaningfully different amount, the Court will, in such event, entertain motions to reconsider its decision with regard to enhancement.

113:25–114:8).) Samsung was "going to invest in creating a sub-20 nm process node *regardless* of the '055 Patent." (*Id.* at FF150 (emphasis added).) Samsung's knowledge of and subsequent disregard of the '055 Patent is equally consistent with a finding of willfulness as it is with a finding of no reliance. The Court concludes that KAIST is not judicially estopped from asserting that Samsung's conduct was willful.

### 2.    Substantial Evidence

Samsung next argues that KAIST failed to adduce substantial evidence to support a finding of willfulness. Samsung argues that no reasonable jury could have found that it copied the '055 Patent based upon two presentations given by Prof. Lee, the inventor of the '055 Patent, in 2006 and 2012. (Dkt. No. 580 at 6–8.) Samsung also argues that Dr. Kuhn was an inappropriate witness to testify about Samsung's alleged copying. (*Id.* at 8–11.) Samsung asserts that its pre-suit knowledge of the patent alone cannot support a finding of willfulness. (*Id.* at 11–12.) Additionally, Samsung argues that KAIST has failed to identify any non-patent materials upon which Samsung may have relied that fully disclose the invention of the '055 Patent. (Dkt. No. 603 at 2.)

KAIST responds by citing inventor and expert testimony that Prof. Lee's publication practiced the '055 Patent. (Dkt. No. 594 at 1 (citing Dkt. No 488 at 89:24–98:8, 93:15–94:15, 95:10–12; Dkt. No. 489 at 65:11–24, 66:12–67:16).) The presentations Prof. Lee gave to Samsung expressly discussed these publications. (*See, e.g.*, PX1608 at 9, 10; Dkt. No. 488 at 93:15–19.) KAIST also cites evidence that as early as 2002 Samsung was aware that Prof. Lee had filed for a patent for his invention and that he asked Samsung to take a license. (Dkt. No. 594 at 4–5.) Prof. Lee testified that Samsung was again approached about the patent in 2011 and 2012. (Dkt. No. 489 at 29:11–15.) The jury also heard that it was not until two to three years after this notice that the accused product was completed and the first infringement occurred. (Dkt. No. 494 at 7;17–8:8; Dkt. No. 493 at 48:20–23; Dkt. No. 491 at 212:25–213:3; Dkt. No. 497 at 71:25–72:2.)

25

In sum, KAIST adduced evidence that Samsung "was aware of the [Asserted Patent] prior to the current litigation," that the parties had "prior business dealings from which the jury could have inferred that [Samsung] believed that it needed [a] license," and "circumstantial evidence that [Samsung] copied [Prof. Lee's] technology." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1245 (Fed. Cir. 2017) This is substantial evidence to support a conclusion that "subjective recklessness led to willful infringement in this case." *Id.* Although Samsung "dispute[s] several of these facts, the jury was free to decide whose evidence it found more compelling on the question of willfulness." *Id.* Having such freedom, the jury reached a verdict that this Court must accept and respect.

### 3.    Enhancement

Having determined that there is substantial evidence to support the jury's finding of willfulness, the Court next turns to the question of enhancement under § 284. Considering the factors set forth by the Federal Circuit in *Read Corp. v. Portec, Inc.*, the Court finds that enhancement is warranted in this case. 970 F.2d 816, 827 (Fed. Cir. 1992).

*Read* Factor 1: As the Court has discussed, KAIST adduced evidence showing that Samsung had access to Prof. Lee's designs while it was developing the accused product, which tends to show that Samsung "deliberately copied the ideas or design of another." *Id.*

*Read* Factor 2: While Samsung asserted at trial reasons that it felt it did not infringe, the Court does not find any specific evidence of any investigation undertaken by Samsung which would have reasonably allowed it to arrive at this belief. (*See* Dkt. No. 607 at 6–7; Dkt. No. 616 at 2–3.) Accordingly, the Court does not find that Samsung "investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed." *Read*, 970 F.2d at 827.

26

*Read* Factor 3: The Court agrees with Samsung that its "behavior as a party to the litigation" is more appropriately analyzed in the context of KAIST's pending § 285 motion. *Id.*; *see Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 120-21 (E.D. Tex. 2017). That Court leaves that analysis to that context.

*Read* Factor 4: The Court agrees with Samsung that its "size and financial condition" are appropriate to consider as a potential mitigating factor rather than as a reason for enhancement. *Read*, 910 F.2d at 827; *see Idenix Pharms. LLC v. Gilead Sciences, Inc.*, 271 F. Supp. 3d 694, 701 (D. Del. 2017).

*Read* Factor 5: Samsung points to two issues in attempting to show the "[c]loseness of the case." *Read*, 910 F.2d at 827. First, Samsung notes that KAIST did not seek summary disposition on many of the issues ultimately tried to the jury. (Dkt. No. 607 at 11.) Second Samsung argues that it "had a strong argument, based on the Intel license, that damages for all Defendants should be no higher than $7.4 million." The jury's verdict awarding $400 million against Samsung alone is a fairly clear indication that Samsung's damages argument was not strong. Moreover, the Court does not view KAISTs decision not to seek summary disposition as dispositive. While the Court finds ample evidence to support the jury's verdict, which found against Samsung in every respect, the Court does not view the case as so close or not close as to meaningfully impact its decision to enhance the damages award.

*Read* Factor 6: The "duration of [Samsung's] misconduct" is relatively short. *Read*, 910 F.2d at 827. Infringement did not occur until 2015 and this case was brought in November of 2016. (*See* Dkt. No. 607 at 12.) However, the Court also considers as relevant Samsung's pre-infringement misconduct that later ripened into infringement. Other *Read* factors, including *Read* factor 1, make clear that pre-infringement conduct is relevant to the issue of enhancement. In that

27

respect, Samsung's misconduct began at least as early as 2011. (*See id.*) The Court views this factor as slightly favoring enhancement.

