# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

F I L E D

SEP 1 3 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN,

        Plaintiff,

        V.

GOOGLE LLC

        Defendants.

---

CASE NO: <u>4:22-cv-05246-HSG</u>

**JURY TRIAL DEMANDED**

(Direct Patent Infringement),
(Induced and Contributory Patent
Infringement), (Joint Infringement,
(Willful Infringement)

# PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
## PLAINTIFF'S AMENDED COMPLAINT
## FOR PATENT INFRINGEMENT

September 12, 2023

## GOOGLE'S NON-INFRINGEMENT THEORY THAT THE INFRINGEMENT ONLY OCCURS WITH SOFTWARE MODIFICATION IS INSUFFICIENT

Google openly admits the company sells and uses *software* to modify products to function and/or operate in an infringing manor. In a recent case decided by jury in the Western District of Texas Court; in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) (**Exhibit A**) Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." (**Exhibit B**)

In a lawsuit between private parties [*Touchstream v. Google*], 28 U.S.C. § 1498 (a) operates as an affirmative defense, and where a private party's use of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement.

Alphabet's Google violated the *software* developer's patent rights with its remote-streaming technology and must pay $338.7 million in damages, a federal jury in Waco, Texas decided on July 23, 2023. The jury found that Google's Chromecast and other devices infringe patents owned by Touchstream Technologies related to streaming videos.

The New York-based Touchstream, which does business as Shodogg, said in its 2021 lawsuit that founder David Strober invented technology in 2010 to "move" videos from a small device like a Google smartphone to a larger device like a television.

According to the complaint, Google met with Touchstream about its technology in December 2011 but said it was not interested two months later. Google introduced its Chromecast media-streaming devices in 2013. Touchstream said in the complaint that Google's

Chromecast copied its innovations and infringed three of its patents. It also said its patents were infringed by Google's Home *software for modifications* and Nest smart speakers' *software* and third-party televisions not sold by Google, with Chromecast *software* capabilities.

Google's Chromecast is designed to let devices, such as the Google smartphone, easily mirror their content onto a screen or a smart speaker. Announced back in 2013, Google Cast has since been integrated into nearly every major app i.e., *software application*, and platform.

Whenever there's a Cast-enabled receiver like Chromecast on the same Wi-Fi network as the phone or computer, the compatible *software* app will show a Cast icon. A user can tap the icon and beam the content they're watching directly to the Chromecast. Since the Chromecast itself is also paired with the internet connection, the user's phone shares the URL of the content.

Cast icon is found on Google's YouTube irrespective of whether the user is browsing the website on a computer through Google Chrome or the *software* app on the Google smartphone. Many other platforms have Cast compatibility, including Netflix, Spotify, Facebook, and more.

Three things transpired from the case that are directly related to this current case *Golden v. Google*: (1) It is a practice throughout this, and other countries, to develop, sell, and use *software*, such as the "Google Android Open-Source Operating System" to modify products to perform in an infringing manor; (2) Google's development, sell, and use of the android operating system *software* was "for or by the Government," and with the "authorization and consent of the Government," as an affirmative defense, was rejected by the Western District of Texas Court; and, (3) Google is "precluded" from relitigating whether or not the Google Android Open-Source Operating System *software* can be used to modify products to function or operate in an infringing manor. Google was found liable for the *software* modification of products to operate in an infringing manor in *Touchstream Technologies Inc. v. Google LLC*. **(Exhibit C)**

## THE U.S. DISTRICT COURT FOR THE DISTRICT OF NORTHERN CALIFORNIA IS BOUND BY THE DECISIONS OF THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### *Vertical Stare Decisis*

The United States Court of Appeals for the Federal Circuit is a federal court that has special importance in patent law. The Federal Circuit does not have jurisdiction over a particular region. Instead, it has jurisdiction over all appeals in cases that "arise under" the patent laws. The Federal Circuit's jurisdiction over appeals in patent cases is exclusive. Other circuit courts cannot review decisions in those cases.

Congress created the Federal Circuit in 1982 to be a court with specialized expertise in patent law. In giving it exclusive jurisdiction over patent cases, Congress aimed to ensure that the interpretation of the patent laws, and applicable legal precedent, would be uniform throughout the nation, and not vary among regional circuits.

Consistent with that, the Federal Circuit has developed a large body of precedent governing patent cases: how to interpret patent claims, how infringement must be proved, how invalidity must be established, and how damages must be calculated. Successful patent litigation in the district courts requires diligently the following of the Federal Circuit's pronouncements on those issues.

Vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

This court engages in vertical stare decisis when it applies precedent from the higher court. For example, if the Northern District of California Court adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be vertical stare decisis.

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

In a Three-Judge Panel DISCUSSION: "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Vertical Stare Decisis bars Google from challenging whether Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google. The Federal Circuit's ruling: "the complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'". **(Exhibit D)**

Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

Something analogous happens with vertical stare decisis: it is not hard law because it sanctions departure; rather it is because of its hard nature that vertical stare decisis brings with it, or needs, a sanction against non-compliance.

So, with vertical stare decisis it is true that in the absence of compliance by the Northern District of California Court, the Federal Circuit will likely overturn the Northern District of California Court's decision. This works as a kind of sanction against the non-complying court. Vertical stare decisis is, indeed, afforded binding weight.

The alleged facts were included in the original complaint because Plaintiff knew and understood he "must allege facts that give rise to "more than a sheer possibility that the Defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

On appeal in *Larry Golden v. Google LLC*; Case No. 22-1267, the Federal Circuit determined Plaintiff has "pled enough fact[s] to raise a reasonable expectation that discovery will reveal that the Defendant is liable for the misconduct alleged."

Therefore, according to the doctrine of "*Vertical Stare Decisis*" Google is barred from challenging, and this Court is barred from relitigating the specifications of the Google Pixel 5 and the Android Team Awareness Kit (ATAK), that was decided as being nonfrivolous in the U.S. Court of Appeals for the Federal Circuit:

The Federal Circuit has determined Golden has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … pled "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged". The decision cannot be overturned by the lower Northern District of California Court.

In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

The next seven pages are the illustrative claim charts of specific claim limitations the Federal Circuit determined on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 "map[ped] claim limitations to infringing product features … in a relatively straightforward manner". **(Exhibits E & F)** Also, included on the bottom half of each page are portions of the illustrative claim charts of specific claim limitations submitted in Plaintiff's amended complaint.

The two charts per page are featured together to show the illustrative claim charts of the specific claim limitation in Plaintiff's amended complaint "*mirrors*" the subject matter of the illustrative claim charts of specific claim limitations the Federal Circuit determined on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 "map[ped] claim limitations to infringing product features … in a relatively straightforward manner".

Therefore, the Defendant is "precluded" from relitigating the same issues of fact.

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

| | |
|---|---|
| <br><br>Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising… | **Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**<br><br>**Asserted Patent Specifications**:<br><br>"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PCs, and cell phones for the receipt and transmission of signals"<br><br>"Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds;" |

*Chart 2-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the … Smartphone"

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

| | |
|---|---|
| <br><br>Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches. | **Central Processing Units (CPUs) for Smartphone**<br><br>The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).<br><br>Example: Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. |

*Chart 3-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the … Smartphone" [Central Processing Unit (CPU)]

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

**ATAK-MILITARY & ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google. com/store/apps/details?id=com.atakmap. app.civ&hl=en_US&gl=US

Google's pre-loaded "built-in, embedded" Android open-source operating system software, enable the infringement of Plaintiff's patents.



*Google Complaint*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the … Smartphone" [Transceiver]

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Android Open-Source Operating System** **"Transceiver" is Equivalent to Google's Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

| | **Camera C/B/R Sensor(s) for Smartphone** |
|---|---|
|  | Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation. |
|  | Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal). |
| | Camera Sensor for Chemical Detection: The sensor that Rhevision and the University of California at San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can resolve a picture finely enough to detect them; system relies on the phone's camera to watch the chip for color changes. |

*Chart 4-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

| | |
|---|---|
| **Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html <br><br> Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. The [] device, can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www. sciencealert.com/new-smartphone-cameras- |  <br><br> Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1 |

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"



MIT chemists devised a new way to wire-lessly detect hazardous gases with a sensor that can be read by a smartphone… [T]he researchers have demonstrated that they can detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, among other gases… The new sensors are made from modified near-field communication (NFC) tags. NFC tags can be read by any smartphone that has NFC capability. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone**
In November 2007, … two Defense Department contractors, a container retailer, a university, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to a detonator built from widely available, over-the-counter components. An undergraduate student spent about $20 to make the detonator. The RFID signal detonated a small amount of explosives in a container by means of a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department, Government Accountability Office, Department of Homeland Security and Coast Guard observed the demonstration. In the Defense Department's own words, the "Army representatives examined the device and wiring and confirm that a commercial RFID interrogator was used to 'wake up' a commercial RFID tag. When the RFID tag responded on the 433 MHz frequency, the relay closed and the blasting cap set off the explosive charge." https://www.nationaldefensemagazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

*Chart 6-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"



**Internet-of-Things (IoTs)**
The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
1. Accelerometer
2. GPS
3. Gyroscope
4. Magnetometer
5. Biometrics
6. Camera
7. Barometer
8. Proximity Sensors
9. Bluetooth connectivity
10. Barcode readers
11. Touchscreen sensors
12. Heart rate monitor
13. ECG
14. Haptic feedback sensors

The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring *software* apps. Also, identity verification, GPS based guidance, position/orientation awareness *software* apps and games are well suited for smartphone-based implementation.

The IoTs contain computing hardware, including processors with embedded programming … sensors that gather … readings of (temperature, motion, *chemical levels*, heart rate and body movement) and communication hardware that can send and receive signals.

*Chart 8-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

**Smartphone Biosensors**:
1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"



The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring *software* apps. Also, identity verification, GPS based guidance, position/orientation awareness *software* apps and games are well suited for smartphone-based implementation.

