# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net



| | |
|---|---|
| LARRY GOLDEN, | CASE NO: <u>4:22-cv-05246-RFL</u> |
| *Plaintiff*, | **JURY TRIAL DEMANDED** |
| V. | (Direct Patent Infringement), |
| GOOGLE LLC | (Induced and Contributory Patent Infringement), (Joint Infringement, |
| *Defendant*. | (Willful Infringement) |

## PLAINTIFF'S MOTION FOR RECONSIDERATION AND PLAINTIFF'S MOTION FOR DISQUALIFICATION

April 9, 2024

The Code of Conduct for United States Judges applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.

> See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(2) (providing that "cognizable misconduct includes: (B) treating litigants [], or others in a demonstrably egregious and hostile manner... and Rule 4(a)(3) (providing that "cognizable misconduct includes intentional discrimination on the basis of race..."). The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards: (C) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts ...

Not until 1911, was a provision enacted requiring a district-judge recusal for bias in general. In its current form, codified at 28 U. S. C. § 144, that provision reads as follows:

> "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

Not until the Judge in this current case, *Larry Golden v. Google LLC*; U.S. District Court for the Northern District of California—San Francisco; Case No. 3:22-cv-05246-RFL, issued the "Opinion Granting Defendant's Motion to Dismiss"; Dkt. 68, Filed 04/03/24, did Plaintiff realize the Judge presiding over the case has a personal bias or prejudice against Plaintiff, a Black and/or African American inventor, and is judicially bias in favor of Google, another multi-billion-dollar corporation accused of stealing the intellectual property of the little guy.

28 U.S. Code § 455(a): Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b)He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

## PLAINTIFF IS ASKING THE JUDGE TO DISQUALIFY HERSELF

## The Judge Deprived Plaintiff of his Seventh Amendment Right of a Jury Trial

The Judge deprived Plaintiff of his Seventh Amendment right to a trial by jury for patent infringement claims that are issues of fact tried by a jury. The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 reviewed the case "*de novo*", which means the Circuit referred to the lower Court's record to determine the facts, but ruled on the evidence and matters of law without deferring to that Court's finding.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation

3

that discovery will reveal' that the defendant is liable for the misconduct alleged." Id. at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Plaintiff believe the Judge to be "judicially bias" in favor of Google because the Judge allowed Google the opportunity to relitigate the very same alleged facts, causes of action, asserted patent claims, and alleged infringing products the Federal Circuit had just ruled on, and determined "the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart".

The Judge's actions are further magnified because the Judge didn't allow the same duplicative case to be presented to a jury, but decided the duplicative case can best to handle by depriving Plaintiff of his Seventh Amendment right to a jury trial on Plaintiff's patent infringement claims that are issues of fact tried by a jury.

4

Petitioner, an African American inventor, has the constitutional right to sue Google, a White-owned company, in Federal Court. The question of whether Google's alleged infringing devices, methods or products are covered by the Plaintiff's patent claims is a question of fact to be resolved by the jury. *See*, e.g., *Oakley, Inc. v. Int'l Tropic-Cal, Inc.*, 923 F.2d 167, 169 (Fed. Cir. 1991) ("Infringement is a question of fact"); *SRI v. Matsushita Electronic Corp.*, 775 F.2d 1107, 1125, 227 USPQ 577, ___ (Fed. Cir. 1985) ("It is settled that the question of infringement (literal or by equivalents) is factual").

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment. No particular form for a jury trial demand is prescribed by California statute or court rule. (See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate"; "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all").

It has been over twenty-five years since the Supreme Court last assessed the scope of the constitutional right to a jury in a patent-infringement case. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). More remarkable, that decision has been its only direct pronouncement on the matter in the 230 years that patent infringement has been actionable [Act of Apr. 10, 1790, ch. 7, §§ 1, 4, 1 Stat. 109, 110, 111 (first federal patent act)].

The Seventh Amendment requires juries in "Suits at common law"; [U.S. CONST. amend. VII]. Law courts always offered juries; and early juries tried nearly all infringement and validity issues.

Long-standing equity principles, according to the Supreme Court, dictated that "only under the most imperative circumstances which in view of the flexible procedures of the Federal

Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equity principles."

For the foregoing reasons stated above, Plaintiff is asking the Judge to disqualify herself, and reconsider granting Plaintiff's demand for a jury trial.

## The Judge Forced Plaintiff to Again Prove His Case at the Pleading Stage

The Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a Plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a Plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols., Inc.* that a Plaintiff must only give the alleged infringer fair notice of infringement. Nothing much has changed with the Federal Circuit's approach to pleading infringement since these two 2018 decisions.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but the Judge in this current case decided the Federal Circuit's opinion is irrelevant in this current case. The Judge ignored the fact that Plaintiff has "alleged enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570, and proceeded to have Plaintiff prove his case at the pleading stage.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 first, examined and determined Golden has allege "enough facts to state a claim to relief that is plausible on its

face." *Twombly*, 550 U.S. at 570 and that Golden has alleged facts that give rise to "more than a

sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The Federal

Circuit explained how Golden has pled enough fact[s] to raise a reasonable expectation that

discovery will reveal' that the defendant is liable for the misconduct alleged.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 also examined

and determined Golden has described how the Google "smartphone" literally infringes at least

claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of

Golden's '189 U.S. Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." |

Although the Federal Circuit did not specifically say "without a doubt, Google's

smartphone products are literally and/or under the doctrine of equivalents, infringing Plaintiff's

patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing

evidence" standard, Google's smartphone products are more likely than not literally and/or under

the doctrine of equivalents, infringing Plaintiff's patents asserted in the case.

The Judge tried to lead Plaintiff down the path of rejecting what the Federal Circuit had already determined by attacking the structure and functionality of the sensing and detecting components; rather than "simply [accepting] the language of the independent claims being mapped to" *See Larry Golden v. Google LLC*; CAFC Case No. 22-1267.

The Judge stated Plaintiff is without leave to amend the complaint to cure the deficiencies of the complaint, something Plaintiff did not ask for with the first amendment, because Plaintiff never believed, after the decision in *Larry Golden v. Google LLC*; CAFC Case No. 22-1267, that there were deficiencies.

How can Plaintiff improve upon what the Federal Circuit has already determined to be "enough factual evidence" without trying to prove direct infringement again, at the pleading stage?

For the foregoing reasons, Plaintiff believe this Judge to be incompetent to adjudicate claims of patent infringement or one that is judicially bias in Google's favor or lack the ability to be impartial. Either, or both are reasons for disqualification.


## The Judge Fail to Strictly Follow the Decision(S) Handed Down by the Higher Court within the Same Jurisdiction

The District Court is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Petitioner's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively

8

straightforward manner". the District Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

 *Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

 A court engages in *vertical stare decisis* when it applies precedent from a higher court. For example, if the Northern District of California Court in *Golden v. Golden* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

 The Judge gives more influence on the decisions from previous cases that victimized Plaintiff in a judicial system of systemic and structural racism, judicial bias in favor of white-owned corporations, and the deprivation of a Seventh Amendment right to a trial by jury, than to honor the decision handed down by a higher Federal Circuit court within the same jurisdiction.

## The Judge "Personal Bias" in Favor of Google is Why the Judge Ignored Plaintiff's "Reversed Engineer" of Google's Alleged Infringing Products and Granted Google's Insufficient and Irrelevant Defense Theory

 Although the Judge overreached when she decided to replace the responsibility of a jury, with herself, the Judge fail to realize this is not a case about the infringement of the ATAK software. The alleged infringement of the DoD DTRA ATAK CBRNE Sensors is pending in another case filed at the United States Court of Federal Claims in *Golden v. US* Case No. 23-811C.

Plaintiff never presented patent claims in this case to show how the DoD DTRA (the Government) ATAK CBRNE Sensors allegedly infringes every element recited in Plaintiff's patent claims. Which means the Judge is outside her jurisdiction to adjudicate an alleged patent infringement claim against the Government for money damages.

The defense theory of "modification of government products by third parties" does not apply too, nor is it relevant to the Plaintiff's burden of proving "literal patent infringement" and/or proving "infringement under the doctrine of equivalents" of Google products.

Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19).

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined the "***reversed engineered***" claim charts and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.

Reverse engineering is when you start with a specific product and work your way backward to figure out the process used to manufacture or develop it. Identifying patent infringement involves mapping relevant patent claims to the results of reverse engineering, which is exactly what Plaintiff did in *Larry Golden v. Google LLC*; Case No. 22-1267, and this case.

Reverse engineering can be used to prove evidence of use when a Plaintiff is trying to assert patent infringement, however, it is best to prove evidence of use with publicly available information and use reverse engineering during discovery to ensure the proof will be accepted in court.

Case law appears obvious: "[T]he use of a patented invention, without either manufacture or sale, is actionable." *Roche Prods., Inc. v. Bolar Pharm. Co., Inc.*, 733 F.2d 858, 861 (Fed. Cir. 1984). The Federal Circuit's definition of use is "to put into action or service." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316-17 (Fed. Cir. 2005)

Historically, the courts have interpreted use broadly. *See Bauer & Cie. v. O'Donnell*, 229 U.S. 1 (1913); *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1283-84 (Fed. Cir. 2011); *NTP, Inc.*, 418 F.3d at 1316; *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356, 360 (E.D. Tex. 2008). "'The inventor of a machine is entitled to the benefit of all the *uses* to which it can be put, no matter whether he had conceived the idea of the use or not.'" *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009) (citing *Roberts v. Ryer*, 91 U.S. 150, 157 (1875))

Therefore, Google in theory, basically put their foots in their mouths when they decided to challenge the use of the government's ATAK software and Draper's CBRNE sensors in this jurisdiction. There is generally no reason to differentiate between the legal definition of "use" relating to a system as opposed to "use" when it relates to a device/apparatus [Google's smartphones] with components [government's ATAK software and CBRNE sensors] used as a whole. See *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356, 361 n.3 (E.D. Tex. 2008).

An accused device may infringe if it is reasonably capable of satisfying claim limitations, even though it may also be capable of non-infringing modes of operation. *Hilgreave Corp. v.*

11

*Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (citations omitted), cert. denied, 535 U.S. 906 (2002).

Reverse engineering, also called "tear down", is a method or process to discover how a Google smartphone product functions with the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors architecture.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 accepted the "reversed engineered" claim charts and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.


## The Judge is Unfamiliar with the Concept of Modifications, and therefore Cannot Adjudicate this Case

Modifications are appropriate if the modifications do not affect the intended use of the patented device or alter the fundamental scientific technology of the patented device.

The Judge fail to understand that a significant change or modification in design, components, method of manufacture, or intended use is enough to qualify for a new patent. Significant changes or modifications are those that could significantly affect the effectiveness of the device, or major changes or modifications in the intended use of the device.

The Judge can't seem to understand or accept the fact that Plaintiff is not making changes to a Google patented smartphone device to make it infringe; Plaintiff is alleging Google has duplicated his patented smartphone invention in its entirety, and any "modifications" to an already existing device (i.e., cell phone) was significant enough that the USPTO granted Golden patents [see claim 23 of Plaintiff's '439 patent]. Plaintiff is not making additional modifications.