*Read* Factor 7: The Court does not agree with Samsung's assertion that its failure to take "[r]emedial action," *Read*, 970 F.2d at 827, is not relevant so long as the defendant disputes the jury's verdict. (Dkt. No. 607 at 12.) The Court expects that most defendants will not agree with a finding of an infringement, and it would completely obviate this factor if a defendant could avoid it simply by challenging the verdict.

*Read* Factor 8: The Court finds no evidence from the record that Samsung had a "motivation to harm" the patentee. *Read*, 970 F.2d at 827.

*Read* Factor 9: The Court finds some evidence that "defendant attempted to conceal its misconduct." *Read*, 970 F.2d at 827. KAIST points to conduct that occurred during the development of the accused product, though not to evidence that Samsung's actual infringement was concealed from KAIST. (Dkt. No. 586 at 15.) The Court views Samsung's pre-infringement misconduct, ultimately ripening into infringement, as having some relevance to the issue of enhancement. Accordingly, Samsung's repeated statements to Prof. Lee that they could not commercialize his invention while simultaneously developing the accused product, counsels in favor of enhancement. (*Id.* (citing PX1374 at 1; PX2068 at 1).)

Taking all these factors together, the Court finds that enhancement is warranted but not to the full extent allowed by § 284. Accordingly, the Court awards KAIST two-times, but not three-times, the amount of damages under § 284.

## IV.   THE PARTIES' MOTIONS RELATED TO DAMAGES AND NEW TRIAL

Samsung also moves for judgment as a matter of law on damages (Dkt. No. 577) and, separately, for a new trial, potentially conditioned on a remittitur (Dkt. No. 579). These issues are closely related. Therefore, the Court addresses them together.

### A.    New Trial on Damages

In its Damages JMOL, Samsung asserts that there is no evidence to support the jury's finding on damages and that the evidence at trial supports only its asserted damages theory—that damages should be no more than $6,200,000. In its Motion for New Trial, Samsung argues that the grounds asserted in its Damages JMOL in the alternative warrant a new trial that could be conditioned on a remittitur. The Court agrees with Samsung that the evidence proffered at trial is insufficient to support the jury's verdict of $400,000,000 against Samsung. However, the court disagrees that $6,200,000 is the appropriate amount to award in place of the jury's verdict.

The Federal Circuit applies regional circuit law to a court's decision to grant a remittitur or new trial. *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). Whether to grant a new trial or remittitur is within the discretion of the district court. *Id.* The Fifth Circuit follows the maximum recovery rule in deciding the amount of a remittitur. *Longoria v. Hunter Express, Ltd.*, 932 F.3d 360, 364–65 (5th Cir. 2019). Under this approach, the court should "award the highest amount the jury could have awarded." *Id.* at 364. This approach "preserves as much of the jury's award as possible" and is the "only remittitur approach . . . compatible with the Seventh Amendment." *Id.* at 365; *see also* 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2815 (3d ed. 2019).

Applying this approach, the Court determines that the maximum amount the jury could have awarded, based upon the evidence adduced at trial, is $101,501,708. Incorporating the

29

Court's determination regarding enhancement under § 284 discussed herein, the Court therefore conditions a new trial on damages on a remittitur of $203,003,416.[10]

### 1. Running royalty evidence was insufficient to support the jury's lump-sum verdict

In its first argument in its Damages JMOL, Samsung argues that running royalty evidence, such as that adduced by KAIST, is insufficient "as a matter of law" to support a lump-sum verdict like the one returned by the jury. (Dkt. No. 577 at 5.) In response, KAIST argues that no authority from the Federal Circuit prohibits the use of running-royalty evidence to award lump-sum damages. (Dkt. No. 593 at 1–2.) KAIST also argues that substantial evidence supported the jury's award of a lump sum beyond the $321,438,451 amount, which KAIST's damages expert, Roy Weinstein, testified was "the 'minimum amount' for the limited damages period of November 29, 2016 to May 14, 2018." (*Id.* at 2 (citing Dkt. No. 491 at 209:10–16); *see also id.* at 2–4.)

The Court agrees with KAIST that running-royalty evidence may be used to arrive at a lump-sum damages award so long as "some basis for comparison . . . exist[s] in the evidence presented to the jury." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326–30 (Fed. Cir. 2009). However, the Court disagrees that such evidence was presented in this case. The jury heard evidence that the minimum amount of damages adequate to compensate KAIST during the November 29, 2016 to May 14, 2018 period was $321,438,451. (Dkt. No. 491 at 208:5–7.) Of this amount, $219,936,743 is attributable to speed and power efficiencies derived from the invention and $101,501,708 are attributable to manufacturing cost savings derived from the invention. (*Id.*

---

[10] The Court disagrees with Samsung's assertion that if the Court finds the jury's verdict unsupported by the evidence its only option is to award $6,200,000, the amount Samsung asserted at trial, or that KAIST has waived it's right to a new trial. (*See* Dkt. No. 604 at 10.) The maximum recovery rule requires the Court to remit the highest amount supported by the evidence. Moreover, Samsung itself moved for a new trial. (Dkt. No. 579.)

at 204:22–207:25.) However, the jury was not presented with evidence from which to extrapolate beyond this period to award damages for the entire life of the patent, such as a per unit royalty rate or evidence of the anticipated number of units to be sold throughout the life of the patent.[11]

While the Court finds the jury's damages award unsupported by the evidence, the proper remedy is not to disregard KAIST's damages theory in its entirety. Rather, the maximum recovery rule requires the Court to award the maximum amount the jury could have awarded based upon the evidence. Mr. Weinstein clearly testified that Samsung was entitled to at least $321,438,451, although neither he nor any other expert gave the jury a basis to extrapolate beyond that number. Thus, the Court concludes that under the maximum evidence rule, it should award $321,438,451 or that portion of it that is otherwise supported by the evidence.