**Internet-of-Things (IoTs)**
The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:

15. Accelerometer
16. GPS
17. Gyroscope
18. Magnetometer
19. Biometrics
20. Camera
21. Barometer
22. Proximity Sensors
23. Bluetooth connectivity
24. Barcode readers
25. Touchscreen sensors
26. Heart rate monitor
27. ECG
28. Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming … sensors that gather … readings of (temperature, motion, *chemical levels*, heart rate and body movement) and communication hardware that can send and receive signals.

*Chart 8-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).



Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

*"Doctrine of Equivalents"*

When the Federal Circuit states, ""express no opinion as to the adequacy [the state or quality of being adequate] of the complaint or claim chart except that it is not facially frivolous", means the Circuit is not expressing an opinion on whether the direct infringement is literal direct infringement or direct infringement under the doctrine of equivalents.

"Literal infringement" means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. "Under the doctrine of equivalents, a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)

In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that Plaintiff, the patent owner, may invoke the doctrine of equivalents to proceed against Google if the Google Pixel smartphones performs substantially the same function in substantially the same way to obtain the same result.

The Doctrine of Equivalents was established in the United States with the case of *Winans v. Denmead*, which dealt with changing a part of the construction of the patented invention to avoid infringement. Setting a precedent, the court held that infringement may be claimed even if the same literal legal patent language was not used. A mere change in form while retaining the rest from the patented claim is still considered infringement.

The doctrine is explained in the words of Judge Curtis for the case as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most

perfectly embodies it, is, in contemplation of law, *deemed to claim every form in which his invention may be copied*, unless he manifests an intention to disclaim some of those forms."

Under this doctrine, Plaintiff can argue infringement even if each and every claim element of the patent is not completely or identically present in the infringed invention. The purpose of the doctrine is to ensure that Google does not benefit from minor or insubstantial changes that may escape literal infringement.

If the accused Google Pixel products or process does not literally infringe Plaintiff's patented invention, the accused Google Pixel products or process may be found to infringe under the doctrine of equivalents. The essential objective inquiry is: "Does the accused Google Pixel products or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 41 USPQ2d 1865, 1875 (1997).

In determining equivalence, "an analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute plays a role substantially different from the claimed element."

For an infringement analysis & litigation, claim charts help confirm or dis-confirm that each and every limitation of the claim is present in a product, service, or standard. An Evidence-of-Use (EoU) or Infringement Chart shows how a product or process accused of infringement contains each claim element to satisfy the 'all elements test' for infringement.

Following are illustrative claim charts of how the doctrine of equivalent applies to the alleged infringing processes of Google for CBRNE detection that are equivalent to the specifications and requirements of Plaintiff's patent claims asserted in this case.

| | |
|---|---|
| **Independent Claim 4 of Plaintiff's '287 Patent:**<br><br>"A communication device comprising: at least one central processing unit (CPU); at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."<br><br>The CPU(s) are included in the chipset and is therefore equivalent to the chipset. | <br>Google's pre-loaded "built-in, embedded" Android Tensor G1 & G2 Chipset-CPU, enable the infringement of Plaintiff's patents. |
| **Independent Claim 5 of Plaintiff's '287 Patent:**<br><br>"A monitoring device, comprising: at least one central processing unit (CPU); at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."<br><br>The "transceiver" is equivalent to the Google Android operating system (OS). | <br>Google's pre-loaded "built-in, embedded" Android open-source operating system (OS) software, enable the infringement of Plaintiff's patents. |

| | |
|---|---|
| **Independent Claim 1 of Plaintiff's '619 Patent:**<br><br>"A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, …, comprising at least a central processing unit (CPU), capable of: processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission…"<br><br>The NFC detection: Performs substantially the same function in substantially the same way to obtain the same result. | <br><br>Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. |
| **Independent Claim 11 of Plaintiff's '619 Patent:**<br><br>"A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, … capable of: processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission…"<br><br>The Bluetooth, WiFi, and GPS detection means: Performs substantially the same function in substantially the same way to obtain the same result. | <br><br>**Google Beacon: Bluetooth; GPS; Wi-Fi**<br>Google Android smart phones and WiFi/Bluetooth beacons as smart phone detectors and sensors. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors ... Specific models in different categories of radiation instruments |

## THE TABLE OF CONTENTS "OUTLINE" OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT: ANSWERED

**INTRODUCTION**

It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones] that directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices. It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Tensor G1 and G2 Chipset-CPUs] that directly infringes Plaintiff's patented central processing unit (CPU) devices. 35 USC 271(a)

**BACKGROUND**

**A. The Asserted Patents**

A patent claim defines the boundaries of an invention, and therefore lays down what the patent does and does not cover. A patent claim is the most important thing in a patent application, for it defines the subject matter that is sought to be protected. A patent claim is usually expressed as a statement of technical facts in legal terms.

In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the Google [] *Smartphone*, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

**B. The Original Complaint and Google's Motion to Dismiss**

The doctrine of equivalents is explained in the words of Judge Curtis [] as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law [with specific regard to the possibility of], *deemed to claim every form in which his invention may be copied*, unless he manifests an intention to disclaim some of those forms."

**C. The Amended Complaint**

The amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to

be filed and request service of process", Google has discontinued the making, offering for sell, and selling of the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them.

**ARGUMENT**

**I. The Amended Complaint Fails to State Claims of Direct Infringement**

It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones] that directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices. It is further the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Tensor G1 and G2 Chipset-CPUs] that directly infringes Plaintiff's patented central processing unit (CPU) devices. 35 USC 271(a)

**A. ATAK-CIVILIAN is a Third-Party Application, Not a Google Product**

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that comprises the Google Tensor Chipset-CPUs [Plaintiff's patented CPU devices], for carrying out operational and functional instructions; that comprises the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which is the software that allows the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to run the ATAK-CIV *software* application that enables the CBRNE sensors to monitor, detect, and relay data. See the complaint (Exhibit A) filed by *Touchstream Technologies Inc. v. Google LLC*

**B. The Complaint Admits That Google Does Not Sell Converted NFC Tags**

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that embeds Google's Near-Field Communication (NFC) technology [Plaintiff's patented short-range radio-frequency (RF) technology]; that is interconnected to the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which allows the NFC enabled Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to share payloads of data between the NFC tags and the Android-powered Google Pixel 6a, 7, 7a, 7 Pro, and Fold

smartphones for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals. A Google Android converter *software* app, converts an NFC tag into a CARD; enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**C. The Complaint Admits That Google Does Not Sell Devices With a Microfluidic Lens**

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that comprises the Google Tensor Chipset-CPUs [Plaintiff's patented CPU devices]; that comprises the Google Pixel Camera [Plaintiff's patented Multi-Sensor Detection Device or Plaintiff's Cell Phone Detection Device], that is used to detect for chemical, biological, and radiological (CBR) agents; that comprises the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which is the *software* that allows the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to run the *software* application that enables the Google Pixel camera to analyze certain microscopic nanopores The Google pixel camera, screen, and LED flashlight of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1

**D. The Complaint Admits That Google Does Not Sell Devices Designed to Go to Mars**

Google design their Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to align with its competitors (i.e., Apple; Samsung; LG) devices, who designed their devices in accordance with the Government's first solicitation in 2007 [DHS S&T BAA-07-10 *Cell-All Ubiquitous Biological & Chemical Sensing*] for a new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. Phase I of the initiative call for the CBR sensors to be embedded inside the cell phone or mobile device; Phase II of the initiative call for the sensors, detection devices, or detection means to be remote the cell phone or mobile device.

Technically, the first Google phone was not the Google Pixel but the Nexus One. It was manufactured by HTC in 2010. In fact, the whole Nexus series was made in collaboration with other brands such as HTC, Samsung, LG, Motorola, and Huawei.

In 2010, Apple, Samsung, and LG were still under an expressed contract to develop and commercialize for the Government, the *Cell-All Ubiquitous Biological & Chemical Sensing* new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. During the same period [2010], the Google Nexus series of phones was being manufactured and commercialized under the implied authorization and consent of the Government, to avoid personable liability for patent infringement.

In a recent case decided by jury in the Western District of Texas Court; in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) (Exhibit A) Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." (Exhibit B)

In a lawsuit between private parties [*Touchstream v. Google*], 28 U.S.C. § 1498 (a) operates as an affirmative defense, and where a private party's use of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement.

Google is "precluded" from relitigating whether or not the Google Android Open-Source Operating System *software* can be used to modify products to function or operate in an infringing manor. Google was found liable for the *software* modification of products [i.e., smartphones and TVs not sold by Google] to operate in an infringing manor in *Touchstream Technologies Inc. v. Google LLC*. (Exhibit C).

**E. The Complaint Admits That Google Beacon is Separate From the Accused Devices**

The Google Beacon is considered an integral part of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone devices

In *DHS v. Larry Golden* IPR2014-00714 Patent RE43,990 E: "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below. Claim Term Construction "built in, embedded" (claim 74) [is construed to mean] "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

Google Android smart phones and WiFi/Bluetooth beacons as smart phone detectors and sensors. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors ... Specific models in different categories of radiation instruments.

## II. The Amended Complaint Fails to Allege Indirect Infringement

### A. Indirect Infringement Requires Direct Infringement

Plaintiff alleges that the defendant Google, has induced infringement, thereby causing direct infringement with its Android Open-Source Operating System under 35 U.S.C. § 271(b). Plaintiff alleges Google actively encouraged the DoD/DTRA and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent infringement, and their encouraging acts actually ***resulted*** in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit considered whether proof of induced infringement requires proof that the encouragement of infringement was successfully communicated to the direct infringer and actually ***resulted*** in direct infringement. However, Fairchild claimed there was no evidence that it encouraged its accused chips to be incorporated into products ... with the specific intent to induce infringement.

The court disagreed, noting that Fairchild [Google]  was involved in activities related to the use of its products ... Fairfield designed its products [same as Google Android Open-Source Operating System] to meet certain [] standards, provided demonstration boards containing the infringing chips [open-source platform] to customers and potential customers in the United States, and maintained a technical support center in the United States that provided support to customers based in the United

States." Plaintiff must prove the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes.