If Google's non-infringement theory of "add-ons that are modified to function" is allowed to stand against the only Black and/or African American inventor who owns the patent rights to the smartphone; under the rule of law Google' smartphone add-ons patents should be invalidated by this Court and the USPTO. Following is a list of patented smartphone add-ons that are relevant to the functionality of Google's smartphones:

*Google Android Open-Source Operation System Patents*: The major milestone in the development of the Android system occurred on November 5th, 2007. On this day, Google unveiled the Open Handset Alliance (OHA), a consortium of technology manufacturers that would work together to create open mobile device standards. At the outset, 34 companies were involved in the consortium. The companies included in the collection at that point included wireless telecommunications providers (T-Mobil), mobile handset makers (Motorola, HTC) and chipset makers (Texas Instruments, Qualcomm). Google wouldn't be limited to simply one device from one manufacturer.

*Google's Transceiver Patent(s)*: A technology for reducing the cost of wireless communications was protected for Google by U.S. Patent No. 6982945, which is titled Baseband Direct Sequence Spread Spectrum Transceiver. This is one of Google's earlier patents in mobile technologies, issued in January 2006, and it protects a method for transmitting a radio frequency signal using the Code Division Multiple Access (CDMA) wireless standard, a mobile technology utilized by smartphones.

*Smartphone Door Lock/Unlock Patent:* A smart lock is an electromechanical lock which is designed to perform locking and unlocking operations on a door when it receives instructions from an authorized remote device, such as a smart phone, using a wireless protocol.

*Smartphone Internet of Things Patent:* IoT devices 110 may include a fitness tracker, a smart watch, smart glasses, or another peripheral and/or wearable device that may be used in connection with a user device (e.g., a smart phone). For example, certain types of IoT devices 110, such as smart phones, may include a transceiver ... In another example, various IoT devices 110 associated with a user, such as wearable devices (e.g., a

13

fitness tracker, smart glasses, smart watch, headphones, etc.) and a smartphone, [] at the user's location.

*Smartphone Disabling Lock Mechanism Patent:* It's not like Apple is unaware of the whole texting and driving scenario. In fact, the company is fully aware of all the dangers associated with it as it had previously filed a patent in 2008 that reflected the lock-out mechanism and was published back in 2014.

*Smartphone Fingerprint Identification Patent:* The present invention relates to a contactless fingerprint recognition method using a smartphone and, more particularly, to a contactless fingerprint recognition method using a smartphone…

*Smartphone GPS Navigation and Location Patent:* With mobile positioning technologies and the additional capabilities of modern mobile computing devices, the mobile devices are frequently used as mapping and navigational tools. A mobile device such as a smart phone, smart watch, or other wearable computing device may identify its current coordinates using a Global Positioning System (GPS) receiver …

*Smartphone Near-Field Communication (NFC) Patent:* The components of mobile device 100 may be a mobile computer-based system, such as, for example, cellular telephone, tablets, hand held computing devices (e.g., smart phones), tablets, laptops, and any other type of mobile computer-based system.

*Smartphone Heart-Rate Sensor Patent:* The International Trade Commission has confirmed its earlier ruling that Apple infringed on AliveCor's heart rate monitoring patents. "Today's ITC ruling is a win for innovation and consumer choice," said Priya Abani, CEO of AliveCor."

*Smartphone Control of Vehicle Patent:* Smartphone-Based Vehicle Control Methods. This present invention relates to the field of smartphones interfacing and communicating with a desired vehicle, more specifically this invention relates a smartphone storing specific user settings, communicating that to a vehicle and providing an interface to control the vehicle using the smartphone.

*Smartphone Bluetooth Patent:* The data source device 20 may be a suitable electronic device that supports A2DP and provides one or a plurality of audio contents, for example, a smart phone, a tablet computer, an MP3 player, a personal computer, a

laptop computer, a personal audio device, a CD player, or any other smart/non-smart terminal device.

*Smartphone-Based Biosensor Patent:* Numerous smartphone-based biosensor developments were published in recent years, some highly effective and sensitive. The ubiquity of smartphones throughout the world has brought about new opportunities to bring point-of-contact (POC) devices near the patients for portable healthcare monitoring, taking advantage of the characteristics of computing power, network connectivity, battery, and cameras of these devices. Current wireless telecommunication infrastructure makes the smartphone a ubiquitous platform worthy of using in order to develop biosensing and diagnostics platforms, especially for point-of-care and telemedicine applications.

*Smartphone Camera Patent:* Canon has submitted a patent application for a smartphone camera system that will enable users to use multiple smartphone camera lenses at once. The main focus of the submitted patent is to make use of the smartphone's many lenses. Most modern phones have several different camera lenses, often of varying focal lengths, but as a rule only one is used at a time.

Plaintiff believes the Judge is aware that Google's non-infringement theory is hypocritical and two-faced to say the least. Google obtains licenses from other patent owners when they realize the "add-ons" to the smartphones as a whole, are the patented inventions of the patent holders.

This Judge obviously don't know the difference between "interconnected"; a requirement of Plaintiff's patent claims asserted in this case, and "modified"; a step Google has included in Plaintiff's patent claims in this case, *OR*, the Judge has chosen not to consider "interconnected"; the necessary requirement of Plaintiff's patent claims asserted in this case, in favor of Google's insignificant added step of "modification".

Under the first scenario the Judge needs to disqualify herself for being incompetent and in the second scenario the Judge needs to disqualify herself for having a personal bias against Plaintiff, and in favor of Google

The only reason Google is standing on such an insufficient and inadequate non-infringement theory and the Judge who mimicked the insufficient and inadequate non-infringement theory in her grant of motion to dismiss, is because they realize the Patent Owner is a Black and/or African American inventor. The Courts have a long history of systemic and structural racism; and in this case the Judge is judicially bias in favor of Google.

## For Illustrative Purposes Plaintiff Will Provide the Judge with What Literal Infringement Looks Like at the Pleading Stage

Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90).

With the use of a reverse engineering claim chart, the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267, examined and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.

In the following chart: 1- Literal infringement precedence; 2- Northern District of California Patent Local Rules for proving literal infringement; and, 3- The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 decision on literal infringement.

| | |
|---|---|
| **Literal Infringement (Precedence)** | Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] |
| **Patent Local Rules Northern District of California 3-1.** | (a)  Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. §271 asserted;<br>(b)  Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process;<br>(c)  A chart identifying specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function.<br>(d)  For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described.<br>(e)  Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality; |
| **Literal Infringement (Fed. Cir. *Golden v. Google*)** | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

Below, Plaintiff will illustrate how each and every element recited in a claim has identical correspondence in the allegedly infringing device or process because "[I]t is a bedrock principle of patent law," says the Federal Circuit Court of Appeals, that "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004).

The U.S. Supreme Court agrees: "the claims made in the patent are the sole measure of the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961)."

In the words of Judge Giles Rich, an author of the U.S. Patent Act of 1952, "the name of the game is the claim." Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

**Patent No. 9,096,189 (claim 1 of the '189 patent)**

1.   *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, ***comprising***: [Plaintiff has identified the Google smartphone(s) as "a communication device" and is now getting ready to outline the features or elements of the Google smartphone(s)]

at least one of *a central processing unit (CPU)* for executing and carrying out the instructions of a computer program … or a front-end processor for communication between a host computer and other devices; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

a ***transmitter*** for transmitting signals and messages to at least one of plurality product groups based on the categories of a ***multi-sensor detection device*** … a ***cell phone detection device*** …; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter]

a ***receiver*** for receiving signals, data or messages from at least one of plurality product groups based on the categories of a ***multi-sensor detection device*** … a ***cell phone detection device*** …; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1

transceiver package and the Shannon 5710 FR2 mmWave transceiver as the receiver]

the communication device is at least a … mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices capable of wired or wireless communication therebetween]

**Patent No. 9,589,439 (claim 23 of the '439 patent)**

23.    *A cell phone comprising*: [Plaintiff has identified the Google smartphone(s) as "a cell phone" and is now getting ready to outline the features or elements of the Google smartphone(s)]

*a central processing unit (CPU)* for executing and carrying out the instructions of a computer program; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

*a transmitter* for transmitting signals and messages to a cell phone detection device; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter]

*a receiver* for receiving signals from the cell phone detection device; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the receiver]

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices capable of wired or wireless communication therebetween] and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices to receive signals or send signals to activate or deactivate]

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone [Plaintiff is identifying the Google smartphone camera as the

biological sensor (because of its standard microscope feature of zooming); capable of being disposed within the Google smartphone(s)]

**Patent No. 10,163,287 (claim 5 of the '287 patent)**

**5.** ***A monitoring device, comprising***: [Plaintiff has identified the Google smartphone(s) as "a monitoring device" and is now getting ready to outline the features or elements of the Google smartphone(s)]

 ***at least one central processing unit (CPU)***; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

 at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; [Plaintiff has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel 8 smartphone as being in connection with the Google "Tensor" CPU/Chipset]

 at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [Plaintiff has identified the Bluetooth® v5.3 with dual antennas for enhanced quality and connection of the Google Pixel 8 smartphone as being in connection with the Google "Tensor" CPU/Chipset]

 at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [Plaintiff has identified the Google Pixel 8 smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band as being in connection with the Google "Tensor" CPU/Chipset]

 at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [Plaintiff is identifying the Google smartphone camera as the biological sensor (because of its standard microscope feature of zooming); as being in connection with the Google "Tensor" CPU/Chipset]

 one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [Plaintiff is identifying the Google Smartphone Beacon's NFC, WiFi, and Bluetooth detectors in communication with the Google "Tensor" CPU/Chipset]

 at least one of ***a transmitter or a transceiver*** in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical

biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter, that is in communication with the Google "Tensor" CPU/Chipset]

**The Judge Fail to Confirm in Her Decision, the Federal Circuit's Ruling that Google has at Least Literally Infringed Claim 5 of Plaintiff's '287 Patent for Plaintiff's Patented Central Processing Unit (CPU).**

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined the "***reversed engineered***" claim charts and determined Golden has described how the Google Smartphone "Tensor CPU/Chipset literally infringes at least claim 5 of Golden's '287 U.S. Patent.

Plaintiff has also illustrated in this document how the Google Smartphone "Tensor CPU/Chipset" literally infringes at least claim 5 of Golden's '287 U.S. Patent. Further, claim 5 of Golden's '287 U.S. Patent illustrates how each of the Google Smartphone elements are connected to the Google "Tensor CPU/Chipset. Here's why:

- A CPU, or central processing unit, is like the brain of any computer or mobile device.
- CPUs receive data from every other part of the device, and then decide how and when to launch apps, display images, and more.
- The CPU is a critical part of any modern device. Processors are essentially the central processing units (CPUs) of smartphones. They execute instructions, perform calculations, and handle data processing tasks at an incredible speed.
- When choosing a smartphone, one of the most important things to consider is the processor or chipset it uses. The processor is like the brain of the phone, responsible for doing all the tasks and making everything run smoothly.
- The CPU act as the brains of a smartphone, responsible for carrying out tasks, managing multitasking capabilities, and optimizing various hardware components to ensure smooth operation.