### 2. KAIST adduced substantial testimony accounting for the Intel license

Samsung argues that KAIST's evidence of damages is insubstantial because its expert, Mr. Weinstein, disregarded a license to the Asserted Patent taken by Intel, "giving it lip service but failing to incorporate it into his analysis." (Dkt. No. 577 at 6.) As an initial matter, the court notes that Samsung brings this motion under Federal Rule of Civil Procedure 50(b), challenging the sufficiency of the evidence presented at trial, not under Federal Rule of Evidence 702, challenging the reliability and admissibility of the evidence. Having failed to raise such an admissibility challenge before now and under Rule 50(a), the Court finds that such an argument has been procedurally waived. (*See* Dkt. Nos. 225, 505.)

---

[11] Mr. Weinstein noted only his per unit royalty rate for smartphones, which is $4.74. The parties in their briefing have had to rely on Mr. Weinstein's demonstratives, which are not evidence, to establish Mr. Weinstein's other royalty rates. (*See* Dkt. No. 577 at 16 (citing Dkt. No. 491 at 206:4–20; PDX 6.49).)

The first of the fifteen *Georgia-Pacific* factors is "the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970). Under this factor, the Intel license was certainly relevant for the jury to consider in reaching is damages decision. Indeed, the record reflects that the jury heard substantial testimony about the Intel license and its disputed comparability or non-comparability to the hypothetical negotiation between the patentee and Defendants. (*See* Dkt. No. 491 at 193:9–198:9; Dkt. No. 497 at 55:20–56–12; 59:23–61:14.) The Court also instructed the jury that, "[i]n determining the reasonable royalty" it may consider "whether the patent owner had an established royalty for the invention." (Dkt. No. 498 at 64:22–25.)

The jury was made well aware of the Intel license and why it should be relevant to their considerations. However, the jury also heard substantial testimony regarding why the hypothetical negotiation between the patentee and the Defendants would have differed from the negotiation between the patentee and Intel. (Dkt. No. 194:8–197:20.) The jury was free to credit this testimony in reaching their final determination on damages.

The cases cited by Samsung are inapposite. *Laser Dynamics, Inc. v. Quanta Computer, Inc.* addressed whether an expert's testimony was reliable under FRE 702, not whether there was sufficient evidence to support the jury's verdict. 694 F.3d 51, 79 (Fed. Cir. 2012). In *Whitserve, LLC v. Computer Packages, Inc.*, the Federal Circuit found an expert's testimony insufficient to support the jury's verdict because the expert simply "recited each [*Georgia-Pacific*] factor and [made] a conclusory remark about its impact on the damages calculation before moving on," not because the expert failed to consider a comparable license. 694 F.3d 10, 31 (Fed. Cir. 2012). These cases do not fit the evidence presented in this trial to this jury.

32

### 3. The evidence in the record establishes a proper apportionment analysis

Samsung argues that KAIST failed to introduce evidence of damages "tied directly to the *incremental value* of the asserted patent" and thus failed to adduce substantial evidence to support its damages theory. (Dkt. No. 577 at 9 (emphasis original).) Specifically, Samsung argues that KAIST failed to properly apportion (1) the improvements in bulk FinFET technology represented by the invention; (2) the power-and-speed benefits and cost savings attributed to Samsung's investment in the technology; and (3) the smallest salable patent practicing unit. (*Id.* at 9–16.) The Court finds that KAIST's damages evidence properly considered and took account of other improvements in the technology and Samsung's own investment. However, the Court finds that Mr. Weinstein failed to establish that his varied royalty rates between smartphones, tablets, and stand-alone chips properly credit the value attributable to the Asserted Patent. Therefore, the Court finds no substantial evidence to support Mr. Weinstein's damages attributable to the power-and-speed benefits.

As a threshold matter, the Court notes that Defendants did not challenge the admissibility of KAIST's experts' apportionment opinions as disclosed in their expert reports. Therefore, any such challenges are procedurally waived and the Court reviews Samsung's challenges only for the sufficiency of the evidence admitted at trial. *Stevenson*, 327 F.3d at 407.

### a. KAIST's experts properly considered the Asserted Patent's improvement over the prior art

Samsung argues that KAIST incorrectly assumed that the Asserted Patent alone was "responsible for *all* benefits of moving from the prior planar mode to the 14 nm bulk FinFET node." (Dkt. No. 577 at 10 (emphasis in original).) Accordingly, Samsung argues, the evidence adduced cannot support the jury's verdict because it failed to "consider the *incremental advancement of the*" Asserted Patent. (*Id.* at 11 (emphasis in original).)

33

KAIST responds that its experts did in fact analyze the prior art designs and concluded that they did not work and accordingly assigned them no value. (Dkt. No. 593 at 15–16.) Dr. Kuhn testified that she analyzed the prior art designs and concluded that "[t]hey just don't work" and that she "couldn't very well calculate benefits . . . from something that doesn't actually work." (Dkt. No. 491 at 36:14–24, 110:9–17.) Another of KAIST's experts, David Witt, similarly testified that if there had been "any type of FinFET device that had gone into production -- you know, people would have used it. I believe all previous attempts at it -- were not successful." (*Id.* at 164:11–22.) He concluded that because no such device was "reduced to practice, then . . . they have no attributable benefit." (*Id.* at 157:5–9.)

Instead, KAIST's experts analyzed the performance improvements of the 14 nm bulk FinFET design over the then dominate 20 nm planar transistor design. (*Id.* at 22:24-23:5, 126:5-12.) They also compared the cost saving of the 14 nm bulk FinFET design over the prior art 28 nm planar transistor design (which was cheaper to manufacture than the 20 nm design). (*Id.* at 28:5-29:3, 136:4-11.)

The jury heard competent testimony that the prior attempts at a FinFET design were unsuccessful and entitled to no value and thus the proper comparison was the incremental value of the patent over the commercially viable alternatives. The jury was free to credit this testimony.