## B. Assuming Direct Infringement, the Complaint Fails to Allege Indirect Infringement

Because the Google Nexus series was made in collaboration with at least other brands such as Samsung, and LG, Plaintiff believes Google's knowledge of Plaintiff's intellectual property and Google's intent to encourage another's infringement of Plaintiff's patents begin in 2010. Google's knowledge of Plaintiff's patents—2010.

Google design their Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to align with its competitors (i.e., Apple; Samsung; LG) devices, who designed their devices in accordance with the Government's first solicitation in 2007 [DHS S&T BAA-07-10 *Cell-All Ubiquitous Biological & Chemical Sensing*] for a new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. Phase I of the initiative call for the CBR sensors to be embedded inside the cell phone or mobile device; Phase II of the initiative call for the sensors, detection devices, or detection means to be remote the cell phone or mobile device.

Technically, the first Google phone was not the Google Pixel but the Nexus One. It was manufactured by HTC in 2010. In fact, the whole Nexus series was made in collaboration with other brands such as HTC, Samsung, LG, Motorola, and Huawei.

In 2010, Apple, Samsung, and LG were still under an expressed contract to develop and commercialize for the Government, the *Cell-All Ubiquitous Biological & Chemical Sensing* new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. During the same period [2010], the Google Nexus series of phones was being manufactured and commercialized under the implied authorization and consent of the Government, to avoid personable liability for patent infringement.

Google was able to shelter its alleged infringing activities under the "implied" provision of performing work for the United States until year 2012, when the Courts closed the loop hole in *Zoltek V*.

Google also lost its Government protection in 2021 when the CFC Court in *Golden v. US* Case No. 13-307C declared Apple, Samsung, and LG [and all OEMs manufacturing smartphones under an implied contract] was never performing work for the Government to develop a new, improved upon, and useful cell phone or mobile device capable of chemical, biological, radiological, and explosive sensing.

Google further lost its Government protection in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) (Exhibit A) when Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." The Texas Court rejected Google's claim.

### 1. The Amended Complaint Fails to Allege Induced Infringement

Google "knowingly induced the infringing acts, and possessed [a] specific intent to encourage another's infringement of Plaintiff's Patents" *Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1115 (N.D. Cal.2016).

Android is an open-source operating system for mobile devices and a corresponding open-source project led by Google. The Android Open-Source Project (AOSP) repository offer the information and source code needed to create custom variants (i.e., ATAK is built on the Android operating system) of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.

Google oversees the development of the core Android open-source platform and works to create robust developer and user communities. Google has committed the professional engineering resources necessary to ensure that Android is a fully competitive software platform.

Plaintiff alleges Google actively encouraged a number of various Government Agencies infringement, knowing that the acts Google induced constituted patent infringement, and their encouraging acts actually ***resulted*** in direct patent infringement. Google encouraged the Government Agencies to build

on its Google Android Open-Source Operating platform to develop the following software apps for CBRNE detection: ATAK-CIV (CBRN); CBRNResponder [CBRN]; Chemical Detectives [Chemical]; USAMRIID's Biodefense Tool [Biological]; GammaPix Lite-Gamma Rad Detect [Radiation]; Explosives Identification [Explosives]; Hazardous material (HazMat); FiRST; Navfree; ERG; REMM; and, HazMasterG3. All the listed *software* apps are sold or offered by Google on Google Play.

## 2. The Amended Complaint Fails to Allege Contributory Infringement

Under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer".

Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an alleged infringement of Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones and is not a commodity suitable for a substantial non-infringing use.

## III. The Amended Complaint Fails to Allege Joint Infringement

Plaintiff alleges that the defendant Google is liable for "joint infringement". In United States patent law, joint infringement is a form of patent infringement liability that occurs when multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.*

## IV. The Amended Complaint Fails to Allege Willful Infringement

Plaintiff alleges that the defendant Google is liable under the doctrine of willful blindness. Willful Blindness applies when Google seeks to avoid civil liability for the wrongful

acts by intentionally keeping itself unaware of facts that would render Google liable or implicated. In the Eastern District of Texas, the Chief District Judge Rodney Gilstrap issued an opinion in the case (*Motiva Patents LLC v. HTC Corporation*) in which he wrote, "A well-pled claim for willful blindness is sufficient to state a claim for willful infringement."

## V. The Court Should Deny Leave to Amend

If this Court finds Plaintiff's complaint inadequate, Plaintiff is seeking leave to amend.

The Rule 12(b)(6) test has been revised in recent years. In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court stated the interplay between Rule 8 (pleading) and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

In *Bell Atlantic Corporation v. Twombly*, 55 U.S. 544 (2007), the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. It continued: "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court further elaborated on the test, including this statement: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 1949 (citation omitted). Where a complaint is inadequate, leave to amend the complaint is common. See, e.g., *Butt v. United Brotherhood of Carpenters & Joiners of America*, No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

## CONCLUSION

Google's "infringing use" refers to the unauthorized utilization or exploitation of Plaintiff's intellectual property rights. It occurs when Google uses, replicates, or modifies a

product or design that is protected by Plaintiff's patents, without obtaining the necessary permissions or licenses.

As the Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols.*, Inc. that a plaintiff must only give the alleged infringer fair notice of infringement.

In a more general comment, a Federal Circuit's panel cautioned that "[t]o the extent this district court and others have adopted a blanket element-by-element pleading standard for patent infringement, that approach is unsupported and goes beyond the standard the Supreme Court articulated in *Iqbal and Twombly*."

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Vertical Stare Decisis bars Google from challenging whether Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google.

Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

The Federal Circuit emphasized that "patentees need not prove their case at the pleading stage" and thus found that the district court had erred by misapplying *Iqbal and Twombly*. Apparently exasperated by the need to reiterate the proper pleading standard, the Court emphasized "[a] plaintiff is not required to plead infringement on an element-by-element basis."

Therefore, in the first instance, Plaintiff has given the Defendant sufficient notice of the claims asserted by the Plaintiff so that they can provide an appropriate answer. *Monroe v. Owens*, 38 F. App'x 510, 515 (10th Cir. 2002).

In the second instance, the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. A blanket element-by-element pleading standard is unsupported by the Supreme Court.

In the third instance, Google is "precluded" from challenging the Federal Circuit's infringement analysis and opinion in *Larry Golden v. Google LLC*; Case No. 22-1267. Further, under the *Vertical Stare Decisis* doctrine, this Court is bound by the Federal Circuit's infringement analysis and opinion in *Larry Golden v. Google LLC*; Case No. 22-1267.

In the fourth instance, the Rule 12(b)(6) test has been revised in recent years. In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court stated the interplay between Rule 8 (pleading)

and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

In *Bell Atlantic Corporation v. Twombly*, 55 U.S. 544 (2007) the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. It continued: "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court further elaborated on the test, including this statement: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face.'" *Id.* at 1949 (citation omitted). <u>Where a complaint is inadequate, leave to amend the complaint is common</u>. *See, e.g., Butt v. United Brotherhood of Carpenters & Joiners of America*, No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

Sincerely,

*Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

30

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of September, 2023, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint for Patent Infringement", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.** | |
| Plaintiff, | Civil Action No. 6:21-cv-<u>569</u> |
| v. | |
| **GOOGLE LLC** | **JURY TRIAL DEMANDED** |
| Defendant. | |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Touchstream Technologies, Inc., hereby files this Original Complaint for Patent Infringement against Google LLC and alleges, upon information and belief, as follows:

### THE PARTIES

1.      Plaintiff Touchstream Technologies, Inc., d/b/a Shodogg ("Touchstream" or "Plaintiff") is a New York corporation with its principal place of business in New York, New York.

2.      Defendant Google LLC ("Google" or "Defendant") is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google maintains a permanent physical presence within the Western District of Texas, conducting business from its offices at 500 West 2nd Street, Austin, Texas, 78701. Google may be served with process through its registered agent CSC – Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Google is currently registered to do business in the State of Texas, and has been since at least November 17, 2006.

## NATURE OF THE ACTION

3.      This is a civil action against Google for patent infringement arising under the patent statutes of the United States, 35 U.S.C. § 271 *et seq*. for the infringement of United States Patent Nos. 8,356,251 (the "'251 patent"), 8,782,528 (the "'528 patent"), and 8,904,289 (the "'289 patent") (collectively, "the Touchstream Patents"). True and correct copies of the '251 patent, the '528 patent, and the '289 patent are attached as Exhibits 1, 2, and 3, respectively, to this Complaint.

## JURISDICTION AND VENUE

4.      This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Google in this action because Google has committed acts within the Western District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Google would not offend traditional notions of fair play and substantial justice. Google has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of products—including the Chromecast products[1] that are used by Google in connection with performing the accused Chromecast functionalities[2]—within this State and this District. Furthermore, Google—directly and/or through subsidiaries or intermediaries—has committed and continues to commit acts of infringement in this District by, among other things, using and providing the Chromecast service.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b). As discussed above, Google currently has a regular and established place of business in

---

[1] The term "the Chromecast products" is defined at ¶ 48, *infra*.
[2] The term "accused Chromecast functionalities" is defined at ¶ 48, *infra*.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 2

this District, and has committed and continues to commit acts of patent infringement in this District.

7.      Google maintains a regular and established place of business within the Western District of Texas, conducting business from its offices at 500 West 2nd Street, Austin, Texas, 78701.

8.      Public reporting indicates that Google has maintained an office in Austin since 2007.[3]

9.      Additionally, reporting indicates that Google currently owns or leases over 500,000 square feet of office space in downtown Austin across at least three locations: 100 Congress Ave., 901 E. Fifth St., and 500 W. Second St.  Google has also indicated that it is scheduled to open another 750,000 square feet of office space in Austin, at 601 W. Second St.[4]

10.      Google currently employs over 1,100 persons in Austin and—as of June 2019—Austin was Google's seventh-largest office outside of the San Francisco Bay Area.[5]  As of June 1, 2021, Google had job postings for 219 positions in Austin, Texas.[6]

11.      Google directly and/or indirectly develops, designs, tests, distributes, markets, offers to sell, sells, and/or utilizes the Chromecast products that Google uses to perform the accused Chromecast functionalities in the Western District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its Chromecast products.