- Smartphones have become an integral part of our lives, and their processing power has increased dramatically over the years. At the heart of every smartphone is a central processing unit, or CPU.
- The CPU is divided into two main components: the control unit and the arithmetic logic unit (ALU). The control unit fetches instructions from memory and decodes them, while the ALU performs calculations and logical operations.
- The CPU communicates with other components on the SoC through buses. The memory bus connects the CPU to the RAM, and the I/O bus connects the CPU to other hardware components such as the camera or speakers.
- Smartphone CPUs are the brain of the device and are responsible for executing all the tasks and processes that keep the device functioning. The process of execution is broken down into three main steps: fetch, decode, and execute.
- Smartphone CPUs are the brain of the device and are responsible for executing all the tasks and processes that keep the device functioning. The process of execution is broken down into three main steps: fetch, decode, and execute.
- During the fetch step, the CPU retrieves the instruction from memory, which tells the CPU what task to perform. In the decode step, the CPU interprets the instruction and converts it into an understandable format for the CPU to execute. Finally, during the execute step, the CPU performs the requested task.
- Smartphone CPUs are at the heart of modern technology, driving the development of new devices and applications. From basic tasks like making calls and sending texts to advanced applications like machine learning and virtual reality, smartphones rely on powerful CPUs to perform their functions quickly and efficiently.

As technology continues to evolve, the importance of Plaintiff's smartphone CPUs will only continue to grow, driving the development of new and innovative devices and applications that will shape the future of technology.

Plaintiff's patented smartphone CPUs have revolutionized the way we communicate, work, and entertain ourselves. With cutting-edge technologies and continuous advancements in manufacturing, these tiny CPU/Chipsets are becoming more powerful and efficient every year.

As the world continues to become more reliant on mobile technology, the importance of Plaintiff's patented smartphone CPUs will only increase. Understanding how they work and what they are capable of is crucial for keeping up with the ever-evolving technological landscape.

Plaintiff has asserted independent patent claims 4, 5, & 6 of Plaintiff's '287 patent; and independent claims 1 & 11, and dependent patent claims 2-10, & 11-20 of Plaintiff's '619 patent to illustrate Plaintiff owns the patent rights for the smartphone central processing unit (CPU), and the right to exclude Google from making, using, offering for sell, and selling Plaintiff's patented smartphone CPUs.

## The Judge Fail to Recognize the Legal Standard for Dismissing a Case for Failure to State a Claim—12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), this Judge must accept as true all factual allegations in the complaint [which means all factual evidence of literal infringement determined by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267] and must draw inferences in a light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a Plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a Plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols., Inc.* that a Plaintiff must only give the alleged infringer fair notice of infringement.

With that being said, and because Plaintiff was pressured by the Judge to prove Plaintiff's case at the pleading stage, the Judge fail to adhere to the legal standard of pleading: A complaint

"should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay [examine] the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Store Co.*, 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)), and certainly not to do everything, including lying, to overturn the decision of the higher United States Court of Appeals for the Federal Circuit.

"The issue on a motion to dismiss is not whether the Plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

The doctrine of res judicata seeks "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *See State v. Ellis*, 466, 497 A.2d at 990

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Petitioner's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". The District Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

24

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment of the United States Constitution. No particular form for a jury trial demand is prescribed by California statute or court rule. (See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate"; "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all").

As noted in more detail throughout this motion for reconsideration, Google's present defense utilizes allegations already rejected by the Federal Circuit Court of Appeals. A case is *NOT* remanded unless there is some error or some correction that the lower court must make.

Google never corrected the error and simply duplicated the same defense. That Plaintiff's "frivolous" case should be dismissed because Plaintiff fail to state a claim for relief. [12(b)(6)]

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous" … [We] "conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart" … "[we] express no opinion as to the adequacy of the complaint or claim chart except that it is not frivolous."

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 directed the lower court to, "vacate the dismissal in Case No. 22-1267, and remand for further proceeding consistent with this opinion." Something this Court and the Judge has fail to do.

What's the purpose of having a United States Court of Appeals for the Federal Circuit (CAFC) if the lower courts continue to do as they please without considering the burden and expense placed on the Plaintiff. When the CAFC stated, "remand for further proceeding consistent with this opinion", it means just that. Not, I think I will just fly solo.

25

# DISQUALIFICATION

The Judge is without any right to adjudicate a device for alleged infringement that is outside the Court's jurisdiction. Plaintiff's case against Google far exceeds $10,000 in damages. Plaintiff informed the Court over and over again that this case was not about the direct infringement of the Government's DoD DTRA ATAK software and Draper (a third-party government contractor) CBRNE Plug-in sensors.

Even if the case was less than $10,000 in damages, the Government, "DoD DTRA" would have to be named as the defendant. The Judge ignored Plaintiff and allowed Google to redirect this case into a case between Plaintiff and the Government:

> "The United States Court of Federal Claims is a federal court of limited jurisdiction. The Federal Courts Improvement Act of 1982 abolished the original Court of Claims and the Court of Customs and Patent Appeals and replaced those courts with the newly created United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims. The jurisdiction of the United States Court of Federal Claims is currently codified in 28 U.S.C. § 1491. The court generally has exclusive jurisdiction over most monetary claims against the United States in excess of $10,000 and has concurrent jurisdiction with United States District Courts for all claims $10,000 and below." *United States Court of Federal Claims*

Plaintiff's case against the Government for allegedly infringing Plaintiff's multi-sensor detection device is pending at the United States Court of Federal Claims (COFC) *Golden v. US* case no. 23-811C. Google is not named as the Defendant in that case, nor is Google named as a third-party defendant in the case. But, the Department of Justice (DOJ) has entered a defense of "lack of subject matter" because they have made the case a case between the two private parties, Golden and Google, which is outside the COFC's jurisdiction.  The Judge, thus far, has entertained the DOJ's defense.

Plaintiff asked the Judge in the case pending at the United States Court of Federal Claims (COFC) *Golden v. US* case no. 23-811C, (**Exhibits A & B**) as far back as July, 2023 to disqualify himself for the same reasons Plaintiff is asking the Judge in this current case to disqualify herself. They both allowed a misdirected defense brought between the wrong parties that landed both of them outside of their respective jurisdictions.

Plaintiff's request for disqualification in *Golden v. U.S.* case no. 23-811C was never responded to by the Judge in that case. Instead, the Judge and the DOJ decided to wait on a decision in this current case *Golden v. Google* on a product pending for litigation in their Court.

Proof that the DOJ believes the Judge in this current has adjudicated a case outside her jurisdiction and in favor of the Government is attached as **Exhibit C**. In the DOJ's Notice to the Court the DOJ writes:

> "In its Order, the Northern District of California observed that "Golden does not allege that" the Defense Threat Reduction Agency ("DTRA")—the Government agency accused of infringement in the present case, see Dkt. 1 — "directly infringed the patents-in-suit" in that case and the present case. Ex. 1 at 5–6. "To the contrary," the court found, "Golden concedes that there was no such direct infringement by" the DTRA. Id. (citing Mr. Golden's statement in his Golden v. Google First Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement"). A copy of Mr. Golden's cited filing from Golden v. Google containing that statement (at p. 3) is attached as Ex. 2.

Plaintiff will make an attempt at understanding what message the DOJ is sending both Courts. First, Plaintiff does not allege that" the Defense Threat Reduction Agency ("DTRA") directly infringe the patents-in-suit" in the *Golden v. Google* case, but do allege the Defense Threat Reduction Agency ("DTRA") directly infringe the patents-in-suit" in the *Golden v. US* case.

27

The question here is, to what Court did Plaintiff concede that there was no such direct infringement by the DTRA? That statement is a lie. Also, Plaintiff never made the statement in the Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement" because even if no single party carried out all the steps, if Plaintiff is claiming "joint infringement", multiple parties can directly infringe the patents-in-suit.

When Plaintiff looked for "the statement cited filing from Golden v. Google containing that statement (at p. 3)", Plaintiff did not find the statement on page 3, nor paragraph 3 of Plaintiff's Amended Complaint. **(Exhibit D).** The DOJ only attached a chart as Ex. 2, not evidence of a statement made by the Plaintiff.


## The Judge Needs to Understand the Difference Between "Interconnected" and "Modification" Before Issuing Opinions in the Area of Computer Science.

The Internet of Things (IoT), is where everyday objects are becoming interconnected and revolutionizing the way we live and work. The IoT is a network of physical devices, vehicles, appliances, and other objects embedded with sensors, software, and connectivity that enables them to collect and exchange data.

IoT devices can connect to the internet through wired, wireless, cellular network, Wi-Fi, Bluetooth, Zigbee, Z-Wave, Thread, NFC, and other types of connections. Each method has its own advantages and use cases, depending on factors such as range, power consumption, data transfer speed, and security requirements.

The Internet of Things (IoT) is a revolutionary concept that refers to the interconnection of everyday objects and devices with the internet, enabling them to collect and exchange data.

These objects, also known as "smart" devices or "connected" devices, are embedded with sensors, software, and connectivity features that allow them to communicate with each other.

The key idea behind IoT is to enable devices to seamlessly communicate and share data, creating a network of interconnected devices that can make our lives easier, more efficient, and even safer. For example, a smart home setup can enable seamless control of lights, temperature, security systems, and other appliances through a smartphone.

While it primarily serves as a communication method between nearby devices, some IoT devices can utilize Bluetooth to connect to a smartphone. While NFC is commonly used for contactless payments and data transfer between smartphones, it can also be utilized by IoT devices. IoT devices with Wi-Fi connectivity can be controlled and monitored remotely through smartphones, tablets, or other devices connected to the same network. Similar to smartphones, IoT devices can utilize cellular networks to establish a connection, for sending and receiving.

The Google operating system software of a smartphone is the backbone of the device, not the brain, the brain of the smartphone is Plaintiff's patented CPUs, that manages the basic functions of the phone and providing a platform for applications to run.

Each Google operating system software is designed to provide a user-friendly interface that makes it easy to access the phones features. Communication protocols are the software that allows the phone to connect to networks, such as the cell towers used for cellular data and voice calls. These protocols are responsible for ensuring that the phone is able to send and receive data over the network.

The Google software, in particular, is responsible for managing the phones basic functions, connecting to networks, and providing access to applications. Without the software, the Google smartphone would be nothing more than an expensive paperweight.

Smartphone patents protect the intellectual property and inventions used to develop mobile electronic devices. More than a billion people worldwide use handheld devices to access the internet and use software via either the iPhone or [Google] Android operating system platforms. https://www.upcounsel.com/smartphone-patents

The Software Components segment of Smartphone is divided into 3 sub segments Mobile Apps, Mobile OS, and UX/UI. A total of 64,331 patents are filed in Software Components for Smartphones between 2007 and 2018 at the USPTO. https://insights.greyb.com/software-patents-wireless-phones/#:

There are roughly 40,000 new software patents issued each year — and the rate of issuance is growing over time. If we estimate that the average software patent has 20 claims — which isn't a stretch given that the average software patent between 1990 – 1995 had 16.8 claims — that is nearly five million potential restrictions on smartphone innovation. https://www.project-disco.org/intellectual-property/one-in-six-active-u-s-patents-pertain-to-the-smartphone/

Some significant smartphone software patents in recent years include the following:

- A software patent granted to the University of Illinois for a biosensor that can be used to test for the presence of bacteria or viruses in an individual's bodily fluid by using a smartphone.

- An eBay software patent for a sensor that determines that a specific user has authorized an online financial transaction, serving as a virtual wallet.