> **b.** **The evidence adduced properly accounts for Samsung's contributions to the technology**

Samsung next argues that KAIST's damages theory failed to account for Samsung's contributions to the technology, specifically the hafnium oxide layer added by Samsung and Samsung's $300,000,000 investment in research and development. (Dkt. No. 577 at 11–14.)

With regard to the hafnium oxide layer, Dr. Kuhn testified that the 20 nm planar transistor, to which she compared the 14 nm bulk FinFET design, also included a hafnium oxide layer. (Dkt.

No. 491 at 22:24–23:5, 104:13–107:24.) Thus, Dr. Kuhn properly accounted for the hafnium oxide, present in the accused product and the prior art, and concluded that the benefits she identified were attributable to the bulk FinFET taught by the Asserted Patent, not the hafnium oxide layer. (Dkt. No. at 107:16–24.)

As to Samsung's $300,000,000 investment in the technology, KAIST argues that these costs were credited back in the 88% of benefits from the Asserted Patent that Mr. Weinstein opined Samsung should keep in the hypothetical negotiation. (Dkt. No. 593 at 16; *see also* Dkt. No. 491 at 208:1–14 ("[Samsung] gets to keep almost 2.4 billion [dollars]. Those are the -- that's its 88 percent share of the benefits.").) Second, KAIST argues that Dr. Kuhn explained that it would be inappropriate to credit this investment because Samsung was going to need to make an investment in a new node regardless. (Dkt. No. 593 at 17; *see also* Dkt. No. 491 at 108:21–109:23 ("Because of the way the industry is structured, there is going to be another node, and so there's the expense of going into manufacture. They are going to run another node no matter what. And it's not fair to attribute the cost of what is going to inevitably happen.").)

As KAIST aptly notes, Samsung obviously disagrees with KAIST's experts, "but this is what jury trials are for." (Dkt. No. 593 at 17.) The jury was free to consider Samsung's adduced testimony about these investments, but it was also free to credit KAIST's expert's analysis about these factors and conclusions that they did not entitle Samsung to a reduction in the royalty to be paid.

           **c.**        **There is not substantial evidence to support Mr. Weinstein's apportionment between smartphones, tablets, and stand-alone chips**

Samsung argues that Mr. Weinstein failed to tie his damages analysis to the smallest salable unit. Samsung says he applied his regression analysis to end-user smartphones and tablets and then apportioned down from there to stand alone chips. (Dkt. No. 577 at 15–16.) Mr. Weinstein provides

a detailed regression analysis in which he excludes all other variables that impact price other than speed and power and offers an opinion about the value increase in a smartphone or tablet attributable to a one-percent increase in speed (or power converted to speed). (Dkt. No. 491 at 188:6–14.)

However, Mr. Weinstein then summarily opines that this value should be "apportioned" down to the chip level for stand alone "SoCs not sold in phones." (*Id.* at 188:15–18.) Mr. Weinstein does not explain how or why he arrived at this apportionment. There is no explanation in the record as to why the speed and power benefits ultimately realized in the completed phone or tablet should not be captured by the stand-alone chip, which allegedly practices the Asserted Patent and will ultimately be incorporated into such a device. Without any explanation, the jury had no substantial evidence from which to conclude that the royalty rate for the smartphones and tablets properly captured the incremental value of the Asserted Patent, whether the much lower royalty rate for the stand-alone chips properly captured that amount, or whether it was somehow both.

The Court agreed with the conclusion of the Magistrate Judge, who initially heard Samsung's *Daubert* challenge, that Mr. Weinstein's report "concludes the sales prices of Samsung's devices increase by an amount tied to the benefits stemming from the accused processors" and that "[t]his approach stays sufficiently clear of the concerns addressed by the 'smallest salable unit' principle." (Dkt. No. 453 at 6.) Nonetheless, at trial, Mr. Weinstein gave no explanation for his apportionment between stand-alone chips and end-user devices or why they should be entitled to such disparate royalty rates despite both practicing the Asserted Patent. There is not, for example, testimony that end-user devices practice the patent *more* than stand-alone chips by perhaps including more transistors than the stand-alone chips. Nor is there testimony that the speed-and-power benefits are somehow more manifest in the end-user devices than in the stand-

36

alone chips. Indeed, such testimony would seem like a concession that some of the benefits being attributed in the end-user devices are attributable to something other than the Asserted Patent since both the end-user device and the stand-alone chip both practice the patent.

Absent any explanation for his apportionment between end-user devices and stand-alone chips, there was not substantial evidence from which the jury could include that the $219,936,743 attributed to speed and power efficiency were properly apportioned. (*See* Dkt. No. 491 at 206:4–20.) The Court thus excludes these damages from its offer of remittitur as unsupported by the evidence.

        **4.**      **KAISTs evidence of damages is consistent with the rules of the hypothetical negotiation**

            **a.**      **There was substantial evidence to support a finding that KAIST would receive 12% of the profits attributed to the Asserted Patent**

Samsung next criticizes Mr. Weinstein's calculation of damages based on a profit-share ratio of 12%. (Dkt. No. 577 at 17.) As an initial matter, the Court notes that there is no evidence that the jury, in fact, credited Mr. Weinstein's testimony that KAIST was entitled to 12% of the profits attributed to the Asserted Patent. KAIST asked for approximately $321 million for a roughly 18-month damages period as part of a running royalty. The jury instead awarded $400 million in a lump-sum award for the entire life of the patent. This amount is substantially less than that which KAIST would have received over the life of the patent had the jury agreed with Mr. Weinstein. Consequently, it is substantially less than Mr. Weinstein's proposed 12% profit share.

Additionally, the Court again notes, that Samsung brings this motion to challenge the sufficiency of the evidence, not its reliability or admissibility under FRE 702. Samsung did not challenge the admissibility of Mr. Weinstein's 12% figure under *Daubert* or via any other pre-trial

mechanism and has procedurally waived such an argument, which it raised for the first time after all such evidence was presented to the jury. (*See* Dkt. Nos. 225, 505.)