---

[3] *See, e.g.,* https://www.builtinaustin.com/2019/06/17/google-new-offices-austin-data-center-midlothian.
[4] *See, e.g.,* https://www.kvue.com/article/money/economy/boomtown-2040/google-austin-texas-real-estate-report/269-2ce6e60e-e8c3-46f5-aca6-864175e67950.
[5] *See, e.g.,* https://austonia.com/technology/google-austin-office, citing https://www.statesman.com/news/20190614/google-says-it-plans-significant-expansion-in-austin.
[6] Search conducted via https://careers.google.com/locations/austin/?src=Online%2FHouse%20Ads%2FAdSitelinks.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 3

12.     On information and belief, the Chromecast products are sold at a variety of retailers in Austin and/or Waco, Texas—including Walmart, Target, Best Buy, Sam's Club, Lowes, and Office Depot.

13.     According to Google, its network infrastructure consists of three elements: data centers, Edge Points of Presence ("PoPs"), and Edge Nodes ("Google Global Cache," or "CGC").[7]

14.     According to Google, its data centers "are the heart of Google content and services." [8]  Google purportedly owns and operates a $600 million data center in Midlothian, Texas, which is located in Ellis County, within the Northern District of Texas.[9]  According to Google, such data centers "keep all of Google's products and services up and running around the clock and around the world."[10]

15.     According to Google, it operates "a large, global meshed network that connects our Edge PoPs to our data centers."[11]  Google purports to operate two points of presence ("PoPs") in Dallas and/or Fort Worth, Texas.

16.     According to Google, it operates Edge Nodes that are used by network operators to "deploy Google supplied servers" within their networks, and some nodes are used "to support the delivery of . . . Google services." [12]  According to Google, it currently operates three "network

---

[7] *See, e.g.,* https://peering.google.com/#/infrastructure.
[8] *Id.*
[9] *See, e.g.,*
https://www.google.com/about/datacenters/locations/midlothian/#:~:text=Google%20is%20proud%20to%20call,data%20center%20in%20Midlothian,%20Texas.
https://www.kvue.com/article/money/economy/boomtown-2040/google-austin-texas-real-estate-report/269-2ce6e60e-e8c3-46f5-aca6-864175e67950.
[10] *See, e.g.,* https://www.google.com/about/datacenters/faq/.
[11] *See, e.g.,* https://peering.google.com/#/infrastructure.
[12] *Id.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 4

edge locations" in Dallas, Texas.[13]  According to Google, at least one Edge Node (GGC) is located in or close to Austin, Texas.[14]

17.     On information and belief, the team lead or "director" responsible for the development and execution of Google's initial go-to-market strategy, global retail sales strategy, and hardware distribution for Chromecast, as well as the development of partnerships for Chromecast, currently resides in or around Austin, Texas, and is currently employed by Google.

18.     On information and belief, at least one person involved in the discussion between Touchstream and Google regarding a potential partnership related to the technology invented by Touchstream, as described further below, currently resides in Texas.

19.     On information and belief, at least one Chromecast "partner" who produces video content that can be streamed via a Chromecast enabled application is located in Austin, Texas.

20.     On information and belief, at least one Chromecast "partner" live-streams sports matches from Austin (as well as other locations) for a sports team located in Austin, Texas, via a Chromecast enabled application.

### TOUCHSTREAM'S PATENTS

21.     In 2010, David Strober, the inventor of the Touchstream Patents and the original founder of Touchstream, was working at Westchester Community College as a Program Manager and e-learning instructional designer.  At this job Mr. Strober facilitated the development of online college courses, developing software as needed to support those efforts.

22.     At least as early as mid-2010, Mr. Strober perceived the need to be able to take videos that could be viewed on a smaller device, like a smartphone, and "move" them to a larger screen, like a computer monitor or television.  In working to bring his idea to fruition, Mr. Strober

---

[13] See, e.g., https://cloud.google.com/vpc/docs/edge-locations.
[14] See, e.g., https://peering.google.com/#/infrastructure.

expanded his work by using a device like a smartphone to cause a video to play on a second screen, even if that video resided elsewhere (like the public internet). Near the end of 2010, Mr. Strober had developed a working prototype that demonstrated his groundbreaking concept. Recognizing that that his invention could revolutionize how people located, viewed, and shared media, Mr. Strober filed his first patent application in April 2011.

23.     Each of the Touchstream Patents, which are each entitled "Play Control of Content on a Display Device," claims priority to U.S. Provisional Patent Application No. 61/477,998 (filed on April 21, 2011).

24.     On January 15, 2013, the U.S. Patent and Trademark Office duly and legally issued the '251 patent to inventor David Strober.

25.     Touchstream is the owner, by assignment, of all rights, title, and interest in the '251 patent.

26.     On July 15, 2014, the U.S. Patent and Trademark Office duly and legally issued the '528 patent to inventor David Strober.

27.     Touchstream is the owner, by assignment, of all rights, title, and interest in the '528 patent.

28.     On December 2, 2014, the U.S. Patent and Trademark Office duly and legally issued the '289 patent to inventor David Strober.

29.     Touchstream is the owner, by assignment, of all rights, title, and interest in the '289 patent.

## <u>BACKGROUND OF THE DISPUTE</u>

## TOUCHSTREAM REVOLUTIONIZES VIDEO STREAMING

30.     In 2011, inventor David Strober officially incorporated Touchstream to share his inventions with the world.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                          Page 6

31.     In the following years, Touchstream raised millions of dollars in investments.

32.     Since 2011, Touchstream, d/b/a "Shodogg," developed software that enables content to be wirelessly cast (e.g., accessed, displayed, and controlled) from a mobile device to a second display screen (e.g., TV, computer, tablet, etc.).   Touchstream has been a leader in developing casting technology and has received numerous awards and recognition.

33.     Unfortunately, the efforts of Touchstream and Touchstream's partners to appropriately monetize Mr. David Strober's inventions were significantly hindered by infringement of the Touchstream Patents, including by Google.   The timing and scope of Google's infringement is discussed in more detail below.

### GOOGLE MEETS WITH TOUCHSTREAM IN 2011-2012 TO LEARN ABOUT THE PATENTED TOUCHSTREAM TECHNOLOGY

34.     Since at least December 14, 2011, Touchstream has made clear that its revolutionary product offerings were "patent-pending."[15]

35.     Just days after the first Touchstream Patent issued on January 15, 2013, Touchstream issued a press release announcing this patent award.[16]

---

[15] *See e.g.*, Sean Ludwig, *Shodogg will let you pause and restart video from any device (exclusive)*, VentureBeat (Dec. 14, 2011 7:00 AM), https://venturebeat.com/2011/12/14/shodogg-video-sharing-phones-tvs-exclusive/; Shodogg, *Shodogg Launches at CES and Transforms Streaming Video Delivery by Fueling Industry Expansion with Content Providers*, Cision PR Newswire (Jan. 10, 2012, 9:43 ET), https://www.prnewswire.com/news-releases/shodogg-launches-at-ces-and-transforms-streaming-video-delivery-by-fueling-industry-expansion-with-content-providers-137010098.html; *see also* https://web.archive.org/web/20111003131546/http://shodogg.com/ (archived snapshot of Shodogg website from October 3, 2011) ("Shodogg is a patent-pending technology that allows viewers to access online streaming content from any smartphone and display it to any larger connected screen, such as a laptop, tablet, or TV.").

[16] Shodogg, *Shodogg announces the release of ScreenDirect a business-to-business solution enabling companies to seamlessly direct digital content across screens*, Cision PR Newswire (Jan. 17, 2013 9:15 ET) https://www.prnewswire.com/news-releases/shodogg-announces-the-release-of-screendirect-a-business-to-business-solution-enabling-companies-to-seamlessly-direct-digital-content-across-screens-187284641.html; *See also, e.g., Meet Shodogg Who Won this Year's Techweek NYC Launch Competition*, AlleyWatch (12/2014),

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                  Page 7

36.    In December 2011, Touchstream and Google began discussing a potential partnership concerning the technology invented by Touchstream.

37.    Touchstream signed Google's Non-Disclosure Agreement, which provided that neither company would get rights to the other company's intellectual property as a result of the meeting.

38.    Google and Touchstream held a video conference by Skype on December 22, 2011.

39.    At this meeting, the attendees for Touchstream informed the attendees for Google that Touchstream had filed for a patent on the Touchstream technology being discussed and demonstrated in the meeting.

40.    In February of 2012, Google informed Touchstream that it did not want to pursue any business partnership with Touchstream in connection with the presented technology.

41.    One or more of the Touchstream Patents (or their underlying applications) were cited to or by Google in connection with the following patents and patent applications filed by Google:

(i) U.S. Patent No. 9,841,939B2, filed December 18, 2014, titled "Methods, systems, and media for presenting requested content on public display devices" ('251 patent cited on face of the issued Google patent);

(ii) U.S. Patent No. 9,916,122B2, filed December 18, 2014, titled "Methods, systems, and media for launching a mobile application using a public display device" ('251 patent cited on face of the issued Google patent);

---

https://www.alleywatch.com/2014/12/meet-shodogg-who-won-this-years-techweek-nyc-launch-competition/.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 8

(iii) U.S. Patent No. 9,967,320B2, filed December 18, 2014, titled "Methods, systems, and media for controlling information used to present content on a public display device" (the '251 patent is cited on face of the issued Google patent);

(iv) U.S. Patent No. 9,367,144B2, filed March 13, 2013, titled "Methods, systems, and media for providing a remote control interface for a media playback device" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent);

(v) U.S. Patent Application Pub. No. 2015/0046812 A1, filed August 11, 2014, titled "Dynamic resizable media item player" (Published Application No. 2012/0027214[8], which later issued as the '251 patent, was one of three references identified by Google on December 4, 2017) (this patent application was later abandoned by Google);

(vi) U.S. Patent No. 10,873,616B1, filed December 10, 2013, titled "Providing content to co-located devices with enhanced presentation characteristics" (Published Application No. 2012/0272147, which later issued as the '289 patent, and Published Application No. 2013/0124759, which later issued as the '528 patent, is cited on the face of the issued Google patent);