- A software patent granted to an individual for a smartphone device that can lock and unlock a handgun. The program also includes automatic locking when the

gun is in prohibited areas such as in a school zone. It can also lock the gun if owner

intoxication is detected.

- An Apple software patent that automatically alerts authorities if a crisis is

detected, including a car accident, medical emergency, or natural disaster.

# CONCLUSION

For the foregoing reasons, Plaintiff is asking the Judge to do at least one of the following:

1. Reopen the case and grant summary judgement

2. Reopen the case and order a trial

3. Disqualify and transfer the case

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 9th day of April, 2024, a true and correct copy of the foregoing "Plaintiff's Motion for Reconsideration and Motion for Disqualification", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit A

Case No: <u>1:23-cv-00811-EGB</u>

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(P) 864-992-7104 (E) atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br> *Plaintiff,*<br><br>V.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY,<br><br> *Defendant.* | **Patent Infringement**<br><br>July 19, 2023 |

## PLAINTIFF'S MOTION FOR DISQUALIFICATION

The Code of Conduct for United States Judges applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.

See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(2) (providing that "cognizable misconduct includes: (B) treating litigants [], or others in a demonstrably egregious and hostile manner... and Rule 4(a)(3) (providing that "cognizable misconduct includes intentional discrimination on the basis of race...").

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:

(C) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited

to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Plaintiff is asking the Judge to disqualify himself for the following reasons: 1- The DOJ is forcing the Judge to comply by intimidation or threats. 2- This current case is to complicated for the Judge. Exhibit A is a chart illustration of the case and should be adjudicated by someone with prior patent litigation experience. Plaintiff recommends Judge Patricia Elaine Campbell-Smith. 3- If after the Judge has read this document and see no wrong, Plaintiff is requesting the Judge disqualify himself because of a personal bias or prejudice the Judge has against Plaintiff.

| Patent #: 9,096,189; Independent Claim 1 | CMDC Devices: Specifications, Descriptions, Meanings, and Functions | Defense Presented by the DOJ & DHS in the Related Case *Golden v. US* No. 13-307C |
|---|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Following is an example of CMDC Devices that are not limited to any particular brand, model, or type of equipment:<br><br>HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC; Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode]; Asus/Qualcomm Smartphone for Snapdragon Insiders; LG V60 ThinQ 5G; Samsung Galaxy S21 Smartphone; Google Pixel 5 Smartphone; Apple iPhone 12 Smartphone | The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which places the case outside the COFC jurisdiction<br><br>When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicated to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC<br><br>The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR made by Rhevision. |

| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor. A processor, also known as CPU, consists of multiple cores: Dual, Quad, Hexa, and Octa core. What do these cores do exactly? Processor cores distribute the work that comes in when you use your phone. One core has a maximum number of instructions it can process within a certain amount of time.<br><br>A process is an operating system concept and it is the smallest unit of isolation provided by, for example, Windows operating system (OS). Application Domain or AppDomain is one of the most powerful features of the framework. AppDomain can be considered as a light-weight process. AppDomain is of great advantage for ISP (Internet Service Provider) who hosts hundreds of applications. Because each application can be contained in an application domain and a process can contain many such AppDomains.<br><br>Sensor Front-End Processors and Sensor Devices: These are processors that are designed to handle data from sensors and convert them into usable data for further processing. They are optimized for handling low-level sensor data and can perform tasks such as signal conditioning, filtering, and data acquisition. Sensor front-end processors are commonly used in sensor devices such as smartphones, wearables, and IoT (Internet of Things) devices. | The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case.<br><br>The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.<br><br>The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting.<br><br>As stated left of this column, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.<br><br>No where, did Golden claim the CPU is used as a sensor for CBR detection.<br><br>Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement.<br><br>Further, if the products do not have CPUs, the products cannot function correctly.<br><br>The case was dismissed because the DOJ & DHS lied to the Court. |

| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use. |
|---|---|---|
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The DOJ & DHS made sure the sensors and detectors required to have product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG. |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

4

| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and, | The DHS Cell-All initiative: "biological and chemical sensors could be [] integrated into common cell phone devices" … "miniaturized biological and chemical sensing with integration into common." "[] second-generation prototypes, chemical sensors were separated from the phones, allowing deployment of the sensors through third-party products, [] that could be added to existing phones (U.S. Department of Homeland Security, 2011a) | Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones.<br><br>When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices. |
|---|---|---|
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | 28 U.S. Code § 1498(a): "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be [] use or manufacture for the United States."<br><br>The NODE+ was invented and produced in 2011 by George Yu, Ph.D. Yu worked as a subcontractor to NASA on the DHS Cell-All initiative. The NODE+ sensor is an interactive scanner that uses … data from NASA to give information [] using sensors on your phone NODE+ wireless sensor platform is a handheld sensor that communicates wirelessly through Bluetooth with Apple iOS devices.<br><br>The Tucker Act, is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*. Instead, the substantive right must appear in another source of law; a "money-mandating constitutional provision, statute or regulation that has been violated…" *Loveladies Harbor, Inc. v United States* | Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative.<br><br>NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS.<br><br>The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."<br><br>The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision. |

| | | |
|---|---|---|
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Patent Specifications:**<br>It is another objective of the present invention to provide a multi sensor detection [] system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist…<br><br>Still yet a further objective of the present invention is to provide a multi sensor detection [] system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.<br><br>Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, [] biometric sensors, [] detection of humans…<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, [] monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, [] PDAs, [] and [] handhelds<br><br>Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, [] airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, [] terminal personnel. | After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.<br><br>Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.<br><br>The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for filing a claim in the United States Court of Federal Claims for just compensation.<br><br>It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.<br><br>The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated. |

| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection... short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" Golden asserted in the case has "capable of" in it. |
|---|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Patent specifications:**<br>"FIG. 1 is a perspective view of the... an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler... FIG. 14 is a representative schematic view of the... lock disabling system of the present invention illustrating interconnection of the... fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock ...<br><br>The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40... Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56... a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual ... The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety... and protection measures are completed... | Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.<br><br>The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.<br><br>The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed. |

| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.

The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |
| --- | --- | --- |

## Pursuant to 37 CFR § 11.303 Candor Toward the Tribunal: The DOJ & DHS Has Failed to Meet or Comply with the Following:

(a) A practitioner shall not knowingly:

  (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the practitioner;

  (3) Offer evidence that the practitioner knows to be false. If a practitioner,

the practitioner's client, or a witness called by the practitioner, has offered material

evidence and the practitioner comes to know of its falsity, the practitioner shall take

reasonable remedial measures, including, if necessary, disclosure to the tribunal.

  A practitioner may refuse to offer evidence that the practitioner reasonably believes is

false.

(b) A practitioner who represents a client in a proceeding before a tribunal and who knows that

a person intends to engage, is engaging or has engaged in [] fraudulent conduct related to the

8

proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) of this section continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by § 11.106.

(d) In an *ex parte* proceeding, a practitioner shall inform the tribunal of all material facts known to the practitioner that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

## THREE CLAIMS OF A GOVERNMENT "TAKINGS" OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSE OF THE UNITED STATES CONSTITUTION WITHOUT PAYING JUST COMPENSATION "RIPEN" WHEN A FINAL DECISION WAS MADE IN THE LEAD CASE 13-307C GOLDEN V. US, ON NOVEMBER 10, 2021 WITHOUT ADJUDICATING THE CLAIMS.

The claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'" proposes a framework for assessing the constitutionality of the Government's deliberate falsehoods. To this end, it builds on due process theory and doctrine, to identify when and how the Government's lies inflict the harms of deception and breach of trust in ways that endanger specific constitutional rights.

More specifically, it proposes that the Government's lies violate the Due Process Clause when they directly deprive individuals of life, liberty, or property; and in those extreme circumstances when they lack any reasonable justification and thus constitute an abuse of governmental power.

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures.

As an illustration, the Model Code of Judicial Conduct and the Model Rules of Professional Conduct impose an explicit duty of truthfulness [] on government actors, and others, who are also members of the bar.

9

- MODEL CODE OF JUDICIAL CONDUCT R. 4.1(A)(11) (2007) (prohibiting judges and judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement");

- MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(1) (2014) ("A lawyer shall not knowingly [] make a false statement of fact or law to a tribunal…");

- MODEL RULES OF PROF'L CONDUCT R. 4.1(a) (2014) ("In the course of representing a client a lawyer shall not knowingly [] make a false statement of material fact or law to a third person[.]");

- MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (2014) ("It is professional misconduct for a lawyer to [] engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]").

Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. *See* In re *Pautler*, 47 P.3d 1175 (Colo. 2002); In re *Carpenter*, 95 P.3d 203 (Or. 2004).

## Standards of Review

"The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow v. Fitzgerald,* 457 U.S. 800, 814-19 (1982)."

"The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied

10

but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976)."

"Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). Retrieved from: Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act

## *"Takings" I*

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

11

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

Golden's initial "takings" begin in 2008 when the DHS made a "final decision" to take and give Golden's intellectual property subject matter to Apple, Samsung, LG, NASA, Synkera, SeaCoast, Rhevision, and Qualcomm for development and commercialization. This happened two years before the DHS cause the release of the first infringing product in 2010.

Some statistics about the award: 1) Golden was the only person (African American) to hold a patent(s) for the cell phone sensing device the Government was requesting; Golden owned the only African American company (ATPG Technology, LLC) not awarded a contract, in view of the eight other white-owned companies that was awarded to develop and assemble Golden's patented devices; and, sixty millions African Americans are the only ones who are not benefitting from the three economic stimulus packages, through the not-for-profit company (ATPG Corporation) Golden established to receive funding specifically targeted for African Americans.

According to Macrotrends, between the years 2010 – 2026, Apple's total estimated revenues are $4.5T dollars; Samsung's total estimated revenues are $3.5T dollars; LG's total

estimated revenues are \$.9T dollars; and, Qualcomm's total estimated revenues are \$.5T dollars. The companies indirectly benefiting from the stimulus packages over the same time period is AT&T's total estimated revenues are \$2.6T dollars; Verizon's total estimated revenues are \$2.2T dollars; T-Mobile's total estimated revenues are \$.8T dollars; and Google's total estimated revenues are \$2.5T dollars.

Within the six-year statute of limitations period, in 2013 Golden filed a takings claim in the COFC. The DOJ & DHS motioned to "stay" Golden's takings claims and in 2014 the COFC court stayed Golden's takings claim until 2019.

The DOJ & DHS spent six years lying to the Court that Golden's takings claim was no different than Golden's infringement claims.

The COFC dismissed Golden takings claim because DOJ & DHS said "taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, sounds like infringement". The takings begin in 2003 and a final decision to take Golden's property [ripeness of the takings] was made in 2008. Two years before the first infringing product that included all the inventions' elements were released.

Therefore, Golden's Takings claim, for the Government taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, was never adjudicated before the case closed on November 10, 2021.

## *"Takings" II*

Within the six-year period from *10/01/2015*, Golden filed in the United States Court of Federal Claims, on *01/17/2019* in *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB, Golden initiated the filing of an Unconstitutional IPR-Based Takings claim against the Government, the United States.