Finally, Samsung challenges the sufficiency of the evidence by making arguments to the Court that it never made in front of the jury. (*See* Dkt. No. 577 at 17–18 (citing no testimony or argument in the record challenging Mr. Weinstein's 12% figure).) The Court will not sit in the place of the jury and entertain evidence and arguments on a Rule 50(b) motion that were not heard by the jury at trial. Samsung has presented no evidence in the record to contradict or challenge Mr. Weinstein's opinion that a 12% profit share is appropriate, let alone evidence "so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361.

### b.    Mr. Weinstein's testimony regarding actual sales and profits was proper and relevant for the jury to consider

Samsung next faults Mr. Weinstein for basing his opinion on "actual financial data" generated after the hypothetical negotiation rather than "any contemporaneous financial projections the parties" might have actually considered as part of the hypothetical negotiation. (Dkt. No. 577 at 19.) However, as Samsung itself admits, the Federal Circuit has stated that "the hypothetical negotiation analysis permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009).

Samsung's argument appears to be that Mr. Weinstein improperly instructed the jury that the parties in the hypothetical negotiation "have access in a sense to information about the future, to the future sales, the future profits associated with using the technology." (Dkt. No. 577 at 19 (citing 176:16–177:9).) However, Mr. Weinstein did not instruct the jury on the law. The Court did. In doing so, the Court properly instructed the jury that "[e]vidence of things that happened

after the infringement first began may be considered in evaluating the reasonably royalty only to the extent the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation." (Dkt. No. 498 at 63:5–9.) The Court also instructed the jury that they should "determin[e] a reasonable royalty *at the time of the hypothetical negotiation.*" (*Id.* at 63:12–13 (emphasis added).)

The Court concludes that Mr. Weinstein's testimony relying upon actual financial data was appropriate for the jury to consider and that the jury was properly instructed on how to weigh this after-infringement information in considering what would have resulted from the hypothetical negotiation. The Court thus finds that this was appropriate and is substantial evidence that supports the jury's verdict.

### c.   Mr. Weinstein's regression analysis was reliable

Samsung renews its challenge, first made in its *Daubert* motion to exclude Mr. Weinstein's testimony, that Mr. Weinstein's regression model, which he uses to determine his speed-and-power-efficiency damages, was unreliable for failing to consider certain variables. (Dkt. No. 577 at 21; *see also* Dkt. No. 491 at 183:13–15; Dkt. No. 225.) As an initial matter, the Court notes that it has already excluded these damages on other grounds.

However, the Court agrees with the Magistrate Judge that this issue "amounts to a disagreement between experts as to what variables should be considered. That goes to the weight to be given to the opinion rather than its admissibility." (Dkt. 453 at 4.) The Court also agrees with KAIST that the proper means for Samsung to address these alleged disparities was through the crucible of cross-examination. The jury was free to credit Mr. Weinstein's testimony as well as any testimony challenging the variables he chose. While the Court finds this portion of Mr. Weinstein's damages opinion unsupported on other grounds, the Court does not conclude that

substantial evidence did not exist due to any alleged impropriety with Mr. Weinstein's regression model.

> **5.    There is no evidence to support Samsung's argument that exhaustion applies to any chips considered in Mr. Weinstein's analysis**

Samsung argues that KAIST "effectively sought both a first royalty from SAS for making Snapdragon chips and also a second royalty from SAS's downstream customer SEA for selling devices including Snapdragon chips." (Dkt. No. 577 at 21.) Samsung then cites to portions of Mr. Weinstein's testimony describing speed and power efficiency damages and cost savings damages analysis, which at no point mentions SAS or SEA. (*Id.* at 21–22 (citing Dkt. No. 491 at 202:15–205:16, 206:4–8, 206:21–208:14).) It then concludes without further citation, "Thus, [KAIST] included in its damages calculation both the SAS chips and also the SEA mobile products containing those same chips." (*Id.* at 22.) The Court agrees with KAIST that this is "an entirely new factual theory that was never presented to the jury." (Dkt. No. 593 at 25.) The Court finds no evidence in the record to support it.

The Court has already noted that it will not substitute itself in the place of the jury and entertain new evidence not presented to the jury at trial. There is no indication in the record, one way or another, whether chips in SAS and SEA products have been counted twice. As such, there is certainly no evidence that "points so overwhelmingly in favor of one party that reasonable jurors could not arrive at any contrary conclusion." *Core Wireless*, 880 F.3d at 1361.

In sum, the Court finds that the jury's damages verdict is unsupported by the evidence because there was not substantial evidence from which the jury could calculate a royalty beyond the damages period to which Mr. Weinstein opined or conclude that Mr. Weinstein's apportionment of speed and power efficiency damages was proper. However, under the maximum recovery rule, the Court finds that up to $101,501,708, representing the amount of damages Mr.

Weinstein opined were attributable to cost savings, is supported by the evidence. (*See, e.g.*, Dkt. No. 491 at 207:5–20.)

### B.   New Trial on Liability

While the Court concludes that a new trial on damages, subject to remittitur, is appropriate, the Court disagrees with Defendants that a new trial on infringement and invalidity is likewise warranted. The Court finds no passion or prejudice in the jury's verdict or any other prejudicial error that would make a remittitur inappropriate and a complete new trial necessary. *See Evers v. Equifax, Inc.*, 650 F.2d 1793, 798 (5th Cir. 1981).

Defendants incorporate by reference their motions for judgment as a matter of law in arguing that the jury's verdict is against the great weight of the evidence. For the reasons discussed above, the Court disagrees. Each of the issues disputed in Defendants' motions for judgment as a matter of law boil down to a battle between the experts. The Court does not find that testimony proffered by one side so greatly outweighs the testimony proffered by the other as to warrant a new trial.

The Court likewise disagrees that a new trial is warranted because Dr. Subramanian was not permitted to testify that the "first oxide layer" cannot comprise two separate layers or that the "first oxide layer" and the "gate oxide layer" limitations must be met by two distinct structures. The Court finds that both of these opinions were properly excluded.