(vii) U.S. Patent No. 10,412,143B2, filed June 24, 2015, titled "Methods, systems, and media for presenting content based on user preferences of multiple users in the presence of a media presentation device" (Published Application No. 2012/0272147, which later issued as the '289 patent, is cited on the face of the issued Google patent);

(viii) U.S. Patent No. 10,306,323B2, filed December 7, 2016, titled "Fast television channel change initiated from a second screen device" (the '528 patent is cited on the face of the issued Google patent);

(ix) U.S. Patent No. 9,712,776B2, filed March 15, 2013, titled "Interfacing a television with a second device" (the '251 patent is cited on the face of the issued Google patent);

(x) U.S. Patent No. 9,992,307B2, filed February 3, 2015, titled "Interoperability of discovery and connection protocols between client devices and first screen devices" (the '251 patent and Published Application No. 2012/0272148, which later issued as the '251 patent, are both cited on face of the issued Google patent);

(xi) U.S. Patent No. 10,659,518B2, filed March 18, 2019, titled "Contextual Remote Control" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent);

(xii) U.S. Patent No. 10,969,950B2, filed May 19, 2015, titled "Dynamic Resizable Media Item Player" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent)

(xiii) International Application Publication No. WO 2015/200531, filed June 24, 2015, titled "Methods, Systems and Media for Presenting Content Based on User Preferences of Multiple Users in the Presence of a Media Presentation Device" (Published Application No. 2012/0272147, which later issued as the '289 patent, was cited to Google in a September 25, 2015 International Search Report);

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 10

(xiv) U.S. Patent Application Pub. No. 2016/0149982 A1, filed May 19, 2015, titled "Dynamic resizable media item player" (Published Application No. 2012/00272148, which later issued as the '251 patent, was identified by Google on July 17, 2018) (this patent application was later abandoned by Google).

42.     As such, Google knew about the patent applications leading to the Touchstream Patents by no later than December 2011.

43.     Google also knew, or at the very least should have known, of the issued Touchstream Patents on or shortly after the date each such patent was issued, beginning with the '251 Patent that issued in January 2013.

44.     At no point in 2011, 2012, or 2013 did Google reach out to Touchstream about potentially acquiring a license to Touchstream's pending or awarded patents, and to this day Google has not requested or received a license to any of the Touchstream Patents.

**GOOGLE UNVEILS ITS INFRINGING CHROMECAST SERVICES**

45.     Google unveiled its Chromecast product—which performs the infringing Chromecast functionalities—in July 2013 at a price of $35 per unit.[17]

46.     As of October 4, 2017, Google announced it had sold 55 million Chromecast units.[18]

---

[17] Matt Burns, *Google Launches The $35 Chromecast Streaming Device To Bring Chrome To The Living Room*, Tech Crunch (July 24, 2013, 11:51 AM CDT) https://techcrunch.com/2013/07/24/google-chromecast/?_ga=2.60674024.478449141.1620755451-2045144417.1620755450.
[18] Emil Protalinski, *Google has sold 55 million Chromecasts, up from 30 million in July 2016*, VentureBeat (Oct. 4, 2017) https://venturebeat.com/2017/10/04/google-has-sold-55-million-chromecasts-up-from-30-million-in-july-2016/.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 11

47.     Google's financial benefit from its Chromecast product is not, however, limited to revenue from the sale Chromecast units.  For instance, the accused Chromecast functionalities also increase ad revenue to Google and support the collection of data that is valuable to Google.

## THE ACCUSED CHROMECAST FUNCTIONALITIES

48.     The accused Chromecast functionalities comprise the methods performed through operation of at least the standalone Chromecast devices (e.g., the Chromecast 1st Generation, Chromecast 2nd Generation, Chromecast 3rd Generation, Chromecast Ultra, and Chromecast with Google TV), as well as devices implementing Chromecast built-in (collectively, "Chromecast" or "the Chromecast products") described in ¶¶ 49-62, *infra*.  The Chromecast products did provide in the past, and continue to provide, functionality and structure that facilitates the controlling of presentation content, such as audio and/or video content, on a content presentation device that loads any one of a plurality of different media players (YouTube, e.g.), <u>for instance</u> as illustrated below.



*Source: https://www.youtube.com/watch?v=GbXeZ16FoCY (2013 Google presentation on Chromecast functionality).*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 12

49.     Upon initial operation, the Chromecast is connected to a device having a screen (e.g., a television).  The Chromecast may prompt the user, via the screen, to download and open the Google Home application (or "app") on the user's mobile device (e.g., a smartphone or tablet). Upon opening the Google Home application on the mobile device, the user is shown the option to "Set up Chromecast."  Upon choosing this option, the Google Home application searches for devices and locates the Chromecast.  The application then prompts the user to set up the Chromecast device.  The mobile device and the Chromecast may be linked via a display of matching alphanumeric codes on the mobile device and display screen.  The Google Home application running on the mobile device prompts for confirmation that the alphanumeric codes match.  Upon receiving confirmation, the Google Home app and Chromecast are linked.

50.     The Chromecast prompts the user to specify the Chromecast's location (e.g., bedroom or living room) via the Google Home app.  Upon receiving location information, the Chromecast further prompts for a "custom room name" (or "friendly name") (e.g., "Master Bedroom" or "Living Room"), which the user provides.  An example of this is provided below.



*Exemplary assignment of custom room name on Chromecast 3rd Generation.*

That friendly name is then assigned to the Chromecast device by Google for future reference. Next, the Chromecast prompts for internet connection information (such as the user's preferred Wi-Fi network) and connects to the internet.

51.     Once connected to the internet, the Chromecast may present a tutorial screen from which the user can, for instance, choose a sample video clip and learn how to cast it for playback on the display screen via the Chromecast.  When the user touches a video clip on the mobile device, a prompt appears on the mobile device screen instructing the user to tap the "Cast" button and select the Chromecast to be used for casting (e.g., "Master Bedroom").   An example of this is provided below.

 

*Exemplary tutorial screens on Chromecast 3rd Generation*

Upon touching cast, a casting session is established and the video clip begins playback on the display screen via the Chromecast.

52.   The Chromecast is enabled to cast content from a mobile device to a display screen for thousands of both Android and iPhone applications, including video streaming services such as YouTube, Google Play, Netflix, Hulu, Prime Video, Disney Plus, as well as audio streaming services such as Spotify and Pandora, as indicated e.g. on the cover of the box in which the Chromecast 3rd Generation is packaged and sold:



By pressing the "Cast" button in any Chromecast-compatible app running on a user's mobile device, the user can stream content from the app to a selected Chromecast device and view the content on a television or other display screen connected to the Chromecast.

53.     Following initial setup, Google periodically pushes software and firmware updates for the Chromecast products, which are downloaded and installed automatically by the Chromecast when it is powered on and connected to the internet.[19]  Google also requires Chromecast users and developers to abide by Google's terms of service.[20]

54.     At the outset of a casting session, the Chromecast-compatible app running on the mobile device (e.g., YouTube or Netflix) causes messages to be sent from the mobile device and

---

[19] *See* https://support.google.com/chromecast/answer/6292664?hl=en.
[20] *See* https://support.google.com/cast-developer/answer/4513288?hl=en;
https://developers.google.com/cast/docs/terms; https://developers.google.com/terms/;
https://policies.google.com/terms?hl=en-US;

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                              Page 16

received by a server system implemented by Google.   These messages relate generally to authentication, selection of the device to cast to, and selection of the casting content.

55.   The messages sent from the mobile device and received by the server system include a "networkAddress," such as an IP address of the Chromecast device, which is assigned to and uniquely identifies the equipment.   The messages also include the Chromecast's user-assignable "friendlyName," such as "Living Room" or "Master Bedroom."   The "networkAddress" and "friendlyName" are locally unique to the particular Chromecast within the user's local access network.   See example, below.   On information and belief, the server system stores a record based on these messages associating the mobile device with the Chromecast, for instance so that an app running on the mobile device continually recognizes which Chromecast device (e.g., "Living Room") is currently casting and can be controlled.



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

56.   The messages sent from the mobile device and received by the server system include messaging that specifies a media file (e.g., audio or video) to be acted upon.   The media

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

file to be acted upon may be specified by providing, for instance, the uniform resource locator (URL) of the media file, for instance as specified by the contentURL property of the GCKMediaInformationBuilder class in the iOS Sender API,[21] which class is further used to build GCKMediaInformation instances that describe a media item to load.[22]

57.     The messages sent from the mobile device and received by the server system further include messaging that identifies an application for playing content from the specified media file. The appropriate application may be identified by providing, for instance, information about the MIME type of the content to be played or by providing an app ID ("applicationID") corresponding to a particular receiver application to be used to play back the content from the media file. Google uses the app ID to locate the appropriate receiver application, for example via a "resolved URL associated with the app ID."[23] The receiver application may then be "downloaded from the network" and loaded onto the Chromecast via the resolved URL.[24] The receiver application "provides an interface to display the app's content on the TV" or other display device, and "handles messages from the sender application to control content on the receiver device."[25] The messages sent from the mobile device and received by the server system also specify the accompanying media codecs needed for playback of different types of content (audio, video, etc.) such as mp3, HE-AAC, h.264, or VP9, as described at https://developers.google.com/cast/docs/media. On information and belief, loading the receiver app includes loading one or more corresponding

---

[21] *See* https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_media_information_builder.

[22] https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_remote_media_client

[23] *See* https://developers.google.com/cast/docs/caf_receiver/basic.

[24] *Id.*

[25] *See* https://developers.google.com/cast/docs/web_receiver.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 18

application programming interfaces (APIs) such as the "Web Receiver API" accessed by a reference in the app.[26]

58.     The Chromecast-compatible app running on the mobile device allows the user to touch "Play," "Resume," or equivalent on the mobile device screen so as to cast the media to the Chromecast and control playback.  An example is shown below.



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

---

[26] *See* https://developers.google.com/cast/docs/web_receiver/basic ("Your Web Receiver app accesses the Web Receiver API with the following reference: <script src="//www.gstatic.com/cast/sdk/libs/caf_receiver/v3/cast_receiver_framework.js"></script>"); *see also id.* at discussion of "major classes" associated with the Web Receiver SDK framework, including cast.framework.CastReceiverContext which "manages overall framework and loads any necessary libraries.")