In *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB *OPINION*. Document: 12 Page: 4 Filed: *05/14/2019*. The United States Court of Federal Claims responded to the Government's Motion to Dismiss for lack of jurisdiction: "Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB." … "Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB." … "In sum, plaintiff's takings claim duplicates his related patent action in Docket No.

13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's Motion is granted pursuant to Rule12(b)(1) and Rule12(b)(1)."

"On Appeal from the United States Court of Federal Claims in No. 1:19-cv-00104-EGB, Senior Judge Eric G. Bruggink, in the *OPINION* for *Larry Golden v. United States* CAFC Case No. 19-2134 Document: 37 Pages: 11-12 Filed: ***04/10/2020***. The Federal Circuit clarified the COFC's jurisdiction:

"We next turn to Golden's IPR-based takings claims. We first address whether the Claims Court had jurisdiction to hear these claims. ... The government argues that the American Invents Act ("AIA")'s creation of inter partes review by the Board, followed by judicial review before this court, creates a "'self-executing remedial scheme' that 'supersedes the gap-filling role of the Tucker Act.'" Id. at 41 (quoting *United States v. Bormes*, 568 U.S. 6, 13 (2012))."

"According to the government, the AIA statutory scheme displaces Tucker Act jurisdiction because there is no procedural impediment to presentation of a takings claim to the agency and because the remedial scheme provides for judicial review of constitutional challenges to the agency's action. Id. at 43–49. The government's argument is without merit."

"In *Bormes*, the Supreme Court explained that Tucker Act jurisdiction is displaced "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." 568 U.S. at 12 (emphasis added). More recently, the Court explained that, "[t]o determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Horne v. Dep't of Agric.*, 569 U.S. 513, 526–27 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). Thus, when there is a precisely defined statutory framework for a claim that could be brought against the United States, the Tucker Act gives way to the more specific statutory scheme. Regardless of the structure of review it establishes, the AIA is not a statute that provides for claims against the United States."

"The government is correct that, under the AIA, parties may raise constitutional challenges in our court on appeal from Board decisions. But this remedial scheme does not convert the AIA into a statutory framework for claims against the United States. The AIA is by no means "a law assertedly imposing monetary liability on the United States." Borne,

568 U.S. at 12. Accordingly, we reject the government's argument that the AIA displaced Tucker Act jurisdiction over Golden's IPR-based takings claims."

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed **11/03/20**, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's IPR-Based Takings claims. Golden could never be time barred when the Claim was still pending in an active case.

The DOJ, the Defendant, continued to defend against Golden's "Takings" claim. In the lead case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on **07/08/2021**, "Defendant the United States' Notice Regarding Service of The Government's Preliminary Invalidity Contentions", with more unqualified patent and publications' references.

When the United States causes injury to property, a property owner can sue in the Court of Federal Claims. This is a result of the Tucker Act, which waives the United States' sovereign immunity in the COFC only, *United States v. Mitchell*, 463 U.S. 206, 215-19 (1983).

Significantly, a suit alleging a compensable taking in the Court of Federal Claims is viable as soon as government invades a property interest without proving a statutory compensation guarantee. *Kirby*, 467 U.S. at 5; Dow, 357 U.S. at 22. The claimant need not sue in another court to "ripen" the takings suit. As the Court stated long ago in *Great Falls Mfg. Co.*, 112 U.S. at 656.

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s).

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate patents; with three unqualified patent references [Astrin, Breed, and Mostov] that does not antedate Golden's patents.

15

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s) with any number of unqualified references.

The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on *11/10/2021*, which "ripen" the takings claim.

## *"Takings" III*

When the DOJ & DHS insisted on a dismissal in their favor *Golden v. US* Case No. 13-307C; dismissed 11/10/2021, without proving non-infringement or that the patents are invalided, it left the patents with the "presumption of validity". Which means the government cannot appropriate or use Golden's patents without paying "just compensation".

The Supreme Court explicitly recognized that patents are property secured by the Fifth Amendment Takings Clause. In *Horne v. Department of Agriculture* 569 U.S. 513 (2013) ("Horne I"); 576 U.S. 350, 135 S. Ct. 2419 (2015) ("Horne II"), the Court held that the Takings Clause imposes a "categorical duty" on the government to pay just compensation whether it takes personal or real property.

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

"*[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser.*"

James Madison, the author of the Takings Clause, once wrote: "Government is instituted to protect property of every sort." The Court's decision vindicates Madison's intent to limit the government's power to take property, both personal and real, without just compensation. And it

extends a long line of cases recognizing that "property" in the constitutional sense subsumes all things arising from labor and invention.

The DOJ & DHS never proved Golden's patents are invalid, and yet, continues to used them without paying just compensation. The only thing the DOJ & DHS proved in the *Golden v. US* Case No. 13-307C is how much of massive liars they are. Examples of their falsehoods are:

The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which placed the case outside the COFC jurisdiction.

When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicate to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC.

The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR developed by Rhevision.

The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case. The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.

The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting. As stated in the chart above, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.

No where, did Golden claim the CPU is used as a sensor for CBR detection. Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement. Further, if the products do not have CPUs, the products cannot function correctly. The case was dismissed because the DOJ & DHS lied to the Court.

The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use.

The DOJ & DHS made sure the sensors and detectors required to have a product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG.

The DOJ & DHS chose not to challenge the communication methods limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.

The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it.

Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones. When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices.

Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative. NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS. The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."

The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision.

After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.

Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.

The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for

filing a claim in the United States Court of Federal Claims for just compensation.

It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.

The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated than *Golden v. US* case no. 13-307C. **Exhibit A: Claim Chart of Current Case No. 23-811C**

Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.

The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.

The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed.

**Exhibit B: Illustration of Damages**

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of July, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Disqualification", was served upon the following Defendant by priority "express" mail:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513


s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit B

Case No: <u>1:23-cv-00811-EGB</u>

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605

(M) 864-992-7104

(E) atpg-tech@charter.net

|  |  |
|---|---|
| LARRY GOLDEN,<br><br>    *Plaintiff,*<br><br>V.<br><br>THE UNITED STATES,<br><br>    *Defendant.* | **Patent Infringement**<br><br><br>August 4, 2023 |

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR DISQUALIFICATION

This reply, in support of Plaintiff's motion to dismiss, consist of substantial evidence that there exists such a personal bias, prejudice or interest on the part of the Judge [Bruggink] that the Judge would be unable to rule impartially." *State v. Fie*, 320 N.C. 626, 627 (1987); accord *State v. Honaker*, 111 N.C. App. 216 (1993); *In re Nakell*, 104 N.C. App. 638 (1991). Plaintiff pleadings demonstrates objectively that grounds for disqualification actually exist.

Plaintiff's allegations in this motion to disqualify and recuse are such that findings of facts will be required regarding the alleged basis of the Judge's bias or conflict, [Therefore] the

Judge should refer the matter to another Judge to conduct the hearing. See *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303 (1976) (citing *Ponder v. Davis*, 233 N.C. 699 (1951)).

Plaintiff have asked that the case be transferred to Judge Patricia Elaine Campbell-Smith because she has an undergraduate degree in electrical engineering from Duke University and extensive patent litigation experience with the law firm of Liskow & Lewis in New Orleans, Louisiana. "[T]he standard for ordering recusal is whether there are reasonable grounds to question the Judge's objectivity. The Judge is only required to order recusal (or refer the matter over to another Judge to decide whether recusal is necessary) if a reasonable person, knowing all the facts, would have doubts about the Judge's ability to be impartial in the case. See *State v. Vick*, 341 N.C. 569 (1995); *State v. Fie*, 320 N.C. 626 (1987); *State v. Poole*, 305 N.C. 308 (1982); *State v. Moffitt*, 185 N.C. App. 308 (2007); *State v. McRae*, 163 N.C. App. 359 (2004).

Plaintiff have doubts about the Judge's ability to be impartial in the case; and that the Judge would be unable to rule impartially, because Plaintiff believes Judge Bruggink is being intimidated and forced to act or decide cases under duress created by the Department of Justice (DOJ) and the Department of Homeland Security (DHS).

In certain limited circumstances, a Judge may be removed from office for "incompetency, misconduct, neglect of duty, engaging in the practice of law, or physical or mental disability" by the U.S. Court of Appeals for the Federal Circuit. 28 U.S.C. § 176(a) [1]

---

[1] 28 U.S.C. § 176 – Removal from Office

    (a) Removal of a judge of the United States Court of Federal Claims during the term for which he is appointed shall be only for incompetency, misconduct, neglect of duty, engaging in the practice of law, or physical or mental disability. Removal shall be by the United States Court of Appeals for the Federal Circuit, but removal may not occur unless a majority of all the judges of such court of appeals concur in the order of removal.

    (b) Before any order of removal may be entered, a full specification of the charges shall be furnished to the judge involved, and such judge shall be accorded an opportunity to be heard on the charges.

    (c) Any cause for removal of any judge of the United States Court of Federal Claims coming to the knowledge of the Director of the Administrative Office of the United States Courts shall be reported by him to the chief judge of the United States Court of Appeals for the Federal Circuit, and a copy of the report shall at the same time be transmitted to the judge.

# ACTING UNDER "DURESS"; FORCE AND INTIMIDATION

## History of the Government's Intimidation and Threats

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to drop Plaintiff's Fifth Amendment "Takings" of Plaintiff's property claim [28 U.S.C. 1491(a)] against the DHS; in view of the fact that Plaintiff, over a four-year period, received response letters from President Bush, VP Cheney, and three South Carolina U.S. Senators Holland, DeMint, and Graham stating they sent Plaintiff's strategies and technology rational over to the DHS. The DHS in 2008 awarded eight (8) white-owned companies' [Qualcomm, Apple, Samsung, LG, NASA, Synkera, SeaCoast, and Rhevision] contracts to develop, manufacture, and commercialized the patented technology of Plaintiff. The only African American owned company [ATPG Technology, LLC], who's African American CEO [Plaintiff] hold the patent(s) on the technology the DHS requested in its DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* solicitation, never received a licensing agreement or contract. The CFC Judge, while acting under Duress, dropped the original Fifth Amendment "Takings" of Plaintiff's property claim, that ripen in 2008 when the DHS awarded eight (8) white-owned companies' contracts to develop, manufacture, and commercialized the patented technology of Plaintiff, and changed the Fifth Amendment "Takings" of Plaintiff's property claim, to a claim of "takings" that sounds in patent infringement to dismiss the case.