### 1.   The jury's verdict does not reflect passion and prejudice

Samsung argues that the jury's verdict reflects passion and prejudice because the jury awarded an amount in excess of what KAIST requested as to Samsung but awarded no damages as to Qualcomm and GlobalFoundries. (Dkt. No. 579 at 15.) Samsung further argues that the jury's finding of willfulness only as to it also reflects passion and prejudice. (*Id.*)

While the Court ultimately concludes that the $400,000,000 verdict awarded by the jury was not supported by the evidence, the Court does not conclude that it was excessive in a manner that reflects prejudice. The jury heard expert testimony that KAIST should be awarded $321,438,451 for a roughly 18-month damages period as part of a running-royalty award. Instead, the jury awarded $400,000,000 as a lump-sum royalty covering the entire life of the patent. This is not more than KAIST asked for. It is less—significantly less over the life of the patent. Thus, the Court finds that the jury's verdict does not reflect passion and prejudice but a reasoned and measured attempt to try to extrapolate a running-royalty request into an appropriate lump-sum award.

That Samsung's co-defendants were assessed no damages does not indicate passion or prejudice on the part of the jury. The jury heard testimony that if one entity makes an accused product on behalf of another entity a royalty is only paid by one of those entities. (Dkt. No. 497 at 80:9–22.) Indeed, this is the very reason why Qualcomm's own expert opined that it should pay "essentially zero" in damages. (*Id.*) The jury also heard testimony that the hypothetical license would have included "make, sell, and have made rights, foundry rights, and rights for their customers." (*Id.* at 64:8–9.) The jury additionally heard testimony that Qualcomm and GlobalFoundries were mere customers of Samsung, relying on Samsung's 14-nanometer bulk FinFET technology, which the jury found infringes the Asserted Patent. (Dkt. No. 493 at 84:16–86:3; Dkt. No. 495 at 5:4–6:11.) Thus, it was reasonable for the jury to conclude that Samsung, who developed the accused technology, would have purchased rights for itself and its customers at the hypothetical negotiation.

Importantly, the Court does not determine whether such a conclusion by the jury would be unimpeachable. No party has challenged the jury's verdict of no damages as to Qualcomm and

GlobalFoundries. The Court merely determines that it is possible for the jury to have reached its conclusion dispassionately based upon the testimony presented and thus that the verdict does not reflect passion and prejudice.

The jury's finding of willfulness likewise does not reflect passion and prejudice. The jury heard evidence, discussed in detail herein, that Samsung had a unique and long-standing relationship with Prof. Lee, and that Qualcomm and GlobalFoundries were mere customers of the technology developed by Samsung relying on Prof. Lee's teachings. Such evidence reasonably supports the jury's finding that Samsung alone was willful.

Samsung also argues that a jury note asking whether the jury may "reward lump sum plus royalty payment for future sales" is an indication of the jury's intent to punish Samsung. (Dkt No. 579 at 15 (quoting Dkt. No. 498 at 120:2–7).) The Court finds that this note was only an indication of "some confusion or lack of understanding" with the Court's initial instructions. *Nissho-Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613, 620 (5th Cir. 1988). The Court further finds that its instructions in response to this note, which Defendants agreed to without objection (Dkt. No. 498 at 123:13–16), "effectively negated any confusion or impropriety," *Nissho-Iwai*, 848 at 620. The Court finds no prejudice indicated by the jury's note. A note from the jury asking some clarification from the Court after a lengthy and detailed charge are both common and reasonable, in this Court's experience.

Finally, Samsung argues that KAIST inappropriately "fostered" prejudice in the jury by arguing that Samsung stole property from Prof. Lee and Dr. Kuhn and inappropriately contrasting Samsung, a foreign company, with "Intel, the American company, who . . . followed the law." (Dkt. No. 579 at 15 (quoting Dkt. No. 498 at 109:11–12).) While the Court does not necessarily applaud these comments by KAIST during its closing arguments, particularly contrasting Samsung

with "the American company," the Court respects the reasonable latitude our jury trial system affords counsel as zealous advocates on behalf of their clients. Further, the Court instructed the jury not to be swayed by prejudice and that each party should be treated equally. (Dkt. No. 498 at 109:25–111:1.) Moreover, Samsung did not object to KAIST's closing at the time or at a sidebar immediately afterward. Absent such a contemporaneous objection or any indication that the jury's verdict was excessive, the Court does not find that KAIST's error, if any, "in final argument was of such magnitude . . . as to have seriously prejudiced defendants' right to a fair trial" such that a new trial is "required even in the absence of timely objection." *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 286 (5th Cir. 1975); *see also Nissho-Iwai*, 848 F.2d at 619–620.

### 2.     The Court properly precluded Dr. Subramanian from testifying about the "first oxide layer" beyond the scope of his report

Defendants argue that the Court improperly excluded testimony within the scope of Dr. Subramanian's report, warranting a new trial. Defendants argue that in his report "Dr. Subramanian was unambiguous that these two oxides are *not* a single 'layer' as required by the claims but 'two layers.'" This argument is not correct. Dr. Subramanian stated consistently in his report that there was "*one* gate oxide" and that "[t]his gate oxide comprises two layers—an interfacial SiO2 layer and a high-k dielectric layer." (Dtk. No. 228-10 ¶ 108; *see id.* ¶¶ 102–125.) Consistent with his report, the Court allowed Dr. Subramanian to testify about these two layers. (*See* Dkt. No. 496 at 22:16–19 ("[W]hat you have is you have a Fin, you have an SiO2 layer, you have a Hafnium oxide layer, and then you have the gate. And that has important consequences on the interpretation.").) Consistent with his report, Dr. Subramanian testified that the SiO2 layer cannot be the "first oxide layer" because the gate electrode is not formed on it and that the hafnium oxide layer cannot either because it is not formed on the surface of the Fin. (*Compare* Dkt. No. 228-10 ¶¶ 112–113, *with* Dkt. No. 496 at 22:21–23:6.)