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 19



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

The class GCKUIMediaController is "a controller for UI views that are used to control or display the status of media playback on a Cast receiver" such as the receiver application running on the Chromecast.[27]  The controller "responds to touch events on the controls [e.g., on the mobile device] by issuing the appropriate media commands to the receiver."[28]  Among the controls associated with the controller are "a 'play' button" (playButton) and "a 'pause' button" (pauseButton).[29]  Further, "Google Cast sender applications control the playback on the receiver device by sending messages in JSON format to the receiver application."[30]  Among the JSON messages are "commands from the sender that change the player state," including "Play" ("Begins playback of the content that was loaded with the load call, playback is continued from the current time

---

[27] *See* https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_u_i_media_controller.

[28] *Id.*

[29] *Id.*

[30] *See*  https://developers.google.com/cast/docs/reference/messages,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                      Page 21

position), "Pause" ("Pauses playback of the current content"), "Seek" ("Sets the current position in the stream"), and "Stop" ("Stops playback of the current content").[31]

59.    According to the Google Cast SDK Additional Developer Terms of Service, "Cast media application[s] must use these messages as defined here"—e.g., "Play," "Pause," "Seek," and "Stop"—to control media playback on the receiver application running on the Chromecast.[32] "Doing so provides the media app with a consistent user experience across platforms and it ensures that a Cast application will support new and future use cases."[33]

60.    On information and belief, the server system receives text-based JSON commands and converts them into code that can be executed by the Chromecast devices.  The Chromecast then executes the retrieved programming code so as to control playback of the specified media file—that is, to play, pause, or stop, e.g., playback of the audio or video streaming on the Chromecast in response to user commands sent from the Chromecast-compatible app running on the mobile device.

61.    Further, during a cast session, on information and belief, Google stores information relating to the source of the media file, the media file itself, the particular receiver app, and playback control commands for statistical purposes, so that playback can be resumed in the event of a crash, and for purposes of allowing another user to take over and control the content streaming on the Chromecast from a separate mobile device.  The Cast receiver API development framework includes the class PlayerData, whose variables include "applicationData," "media" ("current media information"), "metadata" ("media metadata"), "state" ("current player state"), and

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

"supportedMediaCommands" ("the commands supported by this player").[34] The Cast receiver API development framework also includes a state object, cast.framework.messages.SessionState, which "contain[s] all data to be stored in StoreSession and to be recovered in ResumeSession."[35] On information and belief, a receiver application running on the Chromecast retrieves the information associated with these classes from a database to restore content when playback resumes.

62.     Through the managing of the Chromecast by the server, and through the Chromecast's processing of messaging sent by the Chromecast-compatible app running on the mobile device—as described at ¶¶ 54-61, *supra*—the Chromecast allows the user to consume media content on a remote device, separate from the user's mobile device, where the app for playing the media and the media content may further be downloaded from the user's content delivery network (CDN) rather than from the mobile device itself.  The user is therefore free to use his or her mobile device for other purposes during playback of the media on the remote device via the Chromecast.  See example below.

---

[34] *See* https://developers.google.com/cast/docs/reference/web_receiver/cast.framework.ui.PlayerData.
[35] *See* https://developers.google.com/cast/docs/reference/web_receiver/cast.framework.messages.SessionState.









*Source: https://www.youtube.com/watch?v=GbXeZ16FoCY (2013 Google demonstration of Chromecast functionality).*

63.     Each of the steps discussed above is either performed by or otherwise attributable to Google.  To the extent another actor performs any of these steps, Google directs or controls that performance, conditioning participation in the activity or the receipt of a benefit upon performance of the patented method steps, and establishing the manner or timing of that performance. Additionally, Google profits from its infringement and has the right and ability to stop or limit the infringement.  For instance, Google tests and demonstrates the accused functionality, including in

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                              Page 25

advertisements.   Further, Google advertises and demonstrates to customers, and directs to Chromecast developers, that the infringing method steps will be performed, as shown above. Further, Google causes automatic updates to the Chromecast.   As discussed below, the functionality advertised and directed by Google infringes the Touchstream Patents, and on information or belief, is known by Google to do so.

<u>**COUNT I: INFRINGEMENT OF THE '251 PATENT**</u>

64.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-63, *supra*.

65.     Google directly infringes at least claim 1 of the '251 patent by performing the methods described in ¶¶ 48-63, *supra*.

66.     For example, Google performs the machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media players. *See, e.g.*, ¶¶ 54-62, *supra*.   Google further assigns, by a server system, a synchronization code to the display device. *See, e.g.*, ¶ 50, *supra*.   Google further receives, in the server system, a message from a personal computing device that is separate from the server system and separate from the display device, wherein the message includes the synchronization code. *See, e.g.*, ¶¶ 54-55, *supra*.   Google further stores, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code. *See, e.g.*, ¶ 55, *supra*.   Google further receives, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player. *See, e.g.*, ¶¶ 56-60, *supra*. Google further converts, by the server system, the universal playback control command into

corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player. *See, e.g.,* ¶ 60, *supra.* Google further stores, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command. *See, e.g.,* ¶ 61, *supra.*

67.     Google's infringement of the '251 patent has been, is, and continues to be willful, including Google's infringement of at least claim 1, as described at ¶¶ 34-44, *supra.*

68.     Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '251 patent because Touchstream does not have another adequate remedy at law.

### COUNT II: INFRINGEMENT OF THE '528 PATENT

69.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-68, *supra.*

70.     Google directly infringes at least claim 1 of the '528 patent by performing the methods described in ¶¶ 48-63, *supra.*

71.     For example, Google performs the method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players. *See, e.g.,* ¶¶ 54-62, *supra.* Google further receives, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content

presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player. *See, e.g.*, ¶¶ 54-60, *supra*. Google further uses the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device. *See, e.g.*, ¶ 55, *supra*. Google further identifies, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player. *See, e.g.*, ¶ 60, *supra*. Google further obtains, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider. *See, e.g.*, ¶ 57, *supra*. Google further loads the particular media player in the content presentation device. *See, e.g.*, ¶ 57, *supra*. Google further uses the particular media player to execute the programming code with respect to the file. *See, e.g.*, ¶ 57, *supra*.

72.     Google's infringement of the '528 patent has been, is, and continues to be willful, including Google's infringement of at least claim 1, as described at ¶¶ 34-44, *supra*.

73.     Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '528 patent because Touchstream does not have another adequate remedy at law.

## COUNT III: INFRINGEMENT OF THE '289 PATENT

74.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-73, *supra*.

75.     Google directly infringes at least claims 1 and 6 of the '289 patent by performing the methods described in ¶¶ 48-63, *supra*.

76.     For example, Google performs the method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players. *See, e.g.*, ¶¶ 54-62, *supra*. Google further receives, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file, wherein the media player is a computer application operable to present content and control presentation of the content, (iv) identify a location of the particular media player, and (v) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player. *See, e.g.*, ¶¶ 54-60, *supra*. Google further uses the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device. *See, e.g.*, ¶ 55, *supra*. Google further identifies, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player, wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file. *See, e.g.*, ¶ 60, *supra*. Google further loads, by the

server system, a set of protocols or application programming interfaces from a library based on the identity of the particular media player. *See, e.g.,* ¶ 57, *supra.* Google further identifies, based on the set of protocols or application programming interfaces, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player, wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file. *See, e.g.,* ¶ 60, *supra.*

77.     Google's infringement of the '289 patent has been, is, and continues to be willful, including Google's infringement of at least claims 1 and 6, as described at ¶¶ 34-44, *supra.*

78.     Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '289 patent because Touchstream does not have another adequate remedy at law.

## JURY DEMAND

79.     Touchstream demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Touchstream requests entry of a judgment in its favor and against Google as follows:

a)      Judgment that Google has directly infringed one or more claims of the Touchstream Patents;

b)      An award of damages to compensate for Google's infringement, including damages pursuant to 35 U.S.C. § 284, as well as prejudgment and post-judgment interest.

c)   An award of costs and expenses in this action, including an award of Touchstream's reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

d)   A permanent injunction restraining and enjoining Google, and its respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Google who receive actual notice of the order by personal service or otherwise, from any further sales or use of their infringing products and/or services and any other infringement of the Touchstream Patents;

e)   A finding that Google has willfully infringed and is willfully infringing one or more claims of one or more of the Touchstream Patents;

f)   A finding that this case is an exceptional case, and awarding treble damages due to Google's deliberate and willful conduct, and ordering Google to pay Touchstream's costs of suit and attorneys' fees; and

g)   For such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

Dated: June 4, 2021

/s/ Fiona A. Bell
Fiona A. Bell (TX Bar No. 24052288)
**SHOOK, HARDY & BACON L.L.P.**
600 Travis Street, Suite 3400
Houston, TX 77002
(713) 227-2008
Fax: 713-227-9508
Email: fbell@shb.com

***Counsel for Plaintiff***
***Touchstream Technologies, Inc.***

Exhibit B



IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| TOUCHSTREAM TECHNOLOGIES, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Case No. 6:21-cv-569-ADA |
| | § | |
| GOOGLE LLC, | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |

**DEFENDANT GOOGLE LLC'S ANSWER TO**
**THE ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Google LLC ("Google") hereby responds to the Original Complaint (Dkt. No.

1) of Plaintiff Touchstream Technologies, Inc. d/b/a Shodogg ("Plaintiff" or "Touchstream") with

the following Answer and Affirmative Defenses. Google denies the allegations and

characterizations in Touchstream's Complaint unless expressly admitted in the following

numbered paragraphs, which correspond to the numbered paragraphs in the Complaint.

**THE PARTIES**

1.      Google is without knowledge or information sufficient to form a belief as to the

truth of the allegations of this paragraph, and therefore denies them.

2.      Google admits that Google LLC is a Delaware limited liability company with its

principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google

admits that it maintains an office located at 500 West 2nd Street, Austin, Texas 78701 that is within

the Western District of Texas. Google admits that it may be served with process through its

registered agent CSC – Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620,

Austin, Texas 78701. Google admits that it is currently registered to do business in the State of

Texas since at least November 17, 2006. Google denies any remaining allegations of this

paragraph.