> "Pending before the court is defendant's March 18, 2019 motion to dismiss plaintiff's takings claims under Rules 12(b)(l) and 12(b)(6) of the Rules of the United States Court of Federal Claims. Defendant argues that plaintiffs purported takings claims are, in substance, patent infringement claims, which cannot be brought under the Tucker Act, 28 U.S.C. § 1491 (2012), but must instead be brought under the court's separate patent jurisdiction, 28 U.S.C. § 1498(a) (2012)." *Golden v. US* Case No. 13-307C Dkt. No. 171 Filed 05/08/2019

The PTAB Judges at the United States Patent and Trademark Office (USPTO) Patent Trials and Appeals Board (PTAB) in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, who were not, and is not, "persons" authorized to petition the PTAB to invalidate the patents of

3

Plaintiff; to institute a trial to invalidate Plaintiff's '990 patent claims with the unqualified patent references of Astrin, Breed, and Mostov that does not antedate the priority date of Plaintiff's Patents. The PTAB was forced to ignore the fact that no "white" patent owner has ever had to defend his patent(s) at the PTAB against an unauthorized Government agency; and no "white" patent owner has ever had to defend his patent(s) at the PTAB against unqualified patent references that do not antedate the priority date of "white" patent owner's patents, asserted in an *Inter Partes Review* (IPR) by an unauthorized Government agency. Clearly the DOJ & DHS intimidated and forced the Judges to invalidate the Patent Owner's patent claims as a means of retaliating against Plaintiff for filing a complaint against the DHS. The Supreme Court has defined retaliation as an intentional act in response to a protected action. It carries with it the notion of "getting even." As noted in a 2011 law review article: "Retaliation is the deliberate action against African American inventors, used to send a clear message that complaining is unwelcome and risky. *Dred Scott v. Sandford* (1857). In this ruling, the U.S. Supreme Court stated that enslaved people were not citizens of the United States and, therefore, could not expect any protection from the federal government or the courts. Arguably, free blacks were precluded from patenting their inventions after *Dred Scott* because they did not have a country of citizenship and presumably could not swear to the Patent Oath. The Court viewed slaves as "property," and the Fifth Amendment forbids Congress from taking property away from individuals without just compensation.

The PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, to ignore the multiple times the Patent Owner "begged" the DOJ, DHS, and PTAB before, during, and after the institution of the *Inter Partes Review* (IPR) to not take the Patent Owner's patent claims with unqualified patent references. *Procedural Due Process* refers to the constitutional requirement that when the federal government acts in such a way that denies a citizen [Patent Owner] of a life, liberty, or property interest, the person must be given notice, the opportunity to be heard, and a decision by a neutral decision-maker. The following is Patent Owner's evidence:

> ***Patent Owner's Preliminary Response (Paper 10).*** The anticipation basis describes whether the reference is being considered for by its publication date or its priority date. The Patent Owner repeated the DHS/DOJ's anticipation basis in a chart distinguishing: Reference Filing Date / Publication Date (i.e., 120(b)) / Basis for

4

anticipation—Priority Date (102(e)), for U.S. Patent Application Publication No. 2006/0250235 ("Astrin") Publication Date 11/09/2006 Basis 102(b); U.S. Patent Application Publication No. 2006/0181413 ("Mostov") Publication Date 08/17/2006 Basis 102(b); and, U.S. Patent No. 7,961,094 ("Breed") Priority Date 11/29/2007 Basis 102(e). With this disclosure in a preliminary response to the DHS/DOJ's petition for Inter Partes Review (IPR), and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated.

>    *ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 23)*. "We noted that, while we are not constraining what Mr. Golden can argue in the Patent Owner Response, he may be best served by focusing on the challenges on which trial was instituted" [*the PO understood this to mean, the PTAB did recognize Astrin, Breed, & Mostov as being unqualified references, and that the PO had better focus on the challenge of showing how the PO's patent claims was not antedated by the unqualified references*]; "If the Motion to Amend is non-contingent, Mr. Golden is, in essence, abandoning the claims at issue, and saying that we should only look at the claims as amended in the Motion to Amend" [*if the Motion to Amend was non-contingent, and the PO was abandoning the claims at issue, and the PO's intention was to submit new substitute claims, the PO would have stated that in his Motion to Amend submitted on January 7, 2015—but he did not*]; "Mr. Golden has the burden to show a patentable distinction for each proposed substitute claim over the prior art" [*not possible, the way anticipation works is the references of Astrin, Breed, & Mostov has a priority date that antedates the PO's priority date for the RE43,990 patent asserted in the IPR, but because the references of Astrin, Breed, & Mostov priority date does not antedate the PO's priority date for the RE43,990 patent, it is procedurally impossible*]; "In addition, if Mr. Golden is relying on any priority documents to establish an effective filing date, he should also point to where support occurs in those priority documents" [*the only priority document the PO needed to show priority over Astrin, Breed, & Mostov's "basis for anticipation" was the PO's patent no. RE43,990 asserted in the IPR*] …

>    *Patent Owner's Response (Paper 24)*. "The PO again presented the DHS/DOJ with an opportunity to correct their mistake in the Patent Owner's Response, "[t]hus, the

'990 patent antedates Astrin (published on 11/09/2006) and Mostov (published on 08/17/2006), thus resulting in both being ineligible as prior art under 102(b), and antedates Breed (filed on 11/29/2007), thus resulting in it being ineligible as prior art under 102(e)." With this disclosure in the Patent Owner's Response, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

*Patent Owner's Non-Contingent Motion to Amend Claims (Paper 25)*. Again, the PO tried to get the PTAB to respond to the PO's claim that the references of Astrin, Breed, and Mostov does not antedate the PO's '990 patent, "Patent Owner's date of invention is at least as early as April 5, 2006 which is before the publication dates of Astrin and Mostov, and the filing date of Breed." With this disclosure in the Patent Owner's Non-Contingent Motion to Amend Claims, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

In a motion to amend, the PO bears the burden to show a patentable distinction of each proposed substitute claim over the [unqualified] prior art. See 37 C.F.R. § 42.20(c). To that end, the Patent Owner sent the references of Astrin, Breed, and Mostov over to the USPTO for examination. The Examiner writes "[t]he references of petitioner DHS such as Exhibit 1005, 1169, US patent No. 5,959,529 and 7,148,484 and US application No. 13/701,449 do not relevant to the independent claims as a whole. They just had one or more elements in the claimed limitations but do not meet as a whole invention", which means, even if the references of Astrin, Breed, and Mostov were qualified prior art to the PO's '990 patent; according to the USPTO the claims at issue and the substitute claims are patentable and allowable. The PTAB refused to acknowledge the findings of the USPTO. This too was another opportunity for the DHS/DOJ to correct their mistake, but instead they chose to continue retaliating to take the PO's property.

Because the references of Astrin, Breed, and Mostov do not antedate the PO's '990 patent, the only thing that was accomplished in the DHS/DOJ's *inter partes review* is the demonstration of how the patents of Astrin, Breed, and Mostov are invalid because the subject matter is anticipated by the PO's '497 patent.

**Patent Owner's Response: "Motion to Amend" (Paper 26)**. Equally, in the Patent Owner's Response: "Motion to Amend", "Petitioner asserted that Astrin was available as prior art under 35 U.S.C. §102(b) as of November 9, 2006 upon publication. Petition for Inter Partes Review of U.S. Patent No. RE43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104, page 2, lines 12-14. This date is after Patent Owner's priority date of April 5, 2006, and Astrin is therefore disqualified as prior art under 35 U.S.C. §102(b) and cannot be applied against claims 11, 74 or 81 because this publication date is not more than one year before Patent Owner's filing date. Petitioner asserted Mostov as prior art under 35 U.S.C. §102(b) as well and stated that this publication date was August 17, 2006. Petition, page 3, lines 1-3. As August 17, 2006 is not more than one year before, but is in fact after, Patent Owner's filing date of April 5, 2006, Mostov is likewise disqualified as prior art under 35 U.S.C. §102(b). Petitioner also asserted Breed as prior art under 35 U.S.C. §102(e) and stated that the filing date of the application of Breed was November 29, 2007. Petition, page 3, lines 4-6. Patent Owner's date of invention is at least as early as April 5, 2006 which is before the filing date of November 29, 2007 of Breed and likewise this reference is not prior art to claims 11, 74 and 81 under 35 U.S.C. §102(e). With this disclosure in the Patent Owner's Response: "Motion to Amend", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

**ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)**. The PO never really understood how to amend claims to overcome 102-antipation objections when the references do not actually antedate the patent at issue: "Petitioner initiated the conference call ... In its e-mail requesting the call, <u>Petitioner stated that Patent Owner filed both a contingent and a non-contingent Motion to Amend</u>, while only a single motion was

authorized by rule. See 37 C.F.R. § 42.121(a) (stating that a "patent owner may file one motion to amend a patent") ... We noted also that Mr. Golden had filed two papers with respect to the motion to amend—Paper 25, titled "Non-Contingent Motion to Amend," and Paper 26, titled "Motion to Amend Claims." Mr. Golden stated that he was unclear as to how the Motion to Amend should be designated as a noncontingent motion to amend, and thus, in an abundance of caution, he filed a separate paper designating the motion as non-contingent ... As both papers collectively appear to meet the page limit for a motion to amend, we will treat them in the collective as a single motion to amend. Petitioner does not oppose ... Accordingly, it is ORDERED that Papers 25 and 26 will collectively be treated as a single, non-contingent, Motion to Amend, with the proposed claim amendments being set forth in Exhibit 2020". It was the Judge who decided the PO's Motion to Amend was non-contingent; not the Patent Owner. [1]

   *Patent Owner's Reply to Petitioner's Opposition to Patent Owner's Motion to Amend Claims (Paper 33)*. I. SUBSTITUTION CLAIMS ANTEDATES THE PRIOR ART ... 3 – 15. "The amendment makes the prior art of Astrin and Breed unavailable because the subject matter antedates Astrin's publication date and Breed's application filing." Therefore, it is irrelevant that the original claims at issue was cancelled; relevant is the fact that "But For" the DHS/DOJ's "willful blindness", and the multiple opportunities the DHS/DOJ had to correct their mistakes, the IPR would not have been instituted or the IPR would have been withdrawn before the "Final Written Decision".

---

[1] The Defendant ("Government") is redirecting and narrowing the IPR-Based Unconstitutional Takings to Golden's cancellation of patent claims. The Defendant's never denied petitioning the PTAB as a "person" unauthorized to do so; never denied petitioning the PTAB with unqualified references; petitioning the PTAB as a way to retaliating against Plaintiff for filing a complaint against the Government; being "willfully blind" to the many, many times the Patent Owner / Golden tried to get the Government to respond to the PO's claim that the references did not antedate, and Golden's claim of an Unconstitutional IPR-Based "Taking".

   *Final Written Decision 35 U.S.C. § 318(A) and 37 C.F.R. § 42.73 (Paper 35)*.
First, it is recognized further that it was the PTAB Judges who selected the "Non-Contingent Motion to Amend with unqualified references that do not antedate the PO's

'990 patent, "On January 13, 2015, Patent Owner filed a Patent Owner Response (Paper 24 ("PO Resp.")), a Non-Contingent Motion to Amend (Paper 25 ("Non-Cont. Mot. to Amend")), and a Motion to Amend (Paper 26 ("Mot. to Amend"))" ... "The Patent Owner Response contains arguments directed both to claims 11, 74, and 81 and to the proposed substitute claims. To the extent Patent Owner argues the patentability of claims 11, 74, and 81, those arguments are moot because Patent Owner has cancelled those claims. To the extent that Patent Owner wishes us to apply the arguments made regarding claims 11, 74, and 81 to the patentability of the amended claims or incorporate arguments regarding claims 154–156 from the Patent Owner Response into the Motion to Amend, we decline to do so ... Patent Owner is precluded from incorporating arguments regarding the patentability of claims 11, 74, and 81 from the Patent Owner Response into the Motion to Amend to address how proposed substitute claims 154–156 are patentable". But yet, it was the PTAB Judges who combined the two motions and decided for the PO that the two motions will be considered a non-contingent motion to amend.