44

However, the Court precluded Dr. Subramanian from testifying that the layers are *separate* layers or that the hafnium oxide is an *intervening* layer because he did not "opine[] that the claimed oxide layer elements could not be met because the HfO layer is a different, intervening layer." (Dkt. No. 597 at 7.) Neither this language nor opinion appear in his report.

As a result, Defendants argue that they were "precluded from offering expert testimony responding to Dr. Kuhn's opinion that the HfO and SiO2 layers act in concert as one single layer." (*Id.*) However, Dr. Subramanian never opined in his report that the two layers do *not* act in concert. To the contrary, he consistently referred to them as forming "one gate oxide." (Dkt. No. 228-10 ¶ 107.)

Moreover, Defendants had already elicited testimony from Dr. Samavedam that "between the gate and the silicon Fin, we have two layers. We have Hafnium oxide layers that are in contact with the gate and a second oxide layer that is on top of the FIN." (Dkt. No. 494 at 85:6–9.) The Defendants likewise argued in their closing, relying on the testimony of Dr. Kuhn and Dr. Samavedam, that "the Hafnium oxide layer is a separate layer." (Dkt. No. 498:10–21.) Defendants have not explained why Dr. Subramanian's additional, duplicative testimony would have been meaningful or why preventing such duplication would be a meaningful error.

The Court thus concludes that Dr. Subramanian was properly confined to the scope of his report and that, even if any error existed, Defendants have not demonstrated that such error was anything more than harmless.

> **3.** **The Magistrate Judge properly excluded Dr. Subramanian's opinion that a single structure cannot meet both the "first oxide layer" and "gate oxide layer" limitations**

As another ground for new trial, Defendants re-raise their objections to the Magistrate Judge's exclusion of Dr. Subramanian's opinion that one structure cannot satisfy both the "first oxide layer" and "gate oxide layer" limitations of the claims. (Dkt. No. 579 at 8–9; Dkt. No. 470.)

The Court reviews non-dispositive rulings of the Magistrate Judge for clear error or a conclusion contrary to law. *See* Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A). Finding none, the Court overrules these objections.[12]

Federal Circuit law is clear that "the use of two terms in a claim requires that they connote different meanings, not that they refer to two different structures." *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 n.3 (Fed. Cir. 2006) (emphasis omitted); *see also Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 n.9 (Fed. Cir. 2003) ("[W]e see no reason why, as a matter of law, one claim limitation may not be responsive to another merely because they are located in the same physical structure."). Moreover, as the Magistrate Judge correctly recognized, Dr. Subramanian's opinion that the "first oxide layer" and "gate oxide layer" must be distinct structures, would have excluded from the scope of the claims "an embodiment of the invention [disclosed in the specification] with a continuous layer of material in contact with the fin active region." (Dkt. No. 442 at 4 (citing '055 Pat. fig.3a, 3b).) "[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013).

The Court concludes that Dr. Subramanian's opinion that a single structure could not satisfy two limitations was contrary to law and thus properly excluded.

## V.    KAIST'S MOTIONS FOR FINAL JUDGMENT AND FEES AND COSTS

As discussed herein, the Court denies Defendants' Motion for New Trial conditioned on a remittitur by KAIST. KAIST's decision in this regard will impact the final judgment ultimately issued by this Court. Further, if KAIST elects a new trial on damages, the parties' conduct during

---

[12] For clarity, the Court likewise overrules the remaining objections in Dkt. No. 470.

46

such trial may bear on the Court's findings under § 285. Consequently, the Court determines that it should defer action on KAIST's Motion for Final Judgment and Motion for Fees and Costs until after KAIST files a remittitur or a new trial on damages is concluded. Such motions are carried.

## VI.    CONCLUSION

For the reasons set forth herein, Defendants' Motion to Stay Case Pending *Ex Parte* Reexamination (Dkt. No. 651) is **DENIED**.

Defendants' Renewed Motion for Judgment as a Matter of Law on Non-Infringement and Invalidity (Dkt. No. 578), Samsung's Renewed Motion for Judgment as a Matter of Law for Damages of No More Than $6.2 Million (Dkt. No. 577), and Samsung's Renewed Motion for Judgment as a Matter of Law on Willfulness (Dkt. No. 580) are likewise each **DENIED**.

The Motion by KAIST for Enhancement of Damages Due to Willful Infringement (Dkt. No. 586) is **GRANTED** as set forth herein.

Samsung's Motion for New Trial and Contingent Motion of GlobalFoundries and Qualcomm for New Trial (Dkt. No. 579) is **CONDITIONALLY DENIED** subject to a remittitur in the amount of $203,003,416. KAIST shall file such a remittitur within 14 days of the issuance of this Order. If KAIST does not file such a remittitur, the Court shall order a new trial on damages as to Samsung to begin on **Monday, March 16, 2020** and directs the parties to prepare accordingly.

The Motion by KAIST for Entry of Final Judgment as the Prevailing Party and Award of Costs and Pre- and Post-Judgment Interest (Dkt. No. 587) and the Motion by KAIST for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) are each **CARRIED** pending KAIST's filing of a remittitur or the completion of a new trial on damages.