## NATURE OF THE ACTION

3.        Google admits that this action invokes the United States patent laws, 35 U.S.C. §§

271, *et seq.* for the purported infringement of United States Patent Nos. 8,356,251 (the "'251

patent"), 8,782,528 (the "'528 patent"), and 8,904,289 (the "'289 patent") (collectively, "the

Touchstream Patents"). Google admits that Exhibits 1, 2, and 3 of the Complaint appear to be

copies of the Touchstream Patents, but Google lacks sufficient information to verify their

authenticity. Google denies any remaining allegations in this paragraph.

## JURISDICTION AND VENUE

4.        Google admits that this action invokes the United States patent laws, 35 U.S.C. §§

1, *et seq*. To the extent Touchstream has standing to bring this suit, Google admits that this Court

has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) over patent law claims.

Google denies any remaining allegations of this paragraph.

5.        This paragraph sets forth argument and legal conclusions to which no response is

required. To the extent this paragraph includes any allegations to which a response is required,

Google denies them, and specifically denies that it has committed acts of infringement in this

District or any other district.

6.        Google admits that venue is proper in this District for purposes of this particular

action but not convenient or in the interests of justice under 28 U.S.C. § 1404(a). *See generally*

Dkt. 26, 27, 50, 51. Google admits that it maintains an office in this District and is registered to do

business in the State of Texas. Google admits that it offers products and services in this District.

Any remaining allegations in this paragraph consist of argument and legal conclusions, to which

no response is required, but to the extent a response is required, Google denies the allegations, and

specifically denies that it has committed acts of infringement in this District or any other district.

7.     Google admits that it has an office in this District at 500 West 2nd Street, Austin, Texas 78701 and is registered to do business in the State of Texas. Any remaining allegations in this paragraph consist of argument and legal conclusions, to which no response is required, but to the extent a response is required, Google denies the allegations.

8.     To the extent the allegations in paragraph 8 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph.

9.     To the extent the allegations in paragraph 9 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google admits that as of the filing of the Original Complaint, it owned or leased office space in Austin at 100 Congress Ave., 901 E. Fifth St., and 500 W. Second St. Google denies any remaining allegations in this paragraph.

10.    To the extent the allegations in paragraph 10 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google admits that as of the filing of the Original Complaint, Google employed over 1,100 persons in Austin. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph relating to job postings, and therefore denies them. Google denies any remaining allegations in this paragraph.

11.    This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

12.     Google admits that certain Chromecast products are sold in this District including at one or more of the retailers named in paragraph 12. Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

13.     To the extent the allegations in paragraph 13 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. The next tier of Google's network infrastructure is known as "Edge Points of Presence" ("PoPs"), which connects Google's network to the rest of the internet. The last tier of the network is the "Google Global Cache" ("GGC") servers or "edge nodes." GGC servers are off-the-shelf computers hosted in the facilities of a local Internet Service Provider ("ISP"), at the request of the ISP. If an ISP chooses to host a GGC server and a copy of portions of certain digital content is temporarily stored or "cached" on the GGC server, content requested by an end user can be fetched from the GGC within the ISPs network, so the request does not use long haul capacity to do so. GGC servers, though, are not necessary for the delivery of Google content. Google denies any remaining allegations in this paragraph.

14.     To the extent the allegations in paragraph 14 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. Google admits that a Google data center is located in Midlothian, Texas, which is within the Northern District of Texas. Google denies any remaining

allegations in this paragraph.

      15.     To the extent the allegations in paragraph 15 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. The next tier of Google's network infrastructure, the PoPs, connects Google's network to the rest of the internet. Google admits that the webpage in Paragraph 15 purports to identify at least one PoP in or around Dallas and/or Fort Worth, Texas. Google denies any remaining allegations in this paragraph.

      16.     To the extent the allegations in paragraph 16 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The last tier of the network, the GGC servers or edge nodes, are off-the-shelf computers hosted in the facilities of a local ISP, at the request of the ISP. If an ISP chooses to host a GGC server and a copy of portions of certain digital content is temporarily stored or "cached" on the GGC server, content requested by an end user can be fetched from the GGC within the ISPs network, so the request does not use long haul capacity to do so. GGC servers, though, are not necessary for the delivery of Google content. Google admits that the webpages in Paragraph 16 purport to identify at least one ISP-hosted GGC server in or around Dallas, Texas and Austin, Texas. Google denies any remaining allegations in this paragraph.

      17.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

      18.     Google is without knowledge or information sufficient to form a belief as to the

truth of the allegations of this paragraph, and therefore denies them.

19.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

20.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

## **TOUCHSTREAM'S PATENTS**

21.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

22.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

23.     Google admits that, on their face, the Touchstream Patents are each titled "Play Control of Content on a Display Device" and purport to claim priority to U.S. Provisional Patent Application No. 61/477,998, filed on April 21, 2011. Google lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this paragraph, and therefore denies them.

24.     Google admits that, on its face, the '251 patent lists an issue date of January 15, 2013 and David Strober as its inventor. Google denies that the '251 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

25.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

26.     Google admits that, on its face, the '528 patent lists an issue date of July 15, 2014 and David Strober as its inventor. Google denies that the '528 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

27.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

28.     Google admits that, on its face, the '289 patent lists an issue date of December 2, 2014 and David Strober as its inventor. Google denies that the '289 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

29.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

## **BACKGROUND**

30.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

31.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

32.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

33.     Google denies the allegations in paragraph 33 as they relate to Google, and specifically denies that it has committed any acts of infringement. Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 33, and therefore denies them.

34.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

35.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

36.     Google admits that in December 2011, certain Google employees met one or more

times with representatives of Touchstream. Google denies Touchstream's characterizations of those meetings in this paragraph. Google denies any remaining allegations in this paragraph.

37.     Google admits that Touchstream signed a Non-Disclosure Agreement before any meetings discussed in paragraph 36 took place. To the extent the allegations in paragraph 37 purport to describe the terms of the Non-Disclosure Agreement, Google states that the Non-Disclosure Agreement is the best source of its full content and context. Google denies any remaining allegations in this paragraph.

38.     Google admits that certain Google employees met with representatives of Touchstream over a video conference on Skype on December 22, 2011. Google denies any remaining allegations in this paragraph.

39.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

40.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

41.     Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,841,939, which is issued to Google, was filed December 18, 2014, and is titled "Methods, systems, and media for presenting requested content on public display devices." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,916,122, which is issued to Google, was filed on December 18, 2014, and is titled "Methods, systems, and media for launching a mobile application using a public display device." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,967,320, which is issued to Google, was filed on filed December 18, 2014, and is titled "Methods, systems, and media for controlling information used to present content on a public display device." Google admits that Published Application No. 2012/0272148 is cited on the face

of U.S. Patent No. 9,367,144, which is issued to Google, was filed on filed March 13, 2013, and is titled "Methods, systems, and media for providing a remote control interface for a media playback device." Google admits that Published Application No. 2012/0027214 was identified by Google on December 4, 2017 during prosecution of U.S. Patent Application Pub. No. 2015/0046812, which was filed on August 11, 2014 and is titled "Dynamic resizable media item player. Google admits that U.S. Patent Application Pub. No. 2015/0046812 was abandoned by Google. Google admits that Published Application No. 2012/0272147 and Published Application No. 2013/0124759 are cited on the face of U.S. Patent No. 10,873,616, which is issued to Google, was filed December 10, 2013, and is titled "Providing content to co-located devices with enhanced presentation characteristics." Google admits that Published Application No. 2012/0272147 is cited on the face of U.S. Patent No. 10,412,143, which is issued to Google, was filed on June 24, 2015, and is titled "Methods, systems, and media for presenting content based on user preferences of multiple users in the presence of a media presentation device." Google admits that the '528 patent is cited on the face of U.S. Patent No. 10,306,323, which is issued to Google, was filed on December 7, 2016, and is titled "Fast television channel change initiated from a second screen device." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,712,776, which is issued to Google, was filed on March 15, 2013, and is titled "Interfacing a television with a second device." Google admits that the '251 patent and Published Application No. 2012/0272148 are cited on the face of U.S. Patent No. 9,992,307, which is issued to Google, was filed on February 3, 2015, and is titled "Interoperability of discovery and connection protocols between client devices and first screen devices." Google admits that Published Application No. 2012/0272148 is cited on the face of U.S. Patent No. 10,659,518, which is issued to Google, was filed on March 18, 2019, and is titled "Contextual Remote Control." Google admits that Published Application No.

2012/0272148 is cited on the face of U.S. Patent No. 10,969,950, which is issued to Google, was filed on May 19, 2015, and is titled "Dynamic Resizable Media Item Player." Google admits that Published Application No. 2012/0272147 was cited in a September 25, 2015 International Search Report for International Application Publication No. WO 2015/200531, which was filed on June 24, 2015 and is titled "Methods, Systems and Media for Presenting Content Based on User Preferences of Multiple Users in the Presence of a Media Presentation Device." Google admits that Published Application No. 2012/00272148 was identified by Google during prosecution of U.S. Patent Application Pub. No. 2016/0149982, which was filed on May 19, 2015 and is titled "Dynamic resizable media item player." Google admits that U.S. Patent Application Pub. No. 2016/0149982 was abandoned by Google. Google denies any remaining allegations in this paragraph.

42.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them.

43.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them.

44.     Google admits that as of the filing of the Complaint, Google had not reached out to Touchstream regarding licensing any of the Touchstream patents. Google admits that as of the filing of the Complaint, Google had not requested or received a license to any of the Touchstream patents. Google denies any remaining allegations in this paragraph.

45.     To the extent the allegations in paragraph 45 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source

of their full content and context. Google admits that it released a Chromecast device in July 2013.

Google denies any remaining allegations in this paragraph and specifically denies that it has

committed acts of infringement in this District or any other district.

46.     To the extent the allegations in paragraph 46 purport to describe or quote one or

more documents or webpages, Google states that those documents or webpages are the best source

of their full content and context. Google denies any remaining allegations in this paragraph.