Second, it was only in the "Final Written Decision" that the PTAB Judges addressed the references of Astrin and Breed as unqualified references that do not antedate original claims at issue and the substitute claims of the '990 patent, "We next consider Patent Owner's argument that Astrin, Mostov, and Breed are not prior art because the amended claims are entitled to the April 5, 2006 priority date. Mot. to Amend 2–7. Even accepting, for the sake of argument, that the substitute claims are entitled to this earlier priority date, at the very least, Mostov remains prior art under 35 U.S.C. § 102(e) because Mostov's non-provisional filing date is January 30, 2006. Ex. 1003, at [22]". The DHS/DOJ should not have petitioned with Astrin and Breed, and the PTAB should not have instituted with Astrin and Breed, which resulted in the unconstitutional "takings" of the Patent Owner's property.

Third, when the PTAB changed the anticipation basis of Mostov from that of 35 U.S.C. § 102(b) to that of 35 U.S.C. § 102(e), the PTAB literally instituted a new trial, "Mostov remains prior art under 35 U.S.C. § 102(e) ... The fact that we did not institute this proceeding on Mostov does not mean it is no longer relevant to the patentability of the substitute claims". The PO demonstrated how Mostov with an anticipation basis of 102(b) do not antedate the priority date of the '990 patent. If the PTAB was interested in

9

changing the anticipation basis of Mostov, the PTAB should have done so when the PTAB instituted the case to trial. Not after the PO has defended his original claims at issue (i.e., 11, 74, & 81 of the '990 patent) against the unqualified patent references of Astrin and Breed.

    ***Patent Owner's Request for Rehearing (Paper 36)***. With the following disclosure in the Patent Owner's Request for Rehearing", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. Email sent by the PO on October 2, 2015:

> "Mostov, does not qualify as prior art to the Patent Owner's priority date of April 5, 2006 because Mostov was not made public (in a publication) until August 17, 2006. For this reason, the Patent Owner is asking the Board to reverse the 102(e)-anticipation rejection because the Petitioner never filed a 102(e) objection and the Patent Owner was never allowed to respond to a 102(e) objection."

> "On page 26 of the "Final Written Decision" Mostov was re-entered because the Board, "consider Mostov still to be relevant to the patentability of the claims". The Board also states, "at the very least, Mostov remains prior art under 35 U.S.C. 102(e). It should be noted the Petitioner entered the Mostov patent into record under 35 U.S.C. 102(b) and not under 35 U.S.C. 102(e). (IPR Petition; content page and pages 3, 4, & 29). The Patent Owner doesn't recall ever having to respond to a motion made by the Petitioner to change its objection from a 102(b) objection to a 102(e) objection. The Patent Owner is totally unaware of any PTAB rule that would allow for such a change without the Patent Owner having a chance to respond to the amendment to the Petition."

> "Mostov's patent provisional filing date is January 28, 2005. The Patent Owner's "Disclosure Document" filing date is November 26, 2004. Therefore, any subject matter Mostov has outlined in his claims, according to the Federal Circuit decision above, is anticipated by the Patent Owner because the Patent Owner's "Disclosure Document" antedates Mostov's patent provisional filing date. (Attached is a copy of the "Disclosure Document" submitted to the USPTO for the benefit of the Patent

10

Owner that displays a USPTO stamped filing date and a stamped document no. of 565732 used for reference."

The DHS/DOJ knew, or should have known after the Patent Owner repeatedly "begged" the Agencies not to take the property of Golden, that the references of Astrin, Breed, & Mostov do not antedate the priority date of the Patent Owner's '990 patent.

The PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, to conduct a telephone conference call without the DHS & DOJ being present in an effort to convince Patent Owner to change his current motion to amendment to that of a non-contingent motion to amend which requires the cancellation of claims. In an effort to cease the takings of Plaintiff's patent claims, the Patent Owner never decided or agreed to an amendment where the Patent Owner kept the asserted patent claims or a non-contingent amendment which requires the cancellation of the asserted patent claims. It was the Judge who was intimidated and forced to act under duress who decided the PO's Motion to Amend was non-contingent; not the Patent Owner.

"Petitioner initiated the conference call ... In its e-mail requesting the call, Petitioner stated that Patent Owner filed both a contingent and a non-contingent Motion to Amend, while only a single motion was authorized by rule. See 37 C.F.R. § 42.121(a) (stating that a "patent owner may file one motion to amend a patent") ... We noted also that Mr. Golden had filed two papers with respect to the motion to amend—Paper 25, titled "Non-Contingent Motion to Amend," and Paper 26, titled "Motion to Amend Claims." Mr. Golden stated that he was unclear as to how the Motion to Amend should be designated as a noncontingent motion to amend, and thus, in an abundance of caution, he filed a separate paper designating the motion as non-contingent ... As both papers collectively appear to meet the page limit for a motion to amend, we will treat them in the collective as a single motion to amend. Petitioner does not oppose ... Accordingly, it is ORDERED that Papers 25 and 26 will collectively be treated as a single, non-contingent, Motion to Amend, with the proposed claim amendments being set forth in Exhibit 2020". ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)

Two days after the CFC Judge in *Golden v. USA* Case No. 13-307C denied on 11/30/2016 the Government's motion to dismiss under 12(b)(1) and 12(b)(6); in a telephone conference call

on 12/02/2016 the Judge in *Golden v. USA* Case No. 13-307C was intimidated and forced to act under duress, by three (3) attorneys representing the Department of Justice (DOJ) and three (3) attorneys representing the Department of Homeland Security (DHS) to first, drop Plaintiff's alleged infringement claim against the National Institute of Justice (NIJ) because the stated she has never heard of the NIJ [NIJ is the research, development and evaluation agency of the U.S. Department of Justice]; and second, to allow the DOJ & DHS another chance at having the same alleged infringement claims, alleged against the same government agencies, who is allegedly infringing the same patent claims, another chance at having Plaintiff's alleged government infringement claims dismissed under 12(b)(1) and 12(b)(6). The Judge was intimidated and forced to act under duress to make those decisions without a motion from the Government or explanation on why the Court's opinion on 11/30/2016 needed to be reversed.

On March 29, 2018, the CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to cancel 61 of 72 alleged infringement claims against the Government because the use of the smartphones [consumer devices] were purely incidental. When the DHS S&T Directorate released the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* solicitation it was for the development of a mobile device [i.e., cell phone] capable of CBRNE *ubiquitous* [in all places at all times] sensing. The DHS contracted Qualcomm as the prime contractor responsible for the assembly of the new sensing device. Qualcomm was responsible for the new GPS and Tracking needed for the new device; responsible for the new safety mechanisms of a disabling lock, biometric authentication, and fear-field communication; the integration methods; the reporting methods; miniaturized sensors; and the various sensing methodology for chemical, biological, radiological, nuclear, and explosives. DHS "authorized and consented" to the devices' being manufacture by, or for the government; a new novel mobile device [i.e., cell phone] capable of CBRNE *ubiquitous* [in all places at all times] sensing. Therefore, the use by the government of the consumer devices named in Golden's alleged patent infringement claims, was not "purely incidental".

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to drop, without explanation, Qualcomm as a third-party contractor. Qualcomm was the prime third-party contractor for the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and*

12

*Chemical Sensing* initiative. Qualcomm was responsible for four essential components for the new cell-phone sensing device: 1- the mobile device, 2- the CBRNE detectors/sensors, 3- the central processing units (CPUs), and 4- the wireless cellular modems. The DOJ & DHS omitted Qualcomm as a third-party contractor [only after serving Qualcomm notice to appear to protect its interest] and introduced a defense that the mobile devices [without patents] are the property of the private parties, and no sensing element identified was native to the manufacture of the private parties' devices, the CPUs are sensors for CBR detection, and the essential CPUs inclusion only enlarged the case. This type of disparate treatment only happens to African American inventors.

In a related case in the Northern District of California, *Federal Trade Commission v. Qualcomm Incorporated*, NDC Case No. 17-CV-00220-LHK, the Court found that it was an anticompetitive practice for Qualcomm to collect a 5% royalty on the price of each handset, i.e., smartphone sold, without having the patent rights, a license, or authorization to do so. Qualcomm has full knowledge that the African American inventor, Golden owns the patent rights to collect a royalty on the price of each handset, i.e., smartphone sold. When the case was appealed in *FTC v. Qualcomm*, Ninth Circuit US Court of Appeals No. 19-16122 (9th Cir. 2020), the Department of Justice (DOJ) intervene by threatening the withdrawal of jurisdiction from the Northern District of California to the U.S. Court of Federal Claims. The DOJ intervened to say that Qualcomm is doing 5G work that is vital to national security [implied] under contract with the Department of Energy. The DOJ raised this issue against a sister Federal Agency in the Defense of Qualcomm and against Golden. Which means Qualcomm can commit antitrust crimes while performing work for the Government because the Government has not consented to being sued for antitrust violations:

> "The United States [Department of Energy] as a sovereign is immune from suit unless it unequivocally consents to being sued. The United States Supreme Court in *Price v. United States* observed: "It is an axiom of our jurisprudence." It makes no difference which party was successful in the district court [Federal Trade Commission], for, if timely appeal is taken [Ninth Circuit], the case remains a "pending suit" which must be dismissed upon withdrawal of jurisdiction [withdrawal of jurisdiction from the Northern District of California to the U.S. Court of Federal Claims]. See *Gulf Refining Co. v. United States*, 269 U.S. 125, 137 (1925); *Gulf, Col. & S.F. Ry. v. Dennis*, 224 U.S. 503, 506 (1912); *United States v. The Schooner Peggy*, 1 Cranch (5 U.S.) 102, 110 (1801)."

13

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to falsely apply the six-year "statute of limitations doctrine" for litigating Golden's "Unconstitutional IPR-Based "Takings" claim as being time barred.

The "Takings" of Golden's property started on *05/01/2014* when the two Defendants in the lead case, the DHS & DOJ, who are not "persons" authorized to petition for *inter partes review* (IPR) at the PTAB to invalidate patents; submitted a petition for *inter partes review* to the PTAB to invalidate Golden's patent with three unqualified patent references, eighteen unqualified publications, and one unqualified declaration. The only exception is that the Patent Owner is an African American inventor (Golden).

On *Oct. 1, 2015* the PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, to issue a Final Written Decision invalidating Golden's substitute claims 154, 155, & 156. There's no law, provision, or statute available for invalidating patent claims (i.e., independent, dependent, or substitute) under a 102-anticipation basis, with references that do not antedate the Patent Owner's patents' documented priority date. The only exception is that the Patent Owner is an African American inventor (Golden).

On *Jan. 29, 2019* the PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, to consolidate Golden's IPR-Based Unconstitutional "Takings" (Case No. 19-104C), with the lead case (Case No. 13-307C). "On January 17, 2019, plaintiff filed a complaint alleging the government has taken several patents without paying just compensation in violation of the Fifth Amendment … Because this action shares the identical questions of law and fact with Golden, No. 13-307C, and it is in the interest of judicial economy to consider them together, it is proper to consolidate the cases. ***Golden v. United States, 19-104C, therefore is consolidated with Golden v. United States, 13-307C***."

According to the Federal Circuit in *Golden v. US* CAFC Case No. 19-2134 Dkt. 37 Filed *04/10/2020*, "Golden may argue that, in view of *Return Mail*, the cancellation of the patent claims [at least the substitute claims] in an *inter partes review* initiated by the government could be considered an unconstitutional taking under the Fifth Amendment."