**So ORDERED and SIGNED this 13th day of February, 2020.**

RODNEY  GILSTRAP
UNITED STATES DISTRICT JUDGE

Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| KAIST IP US LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.  2:16-CV-01314-JRG |
| | § | |
| SAMSUNG ELECTRONICS CO., LTD.,, | § | |
| SAMSUNG ELECTRONICS AMERICA, | § | |
| INC, SAMSUNG SEMICONDUCTOR, | § | |
| INC.,, SAMSUNG AUSTIN | § | |
| SEMICONDUCTOR, LLC, | § | |
| GLOBALFOUNDRIES, INC., | § | |
| GLOBALFOUNDRIES U.S. INC., | § | |
| QUALCOMM INC., | § | |
| | § | |
| Defendants. | § | |

## FINAL JUDGMENT

A jury trial commenced in this case on June 11, 2018. On June 15, 2018, the jury returned a unanimous verdict (Dkt. No. 499) finding that Defendants Samsung Electronics Co. Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, LLC (collectively, "Samsung"); GlobalFoundries, Inc. and GlobalFoundries U.S. Inc. (collectively, "GlobalFoundries"); and Qualcomm Inc. ("Qualcomm") each infringed one or more claims asserted by Plaintiff KAIST IP US LLC ("KAIST"), such claims being claims 1–6, 11–13, and 15–17 of U.S. Patent No. 6,885,055 (collectively, the "Asserted Claims"); that none of the Asserted Claims were invalid; that Samsung's infringement had been willful; that GlobalFoundries and Qualcomm's infringement had not been willful; that KAIST should recover from Samsung $400,000,000.00 for such infringement as a lump-sum royalty; that KAIST should recover from GlobalFoundries $0.00 for such infringement; and that KAIST should recover from Qualcomm $0.00 for such infringement.

On January 18, 2019, the Court issued findings of fact and conclusions of law, wherein the Court held that KAIST is not barred from asserting its patent infringement claims based on equitable estoppel or implied license. (Dkt. No. 574.) On February 13, 2020 the Court issued an Order addressing the parties' renewed motions for judgment as a matter of law, motion for new trial, and motion for enhancement of damages under 35 U.S.C. § 284. (Dkt. No. 676.) In that Order, the Court left undisturbed the jury's findings regarding infringement, invalidity, and willfulness but otherwise concluded that the evidence adduced a trial did not support a damages award higher than $101,501,708.00, that an enhancement of two-times that damages amount pursuant to § 284 was appropriate, and that a new trial on damages should be denied conditioned on a remittitur by KAIST of $203,003,416.00. (*Id.*) On February 19, 2020, KAIST accepted remittitur in the amount of $203,003,416.00. (Dkt. No. 677.)

KAIST has moved for entry of Final Judgment (Dkt. No. 587), which the Court now **GRANTS.**

Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the foregoing, the Court hereby **ORDERS** and **ENTERS JUDGMENT** as follows:

1. Samsung has infringed one or more of the Asserted Claims;

2. GlobalFoundries has infringed one or more of the Asserted Claims;

3. Qualcomm has infringed on or more of the Asserted Claims;

4. The Asserted Claims are not invalid;

5. Samsung's infringement was willful;

6. GlobalFoundries' infringement was not willful;

7. Qualcomm's infringement was not willful;

2

8.  KAIST is hereby awarded damages from and against Samsung and shall accordingly have and recover from Samsung the sum of $203,003,416.00 U.S. Dollars;

9.  KAIST is hereby awarded damages from and against GlobalFoundries and shall accordingly have and recover from GlobalFoundries the sum of $0.00 U.S. Dollars;

10. KAIST is hereby awarded damages from and against Qualcomm and shall accordingly have and recover from Qualcomm the sum of $0.00 U.S. Dollars;

11. Pursuant to Federal Rule of Civil Procedure 54(d), Local Rule CV-54, and 28 U.S.C. § 1920, KAIST is the prevailing party in this case and shall recover its costs from Defendants, and KAIST is directed to file its proposed Bill of Costs;

12. Pursuant to 35 U.S.C. § 284, the Court awards pre-judgment interest applicable to all sums awarded herein, at the applicable prime rate for each quarter, compounded quarterly, from January 1, 2015 until the date of the entry of this Judgment;

13. Pursuant to 28 U.S.C. § 1961, the Court awards post-judgment interest applicable to all sums awarded herein, at the statutory rate, from the date of entry of this Judgment until paid; and further

KAIST's Motion for Exceptional Case and Award of Attorney Fees and Costs (Dkt. No. 585) is **CARRIED**. All other requests for relief now pending before the Court and not specifically addressed herein are **DENIED**.  The Clerk is directed to **CLOSE** the above-captioned case.

**So ORDERED and SIGNED this 21st day of February, 2020.**


_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

3

PRESS FIRMLY TO SEAL

  FSC MIX PAPER POUCH

PRESS F

 UNITED STATES POSTAL SERVICE®



RDC 07                94612

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC
29616
APR 04 23
AMOUNT
**$28.75**
R2304M112676-8

# PRIORITY
# MAIL
# EXPRESS®

## FLAT RATE
## ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP



---

**UNITED STATES POSTAL SERVICE ®**

**PRIORITY MAIL EXPRESS®**



EJ 772 065 668 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)          PHONE ( 864 ) 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
# 1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**
☑ SIGNATURE REQUIRED *Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.*
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
☐ 10:30 AM Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.*

TO: (PLEASE PRINT)          PHONE ( 510 ) 637-3530

U.S. DISTRICT COURT - NDC - OAKLAND
CASE No: 4:22-CV-05246-HSG
1301 CLAY STREET, SUITE 400 S
OAKLAND, CA

ZIP + 4® (U.S. ADDRESSES ONLY)
9 4 6 1 2 - ___ ___ ___ ___

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

⬅ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☑ 1-Day | ☐ 2-Day | ☐ Military | ☐ D |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 4/5/2023 | $ 28.75 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 10.47.44 | ☐ 10:30 AM  ☑ 3:00 PM  6 PM | $ | $ |

| Time Accepted | 10:30 AM Delivery Fee | Return Receipt Fee | Live Animal Transportation I |
|---|---|---|---|
| 10:47 ☑ AM ☐ PM | $ | $ | |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| | | |

| Weight | ☑ Flat Rate | Acceptance Employee Initials | |
|---|---|---|---|
| ___ lbs. ___ ozs. | | Julia | $ 28.75 |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

LABEL 11-B, MARCH 2019          PSN 7690-02-000-9996

  UNITED ST