47.     This paragraph sets forth argument and legal conclusions to which no response is

required. To the extent this paragraph includes any allegations to which a response is required,

Google denies them, and specifically denies that it has committed acts of infringement in this

District or any other district.

## THE ACCUSED CHROMECAST FUNCTIONALITIES

48.     To the extent the allegations of this paragraph concern Touchstream's definition of

the terms "accused Chromecast functionalities," "Chromecast," and "the Chromecast products,"

they state no facts for Google to admit or deny. To the extent the allegations in paragraph 48

purport to describe or quote one or more documents or webpages, Google states that those

documents or webpages are the best source of their full content and context. Google denies any

remaining allegations in this paragraph and specifically denies that it has committed acts of

infringement in this District or any other district.

49.     To the extent the allegations in paragraph 49 purport to describe or quote one or

more documents, webpages, or application screens, Google states that those documents or

webpages are the best source of their full content and context. This paragraph further sets forth

argument and legal conclusions to which no response is required. To the extent this paragraph

includes any allegations to which a response is required, Google denies them, and specifically

denies that it has committed acts of infringement in this District or any other district.

50.     To the extent the allegations in paragraph 50 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

51.     To the extent the allegations in paragraph 51 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

52.     To the extent the allegations in paragraph 52 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

53.     To the extent the allegations in paragraph 53 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

54.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this

District or any other district.

55.     To the extent the allegations in paragraph 55 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

56.     To the extent the allegations in paragraph 56 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

57.     To the extent the allegations in paragraph 57 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

58.     To the extent the allegations in paragraph 58 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

59.     To the extent the allegations in paragraph 59 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

60.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

61.     To the extent the allegations in paragraph 61 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

62.     To the extent the allegations in paragraph 62 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

63.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this

District or any other district.

## COUNT I – INFRINGEMENT OF THE '251 PATENT

64.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set forth here, as its response to paragraph 64 of Plaintiff's Complaint.

65.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

66.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

67.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '251 patent has been, is, or continues to be willful.

68.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

## COUNT II – INFRINGEMENT OF THE '528 PATENT

69.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set

forth here, as its response to paragraph 69 of Plaintiff's Complaint.

70.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

71.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

72.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '528 patent has been, is, or continues to be willful.

73.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

## COUNT III – INFRINGEMENT OF THE '289 PATENT

74.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set forth here, as its response to paragraph 74 of Plaintiff's Complaint.

75.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required,

Google denies them, and specifically denies that it has committed any acts of infringement.

76.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

77.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '289 patent has been, is, or continues to be willful.

78.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

## RESPONSE TO TOUCHSTREAM'S DEMAND FOR JURY TRIAL

79.     Plaintiff's demand for a trial by jury for all issues triable to a jury does not state any allegation, and Google is not required to respond. To the extent that any allegations are included in the demand, Google denies these allegations. Google likewise demands a trial by jury on all issues so triable.

## RESPONSE TO TOUCHSTREAM'S REQUEST FOR RELIEF

These paragraphs set forth the statement of relief requested by Plaintiff to which no response is required. Google denies the underlying allegations of Touchstream's Prayer for Relief against Google, denies that Touchstream is entitled to any relief whatsoever, and requests that the Court

17

deny all relief to Touchstream, enter judgment in favor of Google, and award Google its attorneys' fees as the prevailing party in the action.

## GOOGLE'S AFFIRMATIVE DEFENSES

Subject to the responses above, Google alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Google further reserves the right to amend this Answer to add affirmative defenses, including allegations of inequitable conduct, and/or any other defenses currently unknown to Google, as they become known throughout the course of discovery in this action. Assertion of a defense is not a concession that Google has the burden of proving the matter asserted.

## FIRST AFFIRMATIVE DEFENSE – NON-INFRINGEMENT

Touchstream is not entitled to any relief against Google because Google does not and has not directly or indirectly infringed (not directly, contributorily, or by inducement), either literally or under the doctrine of equivalents, any valid and enforceable claim of the '251 patent, '528 patent, or '289 patent (the "Patents-in-Suit").

## SECOND AFFIRMATIVE DEFENSE – PROSECUTION HISTORY ESTOPPEL

Touchstream is estopped from construing or interpreting any claims of the '251 patent, '528 patent, or '289 patent in such a way as may cover and/or include, either literally or under the doctrine of equivalents, Google's products, processes, services, and/or activities, and/or has waived any right to do so by reason of cancellation, limitation, or abandonment of claims, admissions, arguments, amendments, and/or representations made by or on behalf of the applicants in any proceedings before the United States Patent and Trademark Office.

## THIRD AFFIRMATIVE DEFENSE – INVALIDITY

Each and every asserted claim of the '251 patent, '528 patent, and '289 patent is invalid for failure to meet the requirements of Title 35, United States Code, including but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112 thereof, and the rules, regulations, and laws pertaining thereto, and/or obviousness -type double patenting.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 101 because the claims are directed to abstract ideas or other non-statutory subject matter.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 103 because the claims are obvious in view of the prior art.

The asserted claims of the Patents-in-Suit are invalid and unenforceable for failure to satisfy the conditions set forth in 35 U.S.C. § 112, including failure of written description, lack of enablement, and claim indefiniteness.

## FOURTH AFFIRMATIVE DEFENSE – EQUITABLE DOCTRINES

Touchstream's claims against Google regarding the '251 patent, '528 patent, and '289 patent are barred by the equitable doctrines of waiver, estoppel, unclean hands, and/or acquiescence.

## FIFTH AFFIRMATIVE DEFENSE – LIMITATION OF DAMAGES

Touchstream's claim for damages, if any, against Google for alleged infringement of the Patents-in-Suit is barred or limited by 35 U.S.C. §§ 286, 287, and/or 288.

## SIXTH AFFIRMATIVE DEFENSE – LACK OF STANDING

Touchstream lacks standing to bring this suit to the extent that Touchstream and/or its

19

predecessors-in-interest lacked sufficient chain of title to the '251 patent, '528 patent, and/or '289 patent. In addition, Touchstream lacks standing to bring this suit to the extent that Touchstream lacks substantial rights to the '251 patent, '528 patent, and/or '289 patent.

## SEVENTH AFFIRMATIVE DEFENSE – LICENSE; PATENT EXHAUSTION

On information and belief, Touchstream's claims for relief are barred in whole or in part by an express or implied license, and/or the patent exhaustion doctrine.

## EIGHTH AFFIRMATIVE DEFENSE – NO WILLFUL INFRINGEMENT

Touchstream is not entitled to a finding of willful infringement with a corresponding increase in damages under 35 U.S.C. § 284.

## NINTH AFFIRMATIVE DEFENSE – NOT EXCEPTIONAL CASE

Touchstream is not entitled to a finding that this case is exceptional warranting attorneys' fees under 35 U.S.C. § 285, or pursuant to the Court's inherent power.

## TENTH AFFIRMATIVE DEFENSE – ENSNAREMENT

Touchstream's claims for infringement are barred by the doctrine of ensnarement.

## ELEVENTH AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief can be granted, including, but not limited to, failure of Plaintiff's Complaint to meet the standard for pleading set by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

## TWELFTH AFFIRMATIVE DEFENSE – INJUNCTION NOT WARRANTED

Touchstream is not entitled to a permanent injunction because: (1) Touchstream has not suffered, nor will it suffer, irreparable harm because of Google's conduct; (2) any harm to Touchstream would be outweighed by the harm to Google if an injunction were entered; (3) Touchstream has an adequate remedy at law even if Touchstream were to prevail in this action; and

(4) the public interest would not be served by an injunction.

## THIRTEENTH AFFIRMATIVE DEFENSE – SUBSTANTIAL NON-INFRINGING USES

Any and all products or actions accused of infringement have substantial uses that do not infringe and do not induce or contribute to the alleged infringement of the claims of the Patents-in-Suit.

## FOURTEENTH AFFIRMATIVE DEFENSE – USE BY THE UNITED STATES

Plaintiff's claims for relief against Google are barred by 35 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States.

## EXCEPTIONAL CASE

On information and belief, this is an exceptional case entitling Google to an award of its attorneys' fees incurred in connection with defending and prosecuting this action pursuant to 35 U.S.C. § 285, as a result of, *inter alia*, Plaintiff's assertion of the Patents-in-Suit against Google with the knowledge that Google does not infringe any valid or enforceable claim of the Patents-in-Suit and/or that the Patents-in-Suit are invalid and/or unenforceable.

## REQUEST FOR RELIEF

WHEREFORE, Google respectfully requests that the Court:

(A)     Enter judgment that Google does not infringe any claims of the '251 patent, '528 patent, or '289 patent literally and/or under the doctrine of equivalents;

(B)     Enter judgment that the '251 patent, '528 patent, and '289 patent are invalid;

(C)     Declare that this case is exceptional pursuant to 35 U.S.C. §285; and

(D)     Award Google its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees; and

21

(E)     Such further and additional relief as is deemed appropriate by this Court.

## **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Google demands a trial by jury on all issues so triable.

Dated: June 29, 2022

By: */s/  Tharan Gregory Lanier, with permission by Michael E. Jones*

Tharan Gregory Lanier
JONES DAY
Tharan Gregory Lanier  (*Admitted pro hac vice*)
CA State Bar No. 138784
E-mail: tglanier@jonesday.com
Michael C. Hendershot  (*Admitted pro hac vice*)
CA State Bar No. 211830
E-mail: mhendershot@jonesday.com
Evan M. McLean  (*Admitted pro hac vice*)
CA State Bar No. 280660
E-mail: emclean@jonesday.com
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:   (650) 739-3939
Facsimile:    (650) 739-3900

POTTER MINTON PC
Michael E. Jones
TX State Bar No. 10929400
E-mail:  mikejones@potterminton.com
Shaun W. Hassett
TX State Bar No. 24074372
E-mail:  shaunhassett@potterminton.com
110 N. College Ave., Suite 500
Tyler, TX 75702
Telephone:   (903) 597-8311
Facsimile:    (903) 593-0846

***Attorneys for Defendant***
***GOOGLE LLC***