14

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed *11/03/20*, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's Unconstitutional IPR-Based Takings claim. Golden could never be time barred when the Unconstitutional IPR-Based Takings Claim was still pending in the lead case *Golden v. US*, No. 13-307C that only ended *11/10/2021*.

The statute of limitations is being falsely applied because within the six-year period following the PTAB final written decision *(Oct. 1, 2015)*; Golden filed in the Claims Court an Unconstitutional IPR-Based "Takings" of Property claim on *01/17/2019* (Case No. 19-104C). On *01/29/2019* the Trial Court consolidated the cases in the interest of judicial economy (Case No. 19-104C and the lead Case No. 13-307C). Golden filed for Summary Judgement on the IPR-Based Unconstitutional "Takings" claim on *11/03/2020*. The Trial Court dismissed the lead case COFC 13-307C on *11/10/2021*, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim.

The "Takings" continued up to the day the Trail Court, that included the same two Defendants (DHS & DOJ), dismissed Golden's lead case COFC 13-307C on November 10, 2021 without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim. Therefore, because this case has never been litigated, the case cannot be barred by *Jes Judicata*.

## CONCLUSION

Judicial misconduct occurs when a Judge acts in ways that are considered unethical or otherwise violate the Judge's obligations of impartial conduct. It is Plaintiff's argument that Judge Bruggink is being intimidated by the DOJ to act under duress.

Otherwise, the Judge Bruggink's actions can be classified as judicial misconduct, which include: conduct prejudicial to the effective and expeditious administration of the business of the Court (as an example: "falsification of facts" or complicit with the "falsification of facts" at summary judgment or final judgement)

Section 28 U.S.C. § 455 provides in relevant part: (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b) He shall also disqualify himself in the following circumstances: (1) [W]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding … 28 U.S.C. § 455. "'[A]

judge must recuse [himself] if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality.'" *United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999) (quoting *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990)) (modifications in original).

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 4th day of August, 2023, a true
and correct copy of the foregoing "Plaintiff's Reply in Support of Plaintiff's
Motion for Disqualification", was served upon the following Defendant by priority
"express" mail and via email:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# Exhibit C

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

           Plaintiff,

       v.

THE UNITED STATES,

           Defendant.

No. 23-811 C

Senior Judge Eric G. Bruggink

## DEFENDANT THE UNITED STATES'
## NOTICE REGARDING RELATED PROCEEDINGS

As noted in the Government's currently pending Motion to Dismiss (Dkt. 10), Plaintiff Larry Golden separately filed a patent infringement suit against Google in the Northern District of California, accusing the same Google Pixel smartphone models of infringement that he accused in the present case and asserting the same patents that he asserted in the present case. *See* Dkt. 10 at 6; *compare* Dkt. 1 (Complaint) *with* Dkt. 10-4 (Complaint in *Golden v. Google* (N.D. Cal.)).

The Government respectfully submits this Notice to provide the Court with the April 3, 2024 Order of the Northern District of California, granting Google's motion to dismiss that suit and denying Mr. Golden leave to further amend his complaint. *See Golden v. Google*, Case No. 3:22-cv-05246-RFL (N.D. Cal. Apr. 3, 2024). A copy of that Order is attached as Exhibit 1.

In its Order, the Northern District of California observed that "Golden does not allege that" the Defense Threat Reduction Agency ("DTRA")—the Government agency accused of infringement in the present case, *see* Dkt. 1—"directly infringed the patents-in-suit" in that case and the present case. Ex. 1 at 5–6. "To the contrary," the court found, "Golden concedes that there was no such direct infringement by" the DTRA. *Id.* (citing Mr. Golden's statement in his

- 1 -

*Golden v. Google* First Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement"). A copy of Mr. Golden's cited filing from *Golden v. Google* containing that statement (at p. 3) is attached as Ex. 2.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

SCOTT BOLDEN
Director

/s/ Grant D. Johnson
GRANT D. JOHNSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
*Grant.D.Johnson@usdoj.gov*
(202) 305-2513

COUNSEL FOR THE DEFENDANT,
April 4, 2024                         THE UNITED STATES

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing "DEFENDANT THE UNITED STATES'

NOTICE REGARDING RELATED PROCEEDINGS" was sent on April 4, 2024 via First Class

Mail and e-mail to:

Larry Golden
740 Woodruff Road
#1102
Greenville, SC 29607
atpg-tech@charter.net

/s/ Grant D. Johnson
Grant D. Johnson
Department of Justice

Case 3:23-cv-09246-RPB   Document 26-2   Filed 04/04/24   Page 6 of 90

# Exhibit 2

# Exhibit H

## Claim Chart of Induced Infringement [DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN]; Contributory Infringement of Google's Pixel 6a, 7, 7a, 7 Pro, and Fold; and Joint Infringement

| DRAPER'S ATAK-CIVILIAN & DoD DTRA ATAK-MILITARY | Patent 2,9,xxx,xxx Independent Claim 19 | Patent 2,9,xxx,xxx Independent Claim 2 |
|---|---|---|
|  Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Plaintiff has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Plaintiff's evidence proves the inducement *resulted* in dirent infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN** Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field. **ATAK-MILITARY** ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile. gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

2

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Plaintiff's '439 patent, and independent claim 7 of Plaintiff's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf<br><br>Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

3

4

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the-move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK— 4G/LTE. Antenna: Internal [] satellite (INMARSAT) https:.//apps. dtic.mil/sti/pdfs/ AD1069441.pdf | at least one satellite or at least one cell phone tower communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower communication between the multi sensor detection device and the monitoring equipment; |
| The Internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones such as Internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one Internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one Internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Si(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Si(x) has real-time communication and information sharing. With Si(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK, Si(x) accessed via free downloadable gateway apps. | wherupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower, or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | wherupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower, or through high short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

6

Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN,<br><br>       Plaintiff,<br><br>       V.<br><br>GOOGLE LLC<br><br>       Defendants. | CASE NO: <u>4:22-cv-05246-HSG</u><br><br>**JURY TRIAL DEMANDED**<br><br>(Direct Patent Infringement),<br>(Induced and Contributory Patent<br>Infringement), (Joint Infringement,<br>(Willful Infringement) |

## PLAINTIFF'S AMENDED COMPLAINT
## FOR PATENT INFRINGEMENT

**FILED**

Aug 22 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

August 21, 2023

Pursuant to the Court Order filed on 08/10/23 Dkt. 41 in *Larry Golden v, Google LLC,* Case No. 4:22-cv-05246-HSG, Plaintiff is submitting this amended complaint against Google LLC for alleged direct infringement, induced and contributory infringement, joint infringement, and willful infringement of Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent).

This amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process", Google has discontinued the making, offering for sell, and selling the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit"), against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., smartphones, laptops, tablets, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, make, use, offer to sell, or sell the Google Pixel 6a, 7, 7a, 7pro, and fold

smartphones, that Plaintiff believes infringes at least one of the claims in the patents-in-suit

under 35 U.S.C. § 271(a), "anyone who makes, uses, offers to sell, or sells any patented

invention domestically, or imports a patented invention into the United States during the term of

the patent, is infringing the patent."

Upon information and belief, Plaintiff alleges that the defendant Google, has induced

infringement, thereby causing direct infringement with its Android Open-Source Operating

System under 35 U.S.C. § 271(b). Plaintiff alleges Google actively encouraged the DoD/DTRA

and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent

infringement, and their encouraging acts actually *resulted* in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit

considered whether proof of induced infringement requires proof that the encouragement of

infringement was successfully communicated to the direct infringer and actually *resulted* in

direct infringement. However, Fairchild claimed there was no evidence that it encouraged its

accused chips to be incorporated into products ... with the specific intent to induce infringement.

The court disagreed, noting that Fairchild was involved in activities related to the use of

its products ... Fairfield [Google] designed its products [same as Google Android Open-Source

Operating System] to meet certain [] standards, provided demonstration boards containing the

infringing chips [open-source platform] to customers and potential customers in the United

States, and maintained a technical support center in the United States that provided support to

customers based in the United States." Plaintiff must prove the inducement *resulted* in direct

infringement, not that the inducement was of a product that already directly infringes.

Similarly, under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a

material component of something that is patented, knowing that the component was especially

made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer". Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use.

Upon information and belief, Plaintiff alleges that the defendant Google is liable for "joint infringement". In United States patent law, joint infringement is a form of patent infringement liability that occurs when multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.*

Upon information and belief, Plaintiff alleges that the defendant Google is liable under the doctrine of willful blindness. Willful Blindness applies when Google seeks to avoid civil liability for the wrongful acts by intentionally keeping itself unaware of facts that would render Google liable or implicated. In the Eastern District of Texas, the Chief District Judge Rodney Gilstrap issued an opinion in the case (*Motiva Patents LLC v. HTC Corporation*) in which he wrote, "A well-pled claim for willful blindness is sufficient to state a claim for willful infringement."

## THE PARTIES

1.      Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

4

2.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3.      Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones, Google Tensor CPU, and Google Android Operating Systems.

## STANDARD FOR REVIEW

4.      Plaintiff has attached a copy of the asserted patents as **Exhibits I-L**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products.

## JURISDICTION AND VENUE

5.      This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).



# PRIORITY MAIL EXPRESS®

**UNITED STATES POSTAL SERVICE**®

EI 935 866 400 US

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)   PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
# 1102
GREENVILLE, SC 29607



**DELIVERY OPTIONS (Customer Use Only)**

☑ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE (      )

U.S. DISTRICT COURT-NDC-SAN FRANCISCO
CASE No: 3:22-CV-05246-RFL
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA

ZIP + 4® (U.S. ADDRESSES ONLY)

9 4 1 0 2 - ____ ____ ____

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

◄ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT** (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day    ☐ 2-Day    ☐ Military    ☐ DPO

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 4-10-24 | $ 30 65 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 4-9-24 | ☐ 6:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 405 | ☐ AM ☑ PM | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | 30 65 |

| Weight | ☑ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| ____ lbs. ____ ozs. | | $ |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

LABEL 11-B, NOVEMBER 2023    PSN 7690-02-000-9996

COURT

**EMS**

EP13L July 2013   OD: 15 x 9.5

P S 1 0 0 0 1 0 0 0 0 5 9

SIG

* Money Ba destinati

+ Money Ba

**VISIT US AT USPS.C**
ORDER FREE SUPPLIES ON

*Retail*

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC 29
APR 09, 2024

94102

**$30.65**

RDC 07

R2305M149520-33

*Retail*

**ESTIC AND INTERNA**
**ACE MAILING LABEL**

U.S. POSTAGE PA
PME 1-Day
GREENVILLE, SC 2
APR 09, 2024

94102

**$0.00**

RDC 07

R2305M149520-33



TEED DELIVERY DATE*

TEED DELIVERY TIME⁺

ACKING™ INCLUDED

CE INCLUDED

VAILABLE

RE INCLUDED UPON REQUEST

INSPECTED BY

APR 10 2024

U.S. MARSHALS SERVICE

antee to U.S., select APO/FPO/DPO, and select International
DMM and IMM at pe.usps.com for complete details.

antee for U.S. destinations only.





**UNITED STATES**
**POSTAL SERVICE**.